**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**Eastern Division**

| | | |
|---|---|---|
| JANE DOES 1-14, on their own behalf and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. _____ |
| v. | ) ) | |
| NORTHSHORE UNIVERSITY HEALTHSYSTEM, | ) ) ) | |
| Defendant. | ) | |

*"It is the public policy of the State of Illinois to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept . . . medical care [and] to prohibit all forms of discrimination . . . by reason of their refusing to act contrary to their conscience or conscientious convictions."[1]*

**VERIFIED CLASS ACTION COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, AND DAMAGES**

For their VERIFIED COMPLAINT against Defendant, NORTHSHORE UNIVERSITY HEALTHSYSTEM ("NorthShore" or "Defendant"), Plaintiffs, JANE DOES 1-14 ("Plaintiffs"), on their own behalf and on behalf of all others similarly situated, allege and aver as follows:

**URGENCIES JUSTIFYING A TEMPORARY RESTRAINING ORDER**

1.      This is a class action brought to remedy NorthShore's pattern of unlawful discrimination against employees who requested religious exemptions and accommodations from NorthShore's COVID-19 vaccine mandate.

2.      In their Prayer for Relief, *infra*, and in the contemporaneously filed Motion for Temporary Restraining Order and Preliminary Injunction, Plaintiffs seek a Temporary Restraining

---

[1] Illinois Health Care Right of Conscience Act, 745 ILCS 70/2 (emphasis added).

Order ("TRO") against Defendant's discriminatory, unlawful, and unconscionable refusal to grant Plaintiffs a religious exemption or accommodation for their sincerely held religious beliefs which prohibit Plaintiffs from complying with NorthShore's policy mandating that all of its employees receive one form of the COVID-19 vaccine (hereinafter "Mandatory COVID-19 Vaccination Policy").

3.    **Unless this Court intervenes and grants a TRO prior to October 31, 2021, Defendants will remove all Plaintiffs and scores of other similarly situated employees from their positions on November 1, 2021, causing incalculable and irreparable harm to them and their families as described herein, including homelessness, lack of medical care, lack of food and shelter, disrupted education for their children, financial ruin, and harms to their physical, mental and emotional health**.

4.    Plaintiffs are healthcare professionals, all of whom have sincerely held religious beliefs against the COVID-19 vaccines because they were either developed from, or tested with, aborted fetal cells lines, or for other religious reasons that were explained to NorthShore. Because of NorthShore's unlawful actions in denying all or virtually all meritorious exemption requests, Plaintiffs are faced with an immediate "choice" to either (a) receive a COVID-19 vaccination in direct violation of their conscience and sincerely held religious beliefs, or (b) be terminated from their employment with NorthShore as a consequence of exercising their fundamental and statutory rights to refuse administration of the COVID-19 vaccines. "Such a Hobson's choice is actually no choice at all." *Smith v. Grams*, 565 F.3d 1037, 1046 (7th Cir. 2009) (emphasis added).

5.    Initially, NorthShore denied all or virtually all exemption requests it received, regardless of merit. More recently, after being confronted with the illegality of its conduct, NorthShore switched tactics from denying all of the Plaintiffs' religious exemption requests to

2

informing them that those same requests will now be "approved" in theory and name only, but NorthShore then claimed that it would suffer an "undue hardship" if it allowed Plaintiffs to continue in their current positions. Instead, NorthShore has informed some of the Plaintiffs that "it is considering an offer of fully remote work" and the remaining Plaintiffs that they "will be offered the opportunity to apply for a fully remote position." NorthShore has not actually made any such offers to any Plaintiff.

6. Plaintiffs and all NorthShore employees whose exemption requests were denied have been given until October 31, 2021 to make the decision whether to comply with NorthShore's unconscionable Mandatory COVID-19 Vaccination Policy. In addition, even though NorthShore has imposed an October 31, 2021 deadline for its employees to be fully vaccinated, it has already sent letters to employees advising them that their positions are currently being actively recruited for and potentially being filled. **Unless this Court intervenes promptly, NorthShore will unlawfully throw Plaintiffs out into the cold as of November 1, 2021**.

7. **Indeed, as of Friday, October 22, 2021, NorthShore had already started to purge itself of employees with sincere religious objections to its Mandatory COVID-19 Vaccination Policy, by removing many of those employees from the November work schedule, thereby confirming NorthShore's intention to terminate these employees**.

8. Plaintiffs stand to suffer severe and irreparable harm absent a TRO. Plaintiffs depend heavily on their employment with NorthShore to support themselves and their families. For some Plaintiffs, they are the sole providers for their family and loss of employment would be devasting. As attested to further below, the harms which would result absent a TRO include, but are not limited to, homelessness, loss of medical insurance and the ability to provide urgent medical care for Plaintiffs and disabled family members, and inability to pay for their children's

educations. Plaintiffs are also being subjected to harassment, intimidation and threats as a result of their religious declination of vaccination, which is causing anxiety and stress for Plaintiffs and their families.

9.     A TRO is needed now to prevent the irreparable harm to Plaintiffs' sincerely held religious beliefs and their cherished occupations, mission and life calling to care for others. Absent a TRO, Plaintiffs will be forced to violate their sincerely held religious beliefs or face adverse employment action from NorthShore.

10.     Plaintiffs have earnestly, honestly, and in good faith sought religious exemptions and reasonable accommodations from NorthShore's Mandatory COVID-19 Vaccination Policy, but have been rejected at every turn. And though NorthShore now purports to have "approved" their exemption requests, NorthShore has taken the unreasonable and unlawful position that it cannot accommodate **any of them** to allow them to remain in their current positions.

11.     Plaintiffs have complied with all requirements for seeking an accommodation and exemption based upon their sincerely held religious beliefs, and otherwise complied with all of the requirements NorthShore established for seeking a religious exemption from the Mandatory COVID-19 Vaccination Policy. Indeed, Plaintiffs have scratched and clawed to obtain the relief they seek without judicial intervention. Those efforts failed and a TRO and preliminary injunction is the only mechanism by which Plaintiffs' sincerely held religious beliefs may be protected and accommodated prior to their suffering of immediate and irreparable injury.

12.     While NorthShore now claims it would be an "undue hardship" to allow Plaintiffs to keep their positions, NorthShore has granted at least one religious exemption from the Mandatory COVID-19 Vaccination Policy with proper accommodations. That religious exemption which NorthShore granted was based on identical or substantially similar religious beliefs as those

espoused by Plaintiffs, and was given to a person who was in the same type of position as Plaintiffs. NorthShore's exemption and accommodation process is therefore arbitrary, capricious and without any logic or reason.

13.     Plaintiffs do not seek to harm anyone, nor do they request license to roam about uninhibited as though no health threat existed. Plaintiffs merely seek to protect their sincerely held religious beliefs not to receive a medical product created with or tested upon aborted fetal cell lines while being afforded the opportunity to continue their employment, service to others and life calling. **Plaintiffs are willing to abide by protections that have been espoused as sufficient to protect against COVID-19, namely wearing a mask, self-monitoring for symptoms, voluntary reporting of potential symptoms, and reasonable testing requirements**. These mechanisms plainly provide a sufficient alternative to forced vaccination in violation of sincerely held religious beliefs.

14.     Several courts in Illinois and throughout the nation have already issued injunctive relief, including temporary restraining orders, to plaintiffs who are threatened with adverse employment consequences because of their religious or conscience-based objections to COVID-19 vaccines: *Velvet Darnell et. al. v. Quincy Physicians and Surgeons Clinic, S.C. and Blessing Corporate Services, Inc*., Case No. 2021 MR 193 (18th Judicial Cir. Adams County, IL October 1, 2021) (granting TRO under Illinois Health Care Right of Conscience Act, and enjoining healthcare provider from taking adverse action against healthcare employees declining COVID-19 vaccination on religious and conscience grounds); *David Sambrano et. al. v. United Airlines, Inc*., Case No. 4:21-01074-P (N.D. Texas. Oct. 18, 2021); *Dr. A. v. Hochul*, No. 1:21-CV-1009-DNH-ML, 2021 WL 4734404, *9 (N.D.N.Y. Sept. 14, 2021) (granting preliminary injunction against enforcement of New York's COVID-19 vaccine mandate on healthcare workers for failure

5

to grant religious exemptions and noting that "**Title VII does not demand mere neutrality with regard to religious practices . . . rather, it gives them favored treatment.' Thus, under certain circumstances, Title VII 'requires otherwise-neutral policies to give way to the need for an accommodation**." (emphasis added)); *We The Patriots USA, Inc. v. v. Hochul*, No. 21-2179, dkt. 65 (2d Cir. Sept. 30, 2021) (issuing an injunction pending appeal against enforcement of New York's COVID-19 Vaccine Mandate for its failure to allow for religious accommodations); *Dahl v. Bd. of Trustees of W. Michigan Univ.*, No. 21-2945, 2021 WL 4618519 (6th Cir. Oct. 7, 2021) (allowing the preliminary injunction to stand against a University's failure to accommodate student athletes with sincerely held religious objections to the COVID-19 vaccine mandate and noting that "The University **put plaintiffs to the choice: get vaccinated or stop fully participating in intercollegiate sports**. . . . **By conditioning the privilege of playing sports on plaintiffs' willingness to abandon their sincere religious beliefs, the University burdened their free exercise rights**." (emphasis added)); *Magliulo v. Edward Via College of Osteopathic Medicine*, No. 3:21-CV-2304, 2021 WL 36799227 (W.D. La. Aug. 17, 2021) (granting temporary restraining order against a medical school for the school's failure to grant religious exemptions when reasonable accommodations were available (such as masking, testing, etc.) and mandatory vaccination was not the least restrictive means of achieving the school's interest in protecting the school's student body); *Bilyeu v. UT-Battelle, LLC*, No. 3:21-cv-352, 2021 WL 4859932, * (E.D. Tenn. Oct. 15, 2021) (granting TRO enjoining healthcare employer "from terminating or placing on indefinite unpaid leave any employee who has received a religious or medical accommodation").

15.     The Illinois Health Care Right of Conscience Act, Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Emergency Use Authorization statute in the United States Code,

protect the right of individuals to refuse administration of an unwanted medical product when acceptance of such product would violate their sincerely held religious beliefs and the exercise of the same. NorthShore's Mandatory COVID-19 Vaccination Policy, including its refusal to grant meritorious religious exemption requests, ignores these fundamental protections for Plaintiffs' sincerely held religious beliefs, and this Court should enjoin the policy immediately, to protect Plaintiffs from imminent irreparable harm.

## PARTIES

16.     Plaintiff Jane Doe 1 is a Nurse Quality Manager at NorthShore University HealthSystem who submitted a signed, written request for a religious exemption and accommodation from NorthShore's Mandatory COVID-19 Vaccination Policy, but Northshore has refused to provide a reasonable accommodation. Jane Doe 1 has already contracted COVID-19 and has since fully recovered. Jane Doe 1 is a major contributor to her family's income making up more half of the total income. Jane Doe 1's husband is self-employed, and she provides the family's benefits including vision, dental and health. Jane Doe 1 has four children who depend on her employment with NorthShore. In addition, Jane Doe 1 is still paying off medical bills from a tragic accident which occurred to her son in May 2020. The loss of Jane Doe 1's employment would be devastating to her family – not only financially, but medically, emotionally and physically.

17.     Plaintiff Jane Doe 2 is a Pharmacy Technician in the Kellogg Pharmacy at NorthShore University HealthSystem who submitted a signed, written request for an exemption and accommodation from NorthShore's Mandatory COVID-19 Vaccination Policy, but Northshore has refused to provide a reasonable accommodation. Jane Doe 2's family relies on her employment for health insurance as well as for paying education expenses for her son. The loss of

Jane Doe 2's employment would severely impact her and her family's, financial and physical well-being.

18.     Plaintiff Jane Doe 3 is an acute care staff nurse at NorthShore University HealthSystem who submitted a signed, written request for an exemption and accommodation from Northshore's Mandatory COVID-19 Vaccination Policy, but Northshore has refused to provide a reasonable accommodation. Jane Doe 3 contracted COVID-19 in 2020 and later fully recovered. Jane Doe 3's loss of health and vision insurance would interrupt her ability to obtain necessary care for her ailing eyesight, thus interfering with her ability to carry on everyday tasks. In addition, Jane Doe 3 is the sole provider for her father who suffered a stroke seven years ago and is in constant need of help. Even more, Jane Doe 3's husband has severe generalized idiopathic urticaria with occasional angioedema and throat swelling that happens unpredictably, as well as a son who is struggling with depression and suicidal thoughts and ideation and is in constant need of psychiatric care and counseling. Without a source of income and health insurance, Jane Doe 3's ability to care for her family would be eliminated to the extreme detriment of her family's health and well-being. Indeed, Jane Doe 3 believes that without her employment, and in light of her difficult circumstances, she and her family would become homeless. On one occasion, Jane Doe 3 informed her manager that her religious exemption appeal was pending and the manager replied "**it doesn't matter, we are not approving anyone**."

19.     Plaintiff Jane Doe 4 is a rehab nurse at NorthShore University HealthSystem who submitted a signed, written request for an exemption and accommodation from NorthShore's Mandatory COVID-19 Vaccination Policy, but Northshore has refused to provide a reasonable accommodation. Jane Doe 4 relies on her employment with NorthShore for income to pay

everyday expenses and for health insurance. Loss of Jane Doe 4's employment would cause significant harm to her and her family.

20.    Plaintiff Jane Doe 5 is an emergency department Clinical Nurse Resident at NorthShore University HealthSystem who submitted a signed, written request for an exemption and accommodation from NorthShore's Mandatory COVID-19 Vaccination Policy, but Northshore has refused to provide a reasonable accommodation. Jane Doe 5 has been harassed by her manager on multiple occasions for not obtaining a vaccine, even while waiting for a response to her appeal. Jane Doe 5 informed her manager that she wants to see what happens with her appeal but her manager informed her that her appeal would likely be denied because everyone else is being denied. Jane Doe 5 tested positive for COVID-19 on December 26, 2020, and later fully recovered. Jane Doe 5 relies on her employment to pay mortgage, utility bills, health insurance, and school loans. Loss of employment would cause her to lose health insurance and default on her mortgage and school loan payments, resulting in significant consequences and loss. Jane Doe 5 has also been dealing with a recent diagnosis of anxiety, which stemmed from losing her sister last year, with bouts of panic attacks. Her mental health has been negatively impacted by the persistent harassment at work, and by the intimidation and threats of losing her job because of her religious beliefs. Jane Doe 5's anxiety has increased, triggering psychological distress which has required her to increase her medications. Jane Doe 5 believes that her work as a nurse is a calling from God and that NorthShore is the place God wants her to be. Losing her employment or being reassigned because of her religious beliefs would be devasting to Jane Doe 5's physical wellbeing and mental health.

21.    Plaintiff Jane Doe 6 is a registered nurse at NorthShore University HealthSystem who submitted a signed, written request for an exemption and accommodation from NorthShore's

Mandatory COVID-19 Vaccination Policy, but Northshore has refused to provide a reasonable accommodation. Jane Doe 6 contracted COVID-19 in October 2020 and has since fully recovered. Jane Doe 6 relies on her employment with NorthShore for insurance and ability to meet everyday expenses. Loss of Jane Doe 6's employment would result in significant consequences to her physical and financial well-being.

22.     Plaintiff Jane Doe 7 is a surgical prep nurse at NorthShore University HealthSystem who submitted a signed, written request for an exemption and accommodation from NorthShore's Mandatory COVID-19 Vaccination Policy, but Northshore has refused to provide a reasonable accommodation. Jane Doe 7 relies on her employment with NorthShore for the ability to meet everyday expenses. Jane Doe 7 also works as a nurse because she has a calling to help patients and co-workers through hard times. Jane Doe 7's termination or reassignment would be detrimental to Jane Doe's physical, emotional and financial wellbeing.

23.     Plaintiff Jane Doe 8 is a registered nurse working in a recovery room at NorthShore University HealthSystem who submitted a signed, written request for an exemption and accommodation from NorthShore's Mandatory COVID-19 Vaccination Policy, but Northshore has refused to provide a reasonable accommodation. Jane Doe 8 maintains insurance for her entire family and losing that insurance would be devastating for her family's well being. Jane Doe 8's income also pays for the education for her two children. Because Jane Doe 8's husband's is self-employed, her income is "the constant" in her family. Therefore, Jane Doe 's employment is crucial for her and her family and any loss employment would have significant and debilitating consequences for her family.

24.     Plaintiff Jane Doe 9 is a nurse in the Infant Special Care Unit at NorthShore University HealthSystem who submitted a signed, written request for an exemption and

accommodation from NorthShore's Mandatory COVID-19 Vaccination Policy, but Northshore has refused to provide a reasonable accommodation. Jane Doe 9 is the sole provider for her family, including a son who suffers from extreme asthma. Loss of her job, along with her health insurance, would cripple Jane Doe 9's ability to care for her family and ensure that her son is properly cared for. Jane Doe 9 is the victim of daily harassment from her supervisors who demean and belittle her for her beliefs. Jane Doe 9 endures this harassment because she has no other option but to provide for her family.

25.    Plaintiff Jane Doe 10 is a surgical prep nurse at NorthShore University HealthSystem who submitted a signed, written request for an exemption and accommodation from NorthShore's Mandatory COVID-19 Vaccination Policy, but Northshore has refused to provide a reasonable accommodation. Jane Doe 10 contracted COVID-19 in August 2020 and later fully recovered. Jane Doe 10's main reason being in the nursing profession is her desire to help others and she believes that nursing is her calling in life. Jane Doe 10 loves the work she does because she can impact others by caring for them. Jane Doe 10's termination or removal from her patient care role would deprive her of the ability to fulfill her mission and life calling of caring for others.

26.    Plaintiff Jane Doe 11 is a Patient Access Representative in the Kellogg Cancer Center at NorthShore University HealthSystem who submitted a signed, written request for an exemption and accommodation from NorthShore's Mandatory COVID-19 Vaccination Policy, but Northshore has refused to provide a reasonable accommodation. Loss of employment would cause harm to Jane Doe 11 and her family because Jane Doe 11 relies on her employment with NorthShore to provide health insurance for her family, to fund her child's education, and to purchase everyday necessities.

27.     Plaintiff Jane Doe 12 is a clinical nurse manager at NorthShore University HealthSystem who submitted a signed, written request for an exemption and accommodation from NorthShore's Mandatory COVID-19 Vaccination Policy, but Northshore has refused to provide a reasonable accommodation. Jane Doe 12 contracted COVID-19 in October 2020 and has since fully recovered. Jane Doe 12 is the primary breadwinner for her household, and she relies on her employment with NorthShore to pay for rent and other daily living expenses. Jane Doe 12 also relies on the insurance she receives from NorthShore to deal with several health issues. As result, any loss of employment, including her health insurance coverage, would be devasting to the wellbeing of Jane Doe 12 and her entire family. Without Jane Doe 12's income, Jane Doe 12's family would not be able to pay its bills and would not be able to afford housing, health insurance and other basic needs.

28.     Plaintiff Jane Doe 13 is a registered nurse at NorthShore University HealthSystem who submitted a signed, written request for an exemption and accommodation from NorthShore's Mandatory COVID-19 Vaccination Policy, but Northshore has refused to provide a reasonable accommodation. Jane Doe 13 contracted COVID-19 back in October 2020 and has regularly tested positive for antibodies. Jane Doe 13 relies on her employment with NorthShore for health insurance and to contribute toward her family's monthly expenses. Loss of Jane Doe 13's employment would result in significant consequences to her physical and financial well-being.

29.     Plaintiff Jane Doe 14 is a Senior Application Analyst at NorthShore University HealthSystem who submitted a signed, written request for an exemption and accommodation from NorthShore's Mandatory COVID-19 Vaccination Policy, but Northshore has refused to provide a reasonable accommodation. Jane Doe 14 previously tested positive for COVID-19 and has since fully recovered. She also tested positive for antibodies and has been excused from weekly

testing. Jane Doe 14 relies on her employment with NorthShore to pay her mortgage, health insurance (for herself and 2 children) and for her ability to meet everyday expenses. NorthShore's actions have had a devastating effect of Jane Doe 14's children (ages 11 & 15) who ask daily whether they will lose their home and subsequently need to relocate schools. This mental anguish is negatively impacting their social emotional health and academics. Jane Doe 14's son has multiple chronic medical conditions including asthma and a congenital thoracic condition. Losing health insurance would have a devastating impact on his medical care, quality of life and health. In addition, NorthShore's intimidation and pressure tactics have caused Jane Doe 14 toxic stress resulting in the exacerbation of previously stabilized health conditions. The prolonged stress is causing Jane Doe 14's adrenal and cortisol levels to rise, resulting in sleep and digestive disturbances that are damaging to her physical, psychological and emotional health, and increased healthcare expenses to mitigate these conditions. Loss of employment and insurance for Jane Doe 14 would result in her defaulting on her mortgage, her family becoming homeless and destitute, her defaulting on healthcare and other unsecured debt, and an inability to provide food, shelter and medical care for herself and her children.

30. Each of the Plaintiffs' initial religious exemption applications were denied on the basis of a non-descript "evidence-based criteria" and each of them appealed those decisions with additional evidence only to be denied any reasonable accommodation for their sincerely held religious beliefs.

31. Each of the 14 Plaintiffs have filed or are filing claims with the Equal Employment Opportunity Commission, accompanied by attorney requests for immediate right to sue letters.

32.     Defendant, Northshore University HealthSystem, is a not-for-profit corporation incorporated under the laws of the State of Illinois since 1891 (then Evanston Hospital) with its principal place of business at 1301 Central Street, Evanston, IL 60201.

## JURISDICTION AND VENUE

33.     This action arises under the laws of the United States, specifically 21 U.S.C. §360bbb-3 and 42 U.S.C. § 2000e, *et seq*. This action also arises under the laws of the State of Illinois, specifically the Illinois Health Care Right of Conscience Act, 745 ILCS 70, *et seq.*

34.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1343, and 1367.

35.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

36.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§2201-02, implemented through Rule 57 of the Federal Rules of Civil Procedure.

37.     This Court is authorized to grant Plaintiffs' prayer for a temporary restraining order and preliminary and permanent injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

38.     This Court is authorized to grant Plaintiffs' prayer for relief regarding damages pursuant to Rule 54 of the Federal Rules of Civil Procedure and the supplementary laws of the State of Illinois, as applicable under Fed. R. Civ. P. 69.

39.     This Court is authorized to grant Plaintiffs' prayer for relief regarding damages, including treble damages, under the Illinois Health Care Right of Conscience Act, 745 ILCS 70/12.

40.     This Court is authorized to grant Plaintiffs' prayer for relief regarding costs and expenses, including reasonable attorneys' fees, pursuant to the Illinois Health Care Right of Conscience Act, 745 ILCS 70/12.

## GENERAL ALLEGATIONS

**A.     NORTHSHORE'S MANDATORY AND DISCRIMINATORY COVID-19 VACCINATION POLICY.**

41.     On August 16, 2021, NorthShore announced a policy mandating COVID-19 vaccines for all of its 18,000 employees, contractors, and volunteers.

42.     NorthShore announced, through a spokesperson, that "[requiring COVID-19 vaccination as a condition of employment is a critical and essential defense against this pandemic."[2]

43.     NorthShore's Mandatory COVID-19 Vaccination Policy specifically states that the "requirement applies to all Northshore team members (physicians, team members, affiliates, partners/contractors and volunteers. . . ."

44.     The Mandatory COVID-19 Vaccination Policy further provides that the final deadline to be "fully vaccinated" is October 31, 2021.

45.     In its Mandatory COVID-19 Vaccination Policy, NorthShore purported to permit employees to obtain religious exemptions from the mandate, but as explained further below, that process was a sham, because NorthShore never intended to grant exemptions or accommodations for all or virtually all of its employees who request them.

46.     The Mandatory COVID-19 Vaccination Policy does not take into account individuals who have already recovered from COVID-19 and thus have antibodies or natural

---

[2] https://www.chicagotribune.com/business/ct-biz-northshore-covid-vaccine-requirement-20210816-7m3b4mmnojag7dtmiycf4dgzem-story.html

immunity, nor does it take into account alternative measures such as face coverings, personal protective equipment, self-monitoring and reporting of symptoms, or periodic testing.

47. NorthShore's Mandatory COVID-19 Vaccination Policy contrasts with and flouts the Federal Government's recent announcement that the Department of Labor is developing a rule to require certain large employers to mandate vaccination **or** periodic testing for their employees. **NorthShore does not provide a testing alternative for any of its employees, as the Federal Government contemplates to be sufficient**.

48. NorthShore's Mandatory COVID-19 Vaccination Policy also contrasts with and flouts Governor Pritzker's Executive Orders 2021-22 and 2021-23, which require healthcare workers to be vaccinated **or** be subject to weekly testing. **NorthShore does not provide a testing alternative for any of its employees, as Governor Pritzker contemplates to be sufficient**.

49. NorthShore's Mandatory COVID-19 Vaccination Policy also contrasts with and flouts the regulations adopted by the Illinois Department of Public Health, including 77 Ill. Adm. Code §250.455(b), 690.1380(i), 690.1385(f), which require patient-facing healthcare workers to undergo COVID-19 vaccination **or** regular testing. **NorthShore does not provide a testing alternative for any of its employees, as the Illinois Department of Public Health contemplates to be sufficient**.

50. The Mandatory COVID-19 Vaccination Policy also differs substantially from the European Union's digital COVID-19 certificate, which considers the following as equivalent: (1) a COVID-19 vaccine; (2) a negative COVID-19 test; or (3) having previously recovered from COVID-19. *See EU Digital COVID Certificate*, EUROPEAN COMMISSION, https://ec.europa.eu/info/live-work-travel-eu/coronavirus-response/safe-covid-19-vaccines-europeans/eu-digital-covid-certificate_en.

51.     Indeed, many healthcare systems around the country, including many in Illinois, have shown that the important policies of accommodating sincerely held religious beliefs and protecting health and safety of patients and fellow healthcare workers can coexist. Attached as composite **Exhibit 1** are **thirty-two sworn declarations from patient-care employees across the country whose employers were willing and able to provide reasonable accommodations for their sincerely held religious beliefs against abortion-derived vaccines, and allowed them to remain in their same job functions, with appropriate precautions in place**. The declarations from Employees 17, 18, 19, and 20, in particular, involve premier Illinois healthcare entities, including University of Chicago Medical Center and Advocate Aurora Health.

52.     There is nothing different or unique about NorthShore that requires NorthShore to flout the recommendations and requirements of the Governor and the Illinois Department of Public Health, and to refuse to accommodate its religiously-exempt employees while all of its peers are able and willing to accommodate their similarly situated employees.

53.     NorthShore's refusal to exempt and accommodate its employees' sincerely held religious convictions is the product of NorthShore's animus towards, and discrimination against, its employees because of their religious beliefs.

54.     NorthShore's religious animus and discrimination are further evidenced by the fact that, while NorthShore requires its employees to be vaccinated and refuses to accommodate its religiously-objecting employees, **NorthShore does not require patients or visitors to be vaccinated**, even though these individuals interact with NorthShore staff on a daily basis. If NorthShore were concerned about potential "outbreaks" caused by unvaccinated people on its premises, NorthShore would not exempt large groups of people on its premises, while refusing to exempt only employees who object to vaccination on religious grounds.

17

55.     NorthShore's religious animus and discrimination are further evidenced by the fact that, while NorthShore requires its employees to be vaccinated and refuses to accommodate its religiously-objecting employees, **NorthShore provides exemptions and accommodation for its employees with medical reasons for declining vaccination, including employees who are pregnant**. Attached hereto as **Exhibit 2** is a sample accommodation notice that NorthShore sends employees who are pregnant, exempting them from undergoing vaccination while they are pregnant, and allowing them to remain in their same job functions, with various alternative safety precautions, including PPE and weekly testing. NorthShore provides this exemption and accommodation to its pregnant employees even though it tells them, in the same notices, that "the CDC recommends vaccination in pregnancy on the basis of data that the benefits of receiving a COVID-19 vaccine outweigh any known or potential risks of vaccination during pregnancy." (Exhibit 2). If NorthShore were concerned about potential "outbreaks" caused by unvaccinated people on its premises, NorthShore would not exempt pregnant employees, and employees with other medical concerns, while refusing to exempt only employees who object to vaccination on religious grounds.

**B.      NORTHSHORE'S SHAM RELIGIOUS EXEMPTION PROCESS, AND ITS DISCRIMINATORY APPLICATION OF ITS MANDATORY COVID-19 VACCINATION POLICY.**

56.     As mentioned above, NorthShore's Mandatory COVID-19 Vaccination Policy provided employees, in theory but not in practice, the illusory ability to obtain a religious exemption from the vaccine mandate.

57.     Those seeking religious exemptions were required to submit a "Request for Religious Exemption" form by September 30, 2021. Attached hereto as **Exhibit 3** is a sample copy of NorthShore's "Request for Religious Exemption" form. The form specified that an employee

need only provide "a description of my sincerely held religious principle or practice that guides my objection to receiving the required vaccination."

58.     NorthShore asked employees to limit their responses to a mere five lines of text, "if possible," indicating to them very clearly that NorthShore was **not** seeking detailed explanations.

59.     In submitting their requests for religious exemptions, each of the Plaintiffs followed the directions given to them by NorthShore, and complied fully with NorthShore's purported requirements.

60.     However, after first granting the exemptions for some employees, NorthShore then unilaterally re-reviewed the requests and denied **all or virtually all** of them in mid-September. A sample of the general and generic denial notice that NorthShore sent to all of its employees who requested religious exemptions is attached hereto as **Exhibit 4**.

61.     NorthShore's generic denials were purportedly because all of the requests failed to meet some phantom "evidence-based criteria" that NorthShore never provided its employees in advance. (*See* Exhibit 4). The Religious Exemption Form contained no "criteria," "evidence-based" or otherwise, to guide employees as to what information or "evidence" NorthShore was seeking. (*See* Exhibit 3).

62.     Even though NorthShore's employees went far above and beyond what NorthShore itself requested, and submitted detailed letters explaining the basis of their sincerely held religious beliefs against the vaccine, NorthShore ultimately and uniformly denied all exemptions for no reason at all, or for supposed lack of "evidence-based criteria," without identifying any such "evidence" – either in advance or at the time of the denials.

63.      In fact, NorthShore had previously granted one of its employees (Jane Doe 1) a "lifetime religious exemption" to required vaccines, and told her that she did "**not need to submit**

**exemption requests anymore**," but then denied even her a religious exemption to the COVID-19 vaccine for supposed lack of "evidence-based criteria."

64.     NorthShore then only gave Plaintiffs three business days to file an appeal – providing no guidance on what was deficient in the original application. (*See* Exhibit 4). A sample of NorthShore's "Appeal for Exemption" form is attached hereto as **Exhibit 5**.

65.     In that appeal, and regardless of the nature of any individual request, NorthShore also required employees to do the impossible – include their **entire vaccination history since the age of eighteen** (see Exhibit 4 at 2), ostensibly to judge the validity of their religious beliefs, even though NorthShore never requested its employees to provide prior vaccine information in their initial exemption requests. (See Exhibit 3).

66.     NorthShore's "Appeal for Exemption" form also contained no guidance for employees as to any criteria NorthShore would be using or expecting. (See Exhibit 5). NorthShore asked its employees to "limit your response to the area provided if possible," **meaning only three lines of text**, signaling to its employees that NorthShore was interested in even less detail than the five lines it provided in its initial exemption form. (*Id*.)

67.     In one case, after being denied an exemption an employee privately requested clarification as to what NorthShore meant by "evidence-based criteria." NorthShore privately told the employee that the committee supposedly evaluated (1) whether the request includes a clear description of the sincerely held religious belief or practice that supports the request and (2) why such belief or practice guides the individual's objection to receiving the required vaccination. The email further stated that if the employee previously obtained vaccines, then a "satisfactory explanation of how this vaccine impacts their religious belief or practice is necessary." A copy of

NorthShore's explanation of its supposed criteria, which NorthShore never published to its employees in advance of any requests or appeals, is attached hereto as **Exhibit 6**.

68. NorthShore then removed all pretense of a lawful exemption process by suddenly changing its exemption form to include a warning that all religious objections based on "aborted fetal cell lines, stem cells, tissue or derivative materials" "will result in denials," because supposedly "[t]hese are not in the NorthShore administered vaccines." A copy of NorthShore's revised Request for Religious Exemption is attached hereto as **Exhibit 7.**

69. NorthShore falsely asserted or implied that the COVID-19 vaccines have no link to aborted fetal cell lines, and also unlawfully purported to judge as invalid the religious beliefs of employees who object to the vaccines' indisputable connection to aborted fetal cell lines. (*See* Exhibit 7).

70. All of the individual exemption requests submitted by Plaintiffs clearly met NorthShore's unpublished, purported "criteria," yet were **still** denied, uniformly and generically. For example:

    a. Each of these employees provided "evidence" of their religious beliefs, including references to multiple Bible verses which they understand as commands from God to abstain from the vaccine.

    b. With only one or two exceptions, each of these employees provided the name and telephone number of their religious leader, as improperly requested by NorthShore. Most of the employees also provided letters of support from their clergy and churches, further discussing and validating their sincere religious beliefs, even though NorthShore did not, and could not legally, require such letters.

    c. These employees also provided ample "evidence" of the indisputable connection between the COVID-19 vaccines and aborted fetal cells, including by reference to multiple government websites that establish and document this connection. Several of the clergy letters provided by these employees also themselves contain further evidence of the connection between COVID-19 vaccines and aborted fetal cells.

71.     And yet, **NorthShore denied all fourteen Plaintiffs' exemption requests** (and numerous others) with the same generic and non-descript communication referring to phantom "evidence-based criteria." (Exhibit 4).

72.     It is clear from NorthShore's denials, that NorthShore never intended to grant any of these exemption requests to begin with, and that its entire exemption process was a sham. Indeed, NorthShore's express exclusion of abortion-related religious beliefs from consideration, and NorthShore's imposition of the requirement for employees to provide vaccination records for their entire adult lives (both of which are unlawful) rendered most, if not all, of those appeals futile.

73.     This point is further reinforced by Jane Doe 3's experience with a manager. On one occasion, a manager approached Jane Doe 3 and informed her that her position was going to be filled by someone else. When Jane Doe 3 informed the manager that her religious exemption appeal was still pending, the manager replied, "**it doesn't matter, we are not approving anyone**."

74.     Likewise, when Jane Doe 5 informed her manager that she was still waiting on her appeal, her manager simply told her that the appeal would be denied.

75.     Moreover, even though NorthShore has imposed an October 31, 2021 deadline for its employees to be fully vaccinated, it has already sent letters **before that deadline** to employees advising them that their positions are currently being actively recruited for and potentially being filled. **NorthShore did this even for employees who had filed appeals of their exemption denials, before NorthShore gave them a decision on those appeals**.

76.     In fact, NorthShore committed to providing a decision to exemption appeals within "approximately 10 days of receiving" an appeal. (Exhibit 4.) However, even though Northshore held its employees strictly to their "three business days" deadline for filing appeals, and warned them that "your appeal will not be considered if submitted after 3 business days," (Exhibit 5),

NorthShore did not provide its appeal decisions timely, as it has promised. Indeed, as of the filing of this lawsuit, weeks after NorthShore received its employees' appeals, and with only one week remaining before NorthShore's November 1, 2021 deadline to purge itself of employees with religious objections, **NorthShore still has not responded to the great majority of the appeals it received from its employees**. This has left employees purposefully in the dark as to their fate on November 1, 2021, which NorthShore is using as an unconscionable pressure and intimidation tactic to force its employees to receive vaccination in violation of their sincerely held religious beliefs.

77.     **And, as of Friday, October 22, 2021, NorthShore had already started to purge itself of employees with sincere religious objections to its Mandatory COVID-19 Vaccination Policy, by removing many of those employees from the November work schedule, thereby confirming NorthShore's intention to terminate these employees**.

78.     **NorthShore even removed from the November schedule numerous employees whose appeals were still pending, indicating that NorthShore never intended to consider those appeals in good faith or to grant them.**

79.     Therefore, NorthShore's provision for a religious exemption was a sham and its practice, with the exception of an isolated incident, was to simply deny religious exemptions *en masse* with boilerplate language, for unlawful reasons.

80.     As a result, NorthShore failed to engage with the individual Plaintiffs, and with all of its similarly situated employees, in good faith in the interactive process contemplated by Title VII.

81.     The one exception appears to be a nurse, Jane Doe 15, who submitted an exemption request very similar to (but much simpler and less detailed than) those submitted by Plaintiffs.

Jane Doe 15 was initially denied her exemption, but upon filing her appeal NorthShore reversed itself and granted of her exemption request. A copy of NorthShore's approval notice to Jane Doe 15 is attached hereto as **Exhibit 8**. NorthShore granted Jane Doe 15 an accommodation to permit her to remain in her same patient-care role, with appropriate use of PPE and regular testing. (*Id.*) NorthShore did not claim that it would be an "undue hardship" to allow Jane Doe 15 to remain onsite or in her patient care role, and did not reassign Jane Doe 15 to a remote or other position. (*Id.*)

82. Jane Doe 15 was similarly situated to Plaintiffs and scores of other NorthShore employees. Jane Doe 15's request and subsequent appeal were basic and significantly shorter and less detailed than any of the Plaintiffs. She included only a short and plain statement identifying the conflict between her beliefs and the vaccination requirement (*i.e.*, the vaccines' connection to aborted fetal cells), provided no "evidence" of the link between COVID-19 vaccines and abortion, and no "evidence" of her prior vaccination history. Jane Doe 15 described her religious beliefs generally, did not cite to a single Bible verse, and was ultimately granted a religious exemption and accommodation. There is nothing materially different about Jane Doe 15's religious beliefs, or about her patient-care position at NorthShore, that would have justified NorthShore's uneven, illogical and discriminatory treatment of its other employees.

83. In contrast, Plaintiffs' religious exemption requests were far more detailed and contained significantly more "evidence," and yet were repeatedly denied. NorthShore's approval of Jane Doe 15's religious exemption request, and its accommodation of her belief without any remote work requirement, while denying those of the Plaintiffs and many other employees amounts to unlawful disparate treatment and only further highlights NorthShore's sham, arbitrary and illogical religious exemption process.

84.     On October 1, 2021, counsel for the Plaintiffs sent NorthShore's counsel a detailed letter advising NorthShore that its policy and actions violated state and federal law. A copy of this letter is attached as **Exhibit 9**. Specifically, Plaintiffs' counsel informed NorthShore that its exemption application process was a sham and that NorthShore's failure to provide any religious exemptions and accommodations was a violation of the Illinois Health Care Right of Conscience Act, Title VII of the Civil Rights Act of 1964, and the Emergency Use Authorization statute. (*Id.*)

85.     On October 19, 2021, after some deliberation between counsel for the parties, NorthShore sent a letter to Plaintiffs' counsel purportedly reversing the denials of all but one of the Plaintiffs' religious exemption requests. The one religious request that was not granted is purportedly still pending review. A copy of NorthShore's response is attached hereto as **Exhibit 10**.

86.     However, while NorthShore reversed course and supposedly "approved" the religious exemptions, it did so in name only. Understanding that its previous rejection of its employees' religious exemption requests are legally indefensible, NorthShore now has switched tactics to achieve the exact same result, claiming that it will suffer an "undue hardship" if the Plaintiffs "remain in the worksite," and therefore, even though the exemptions have been "approved," NorthShore will only consider "an offer of fully remote work" or give Plaintiffs "the opportunity to apply for a fully remote position." (Exhibit 10).

87.     NorthShore has therefore made it clear that it is unwilling to reasonably accommodate the religious beliefs of any of its employees, to allow them to continue their passion and life calling of serving others. This is the same result that NorthShore set out to accomplish from the very beginning, when it denied virtually all of its employees' exemption and

accommodation requests for supposed failure to meet NorthShore's phantom, undisclosed "evidence-based criteria."

### C. PLAINTIFFS AND THEIR SINCERELY HELD RELIGIOUS BELIEFS.

88. Plaintiffs all have sincerely held religious beliefs that preclude them from complying with the Mandatory COVID-19 Vaccination Policy because of the connection between all three COVID-19 vaccines (in their origination, production, development, or testing), and the cell lines of aborted fetuses.

89. A fundamental component of Plaintiffs' sincerely held religious beliefs is that all life is sacred, from the moment of conception to natural death, and that abortion is a grave sin against God and the murder of an innocent life.

90. Plaintiffs' sincerely held religious beliefs are rooted in Scripture's teachings that "[a]ll Scripture is given by inspiration of God, and is profitable for doctrine, for reproof, for correction, [and] for instruction in righteousness." *2 Timothy* 3:16 (KJV).

91. Because of that sincerely held religious belief, Plaintiffs believe that they must conform their lives, including their decisions relating to medical care, to the commands and teaching of Scripture.

92. Plaintiffs have sincerely held religious beliefs that God forms children in the womb and knows them prior to their birth, and that because of this, life is sacred from the moment of conception. *See Psalm* 139:13-14 ("For you formed my inward parts; you knitted me together in my mother's womb. I praise you, for I am fearfully and wonderfully made." (ESV)); *Psalm* 139:16 ("Your eyes saw my unformed substance; in your book were written, every one of them, the day that were formed for me, when as yet there was none of them." (ESV)); *Isaiah* 44:2 ("the Lord that made thee, and formed thee from the womb . . ." (KJV)); *Isaiah* 44:24 ("Thus saith the Lord, thy

redeemer, and he that formed thee from the womb, I am the Lord that maketh all things." (KJV)); *Isaiah* 49:1 ("The Lord hath called my from the womb; from the bowels of my mother hath he made mention of my name." (KJV)); *Isaiah* 49:5 ("the Lord that formed me from the womb to be his servant" (KJV)); *Jeremiah* 1:5 ("Before I formed thee in the belly I knew thee; and before thou camest forth out of the womb I sanctified thee, and I ordained thee." (KJV)).

93.     Plaintiffs also have sincerely held religious beliefs that every child's life is sacred because they are made in the image of God. *See Genesis* 1:26-27 ("Let us make man in our image, after our likeness . . . So God created man in his own image; in the image of God created he him; male and female created he them." (KJV)).

94.     Plaintiffs also have sincerely held religious beliefs that because life is sacred from the moment of conception, the killing of that innocent life is the murder of an innocent human in violation of Scripture. *See, e.g.*, *Exodus* 20:13 ("Though shalt not kill." (KJV)); *Exodus* 21:22-23 (setting the penalty as death for even the accidental killing of an unborn child); *Exodus* 23:7 ("the innocent and righteous slay thou not, for I will not justify the wicked." (KJV)); *Genesis* 9:6 ("Whoso sheddeth a man's blood, by man shall his blood by shed: for in the image of God made he man." (KJV)); *Deuteronomy* 27:25 ("Cursed be he that taketh reward to slay an innocent person." (KJV)); *Proverbs* 6:16-17 ("These six things doth the Lord hate: yea, seven are an abomination to him . . . hands that shed innocent blood." (KJV)).

95.     Plaintiffs have sincerely held religious beliefs, rooted in the Scriptures listed above, that anything that condones, supports, justifies, or benefits from the taking of innocent human life via abortion is sinful, contrary to the Scriptures, and must be denounced, condemned, and avoided altogether.

96. Plaintiffs have sincerely held religious beliefs, rooted in the Scriptures listed above, that it is an affront to Scripture's teaching that all life is sacred for Plaintiffs to use a product derived from or connected in any way with abortion.

97. Plaintiffs' sincerely held religious beliefs, rooted in the above Scriptures, preclude them from accepting any one of the three currently available COVID-19 vaccines, because all three vaccines were derived from, produced, manufactured by, tested on, developed with, or otherwise connected to aborted fetal cell lines.

98. Plaintiffs have sincerely held religious objections to the Johnson & Johnson (Janssen Pharmaceuticals) vaccine because it unquestionably used aborted fetal cells lines to produce and manufacture the vaccines.

99. As reported by the North Dakota Department of Health, in its handout literature for those considering one of the COVID-19 vaccines, "[t]he non-replicating viral vector vaccine produced by Johnson & Johnson **did require the use of fetal cell cultures, specifically PER.C6, in order to produce and manufacture the vaccine**." *See* North Dakota Health, *COVID-19 Vaccines & Fetal Cell Lines* (Apr. 20, 2021), *available at* https://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine%20Page/COVID-19_Vaccine_Fetal_Cell_Handout.pdf (last visited Aug. 2, 2021) (bold emphasis original).

100. The Louisiana Department of Health likewise confirms that the Johnson & Johnson COVID-19 vaccine, which used PER.C6 fetal cell line, "is a retinal cell line that was **isolated from a terminated fetus in 1985**." Louisiana Department of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ* (Dec. 12, 2020), *available at* https://ldh.la.gov/assets/oph/Center-PHCH/Center-PH/immunizations/You_Have_Qs_COVID-19_Vaccine_FAQ.pdf (last visited Aug. 2, 2021) (emphasis added).

101.    Scientists at the American Association for the Advancement of Science have likewise published research showing that the Johnson & Johnson vaccine used aborted fetal cell lines in the development and production phases of the vaccine. *Meredith Wadman*, *Vaccines that use human fetal cells draw fire*, Science (June 12, 2020), *available at* https://science.sciencemag.org/content/368/6496/1170.full (last visited Aug. 2, 2021).

102.    Plaintiffs also have sincerely held religious objections to the Moderna and Pfizer/BioNTech COVID-19 vaccines because both of these vaccines, too, have their origins in research on aborted fetal cells lines.

103.    As reported by the North Dakota Department of Health, in its handout literature for those considering one of the COVID-19 vaccines, the Moderna and Pfizer mRNA vaccines are ultimately derived from research and testing on aborted fetal cell lines. In fact, "[e]arly in the development of mRNA vaccine technology, **fetal cells were used for 'proof of concept' (to demonstrate how a cell could take up mRNA and produce the SARS-CoV-2 spike protein) or to characterize the SARS-CoV-2 spike protein**." *See* North Dakota Health, *COVID-19 Vaccines & Fetal Cell Lines* (Apr. 20, 2021), *available at* https://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine%20Page/COVID-19_Vaccine_Fetal_Cell_Handout.pdf (last visited Aug. 2, 2021) (emphasis added).

104.    The Louisiana Department of Health's publications again confirm that aborted fetal cells lines were used in the "proof of concept" phase of the development of their COVID-19 mRNA vaccines. Louisiana Department of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ* (Dec. 12, 2020), *available at* https://ldh.la.gov/assets/oph/Center-PHCH/Center-PH/immunizations/You_Have_Qs_COVID-19_Vaccine_FAQ.pdf (last visited Aug. 2, 2021).

105.    Therefore, NorthShore's pretext for excluding religious beliefs premised on the demonstrable and undeniable association between all three COVID-19 vaccines and aborted fetal cell lines was patently false, and the exclusion of those beliefs was unlawful and discriminatory.

106.    Because all three of the currently available COVID-19 vaccines are developed and produced from, tested with, researched on, or otherwise connected with the aborted fetal cell lines HEK-293 and PER.C6, Plaintiffs' sincerely held religious beliefs compel them to abstain from obtaining or injecting any of these products into their body, regardless of the perceived benefit or rationale.

107.    In addition, Plaintiffs have sincerely held religious beliefs that their body is the temple of the Holy Spirit, and to inject medical products that have any connection whatsoever to aborted fetal cell lines would be defiling the Temple of the Holy Spirit. (*See 1 Corinthians* 6:15-20 ("Know ye not that your bodies are the members of Christ? shall I then take the members of Christ and make them members of an harlot? God forbid. . . . What? Know ye not that your body is the temple of the Holy Ghost which is in you, which have of God, and ye are not your own? For ye are bought with a price: therefore glorify God in your body, and in your spirit, which are God's." (KJV)).

108.    While there may be some faith leaders and other adherents whose understanding of Scripture is different, and who may be willing to accept one of the three currently available COVID-19 vaccines despite their connection with aborted fetal cell lines, Plaintiffs' sincerely held religious beliefs compel them to adhere to the truth that the testing, development, production, or other connection to aborted fetal cell lines is morally and Scripturally unacceptable and an affront to Scripture's teachings that God values all human life, and that abortion – in all of its

manifestations and with all of its so-called 'benefits' – is a grave sin in which Plaintiffs cannot participate.

109.     In addition to their sincerely held religious beliefs that compel them to abstain from any connection to the grave sin of abortion, Plaintiffs have sincerely held religious beliefs that the Holy Spirit – through prayer and the revelation of Scripture – guide them in all decisions they make in life.

110.     Plaintiffs have sincerely held religious beliefs that Jesus Christ came to this earth, died on the cross for their sins, was resurrected three days later, and that when He ascended to Heaven, He sent the Holy Spirit to indwell His Believers and to guide them in all aspects of their lives. *See John* 16:7 ("Nevertheless I tell you the truth, it is expedient for you that I go away: for if I go not away, the Comforter will not come unto you; but if I depart, I will send him unto you." (KJV)); *John* 14:26 ("But the Comforter, which is the Holy Ghost, whom the Father will send in my name, he shall teach you all things, and bring all things to your remembrance, whatsoever I have said unto you." (KJV)).

111.     Plaintiffs have sincerely held religious beliefs that the Holy Spirit was given to them by God to reprove them of righteousness and sin and to guide them into all truth. *See John* 16:8,13 ("And when he is come, he will reprove the world of sin, and of righteousness, and of judgment . . . when he, the Spirit of truth, is come, he will guide you into all truth: for he shall not speak of himself; but whatsoever he shall hear, that shall he speak: and he will shew you things to come." (KJV)).

112.     Plaintiffs also have sincerely held religious beliefs that they shall receive all answers to their questions through prayer and supplication, including for decisions governing their medical health. *See James* 1:5 ("If any of you lack wisdom, let him ask of God, that giveth to all

men liberally, and upbraideth not; and it shall be given him." (KJV)); *Mark* 11:24 ("Therefore I say unto you, What things soever ye desire, when ye pray, believe that ye receive them, and ye shall have them." (KJV)); *Philippians* 4:6-7 ("but in everything by prayer and supplication with thanksgiving let your request be made known to God. And the peace of God, which passeth all understanding, shall keep your hearts and minds through Christ Jesus." (KJV)); *1 John* 4:14-15 ("And this is the confidence we have in him, that, if we ask anything according to his will, he heareth us. And if we know that he hear us, whatsoever we ask, we know that we have the petitions that we desired of him." (KJV)).

113.    Through much prayer and reflection, Plaintiffs have sought wisdom, understanding, and guidance on the proper decision to make concerning these COVID-19 vaccines, and Plaintiffs have been convicted by the Holy Spirit in their beliefs that accepting any of the three currently available vaccines is against the teachings of Scripture and would be a sin.

114.    Plaintiffs have sincerely held religious beliefs that compel them to follow the teachings of the Holy Spirit, who has not given them peace or comfort to accept any of the three currently available COVID-19 vaccines.

115.    Plaintiffs have sincerely held religious beliefs that they are being guided and instructed by the Holy Spirit not to accept any of the three currently available COVID-19 vaccines and that it would be a sin against God to do so.

116.    Plaintiffs have shared these religious beliefs, and others, with NorthShore, and have asked NorthShore for exemption and reasonable accommodation for these beliefs, but NorthShore has unlawfully and callously refused.

### D. PLAINTIFFS' WILLINGNESS TO COMPLY WITH ALTERNATIVE SAFETY MEASURES.

117. Plaintiffs can and will comply with all other reasonable alternatives to compliance with NorthShore's Mandatory COVID-19 Vaccination Policy.

118. Plaintiffs are willing to and will comply with all requirements to wear a mask, if necessary, as a part of the reasonable accommodation for their sincerely held religious objection to NorthShore's Mandatory COVID-19 Vaccination Policy.

119. Plaintiffs are willing to and will comply with surveillance testing protocols as part of their reasonable accommodation for their sincerely held religious objection to NorthShore's Mandatory COVID-19 Vaccination Policy.

120. Plaintiffs are willing to and will comply with all self-monitoring, self-reporting, or other reasonable safety protocols to monitor and report any sign of symptoms or other issues, as part of their reasonable accommodation for their sincerely held religious objection to NorthShore's Mandatory COVID-19 Vaccination Policy.

121. Plaintiffs are willing to and will comply with any reasonable request to accomplish their pursuit of obtaining a reasonable accommodation for their sincerely held religious objection to NorthShore's Mandatory COVID-19 Vaccination Policy.

122. Plaintiffs are willing to and will comply with the same alternatives to vaccination that NorthShore provided as accommodations to Jane Doe 15, to employees with pregnancy and other medical conditions, and to visitors and patients of NorthShore, all of whom are allowed to be at NorthShore and are not being purged and excluded as NorthShore is doing to Plaintiffs and numerous other employees that have requested religious exemptions.

**E.     IRREPARABLE INJURY TO PLAINTIFFS FROM THE MANDATORY COVID-19 VACCINATION POLICY.**

123.    Absent a TRO and injunctive relief, **and beginning on November 1, 2021, Plaintiffs will be subject to adverse employment action from NorthShore**. Plaintiffs will not be permitted to remain in their positions or any reasonably-similar position. NorthShore will expel Plaintiffs out of its facilities, and will terminate all or almost all of them. **NorthShore has already begun this purge by removing many Plaintiffs and others who have declined vaccination on religious grounds from the November work schedule**.

124.    Absent a TRO and injunctive relief, Plaintiffs will be deprived of the statutorily protected rights to the exercise of their sincerely held religious beliefs.

125.    Despite being willing and capable of complying with all social distancing, testing, monitoring, and facial covering requirements (and all other reasonable requests arising from accommodation for their sincerely held religious beliefs), Plaintiffs are being discriminatorily targeted, singled out, and punished for the exercise of their sincerely held religious beliefs.

126.    Some of the harms which Plaintiffs will suffer absent a TRO include homelessness, lack of medical care, lack of food and shelter, disrupted education for their children, financial ruin, and harms to their physical, mental and emotional health.

**F.     CLASS ALLEGATIONS.**

127.    Plaintiffs bring this class action under Federal Rules of Civil Procedure 23(a) and (b).

128.    Through this action, Plaintiffs seek to represent a class of all NorthShore employees who have requested or will request religious exemptions and accommodations from the Mandatory COVID-19 Vaccination Policy and who have had those requests unlawfully denied (expressly or constructively).

34

129.     The class is so numerous that joinder of all members is impractical. While the exact class size is unknown to Plaintiffs at this time, public reports indicate that NorthShore has as many as 18,000 employees.[3] The precise number and identification of the class members will be ascertainable from NorthShore's records during discovery.

130.     There are questions of law and fact common to all members of the class. Those common questions include, but are not limited to, the following:

a.   Did NorthShore comply with federal and state law when it indiscriminately denied religious exemption and accommodation requests *en masse*?

b.   Did NorthShore comply with federal and state law when it informed the Plaintiffs that while their exemptions were finally "approved," it would be an "undue hardship" on NorthShore for them to keep their current positions, irrespective of any alternative safety measures that Plaintiffs are willing to undertake, and that other healthcare employers in Illinois and throughout the country allow their employees to undertake?

c.   Did NorthShore violate federal and state law when it granted Jane Doe 15 her religious exemption request, and provided her a reasonable accommodation, even while denying Plaintiffs' similar requests?

d.   Did NorthShore comply with its obligations under federal law to engage in the interactive process when responding to each exemption request?

---

[3] https://www.chicagotribune.com/business/ct-biz-northshore-covid-vaccine-requirement-20210816-7m3b4mmnojag7dtmiycf4dgzem-story.html

e.  Did NorthShore violate federal and state law when it informed Plaintiffs and others that they could not, and should not, submit exemption requests premised on the link between the vaccines and abortion?

f.  Did NorthShore provide an adequate mechanism for requesting and obtaining a religious exemption when it provided Plaintiffs and others only three days to appeal, and to provide an entire adult vaccine history, and then to deny them based on the lack of "evidence-based criteria"?

g.  Did NorthShore violate federal and state law when it failed to provide a decision to its employees appeals within the timeframe to which NorthShore committed; when it pressured its employees to accept vaccination against their religious beliefs by posting their jobs and recruiting their replacements; and when it removed employees from the November work schedule, even as their appeals were supposedly still pending?

131.  Plaintiffs' claims are typical of the claims of the class because they, like the class members, requested exemptions and accommodations from the Mandatory COVID-19 Vaccination Policy and NorthShore denied those requests.

132.  For the same reason, Plaintiffs will fairly and adequately protect the interests of the class.

133.  The question of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating Plaintiffs' claims. Joinder of all members is impracticable.

## COUNT I – VIOLATION OF THE ILLINOIS HEALTH CARE RIGHTS OF CONSCIENCE ACT, 745 ILCS 70

134.     Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-133 as if fully set forth herein.

135.     The Illinois Health Care Right of Conscience Act (the "Act") protects Plaintiffs' rights to engage in the exercise of their sincerely held religious beliefs without fear of discrimination from any entity, whether public or private, including NorthShore.

136.     In fact, the State of Illinois has declared it to be the public policy of the State to protect the religious conscience rights of all individuals in the State of Illinois as it relates to health care services. The Illinois Health Care Right of Conscience Act provides, specifically,

> The General Assembly finds and declares that people and organizations hold different beliefs about whether certain health care services are morally acceptable. **It is the public policy of the State of Illinois to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept, or who are engaged in, the delivery of, arrangement for, or payment of health care services and medical care whether acting individually, corporately, or in association with other persons; and to prohibit all forms of discrimination, disqualification, coercion, disability or imposition of liability upon such persons or entities by reason of their refusing to act contrary to their conscience or conscientious convictions in providing, paying for, or refusing to obtain, receive, accept, deliver, pay for, or arrange for the payment of health care services and medical care**. It is also the public policy of the State of Illinois to ensure that patients receive timely access to information and medically appropriate care.

745 ILCS 70/2 (emphasis added).

137.     In furtherance of the State of Illinois public policy of protecting the religious conscience rights of all Illinoisans to exercise their sincere religious convictions in their medical decision-making, the Illinois Health Care Right of Conscience Act states:

> **It shall be unlawful for any** person, public or **private institution**, or public official **to discriminate against any person in any manner**, including but not limited to, licensing, hiring, promotion, transfer, staff appointment, hospital, managed care entity, or **any other privileges**, **because of such person's conscientious refusal**

37

> **to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care services contrary to his or her conscience**.

745 ILCS 70/5 (emphasis added).

138.    The Illinois Health Care Right of Conscience Act further provides:

> **It shall be unlawful for any public or private** employer, entity, agency, **institution**, official or person, including but not limited to, a medical, nursing or other medical training institution, to deny admission because of, to place any reference in its application form concerning, to orally question about, to impose any burdens in terms or conditions of employment on, or to otherwise discriminate against, any applicant, in terms of employment, **admission to or participation in any programs for which the applicant is eligible, or to discriminate in relation thereto, in any other manner, on account of the applicant's refusal to receive, obtain, accept, perform, counsel, suggest, recommend, refer, assist or participate in any way in any forms of health care services contrary to his or her conscience.**

745 ILCS 70/7 (emphasis added).

139.    The Illinois Health Care Right of Conscience Act defines "Health care" broadly to include vaccinations. Specifically, it provides that "Health Care":

> means **any phase** of patient care, including but not limited to, **testing**; diagnosis; **prognosis**; ancillary research; **instructions**; family planning, counselling, referrals, or any other advice in connection with the use or procurement of contraceptives and sterilization or abortion procedures; **medication**; surgery or **other care or treatment rendered by a physician or physicians, nurses, paraprofessionals or health care facility**, **intended** for the **physical**, emotional, and mental well-being of persons.

745 ILCS 70/3 (a) (emphasis added).

140.    The Illinois Health Care Right of Conscience Act defines "Conscience," as "a sincerely held set of moral convictions arising from belief in or relation to God, or which, though not so derived, arises from a place in the life of its possessor parallel to that filled by God among adherents to religious faiths." 745 ILCS 70/3(e).

141.    A violation of the Illinois Health Care Right of Conscience Act provides for the following remedies:

> **Any person, association, corporation, entity or health care facility injured by any public or private person, association, agency, entity or corporation by reason of any action prohibited by this Act may commence a suit therefor, and shall recover threefold the actual damages, including pain and suffering, sustained by such person, association, corporation, entity or health care facility, the costs of the suit and reasonable attorney's fees; but in no case shall recovery be less than $2,500 for each violation in addition to costs of the suit and reasonable attorney's fees. These damage remedies shall be cumulative, and not exclusive of other remedies afforded under any other state or federal law**.

745 ILCS 70/12 (emphasis added).

142. The Illinois Health Care Right of Conscience Act acts as a super statute in Illinois, preempting and superseding all other acts and portions of acts that conflict with the explicit policies contained in the statute.

143. Specifically, the Illinois Health Care Right of Conscience Act states: "This Act shall supersede all other Acts or parts of Acts to the extent that any Acts or parts of Acts are inconsistent with the terms or operation of this Act." 745 ILCS 70/14.

144. Even as a private institution, NorthShore is subject to the provision of the Illinois Health Care Right of Conscience Act under 745 ILCS 70/5 and 745 ILCS 70/7, and is therefore prohibited from discriminating against Plaintiffs for their refusal to accept one of the vaccines on account of their sincerely held religious beliefs.

145. Plaintiffs' sincerely held religious beliefs, which were articulated to NorthShore under the signed written requests required by the Mandatory COVID-19 Vaccination Policy, constitute Plaintiffs' "conscience" under the Act because they are "a sincerely held set of moral convictions arising from belief in or relation to God." 745 ILCS 70/3(e).

146. The COVID-19 vaccines constitute "Health care" under the Act because they are a "phase of patient care," "medication," and/or "other care or treatment rendered by a physician or

physicians, nurses, paraprofessionals or health care facility, intended for the physical, emotional, and mental well-being of persons." 745 ILCS 70/3(a).

147.     The Act does not provide NorthShore with any defense to discriminate against Plaintiffs based on so-called "undue hardship." *Rojas v. Martell*, 2020 IL App (2d) 190215, ¶ 43, 443 Ill. Dec. 212, 224, 161 N.E.3d 336, 348.

148.     By imposing its Mandatory COVID-19 Vaccination Policy upon Plaintiffs and refusing to grant them religious exemptions and reasonable accommodations from the Mandatory COVID-19 Vaccination Policy, NorthShore has impermissibly, unlawfully, and unconscionably discriminated against Plaintiffs because of their conscientious refusal to receive or accept one of the three currently available COVID-19 vaccines in contradiction to their rights of conscience and sincerely held religious beliefs.

149.     By threatening Plaintiffs with adverse employment action for failure to comply with the Mandatory COVID-19 Vaccination Policy, NorthShore has impermissibly discriminated against the Plaintiffs on account of their sincerely held religious objections to receiving or accepting one of the three COVID-19 vaccines in violation of 745 ILCS 70/5.

150.     NorthShore's Mandatory COVID-19 Vaccination Policy, on its face and as applied, is a gross violation of Plaintiffs' sincerely held beliefs, and their rights of conscience under the Illinois Health Care Right of Conscience Act.

151.     NorthShore's Mandatory COVID-19 Vaccination Policy, on its face and as applied, is an impermissible discrimination against Plaintiffs on the basis of their sincerely held religious beliefs, and in violation of Plaintiffs' rights of conscience under the Illinois Health Care Right of Conscience Act.

152.     NorthShore's Mandatory COVID-19 Vaccination Policy has caused, is causing, and will continue to cause Plaintiffs immediate and irreparable harm by denying them their statutory right to accept or refuse administration of a COVID-19 vaccine that violates their conscience and religious beliefs, in direct violation of the Illinois Health Care Right of Conscience Act.

153.     Plaintiffs have no adequate remedy at law to prevent the ongoing deprivation of their statutory rights under the Illinois Health Care Right of Conscience Act.

154.     Absent a TRO and injunctive relief, NorthShore's deprivation of Plaintiffs' right to accept or refuse administration of health care will cause them to suffer for the exercise of their statutory rights under the Illinois Health Care Right of Conscience Act.

WHEREFORE, Plaintiffs respectfully pray for relief against NorthShore as set forth in their Prayer for Relief.

## COUNT II – VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.*

155.     Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-133 as if fully set forth herein.

156.     Title VII of the Civil Rights Act of 1964 prohibits NorthShore from discriminating against its employees on the basis of their sincerely held religious beliefs. *See* 42 U.S.C. §2000e-2(a).

157.     Plaintiffs hold sincere religious beliefs that preclude them from receiving a COVID-19 vaccine.

158.     Plaintiffs informed NorthShore of those beliefs and requested religious exemptions and reasonable accommodations from the vaccine mandate.

159.     NorthShore has failed to engage in the interactive process with Plaintiffs regarding their religious accommodation requests.

160.     Irrespective of the interactive process, NorthShore failed to provide Plaintiffs with religious exemptions and reasonable accommodations, thereby discriminating against Plaintiffs because of their religious beliefs.

161.     NorthShore's failure to provide religious exemptions and accommodations has harmed and will continue to harm the Plaintiffs.

162.     By failing to engage in the interactive process or offer any reasonable accommodation, NorthShore's discriminatory actions were intentional and/or reckless and in violation of Title VII.

163.     Plaintiffs have filed and are filing charges with the EEOC complaining of these discriminatory actions, accompanied by attorney-requested immediate right to sue, which is expected imminently. This Court may exercise its equity jurisdiction to grant preliminary injunctive relief to preserve the status quo pending completion of the EEOC's administrative process. *See e.g.*, *Sheehan v. Purolator Courier Corp.*, 676 F.2d 877, 884 (2d Cir. 1981); *Drew v. Liberty Mut. Ins. Co.*, 480 F.2d 69, 74 (5th Cir. 1973); *Bailey v. Delta Air Lines, Inc.*, 722 F.2d 942, 944-45 (1st Cir. 1983).

WHEREFORE, Plaintiffs respectfully pray for relief against NorthShore as set forth in their Prayer for Relief.

### COUNT III – VIOLATION OF EMERGENCY USE AUTHORIZATION PROVISIONS OF THE UNITED STATES CODE, 21 U.S.C. §360bbb-3, *et seq.*

164.     Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-133 as if fully set forth herein.

165.     The United States Code provides that:

> **subject to the provisions of this section**, the Secretary (of the Department of Health and Human Services) may authorize the introduction into interstate commerce, during the effective period of a declaration under subsection (b), of a drug, device, or biological product intended for use in an actual or potential emergency (referred to in this section as an "emergency use."

21 U.S.C. §360bbb-3(a)(1) (emphasis added).

166.     For ease of reference, Plaintiffs will refer to the general provisions of 21 U.S.C. §360bbb-3 as the "Emergency Use Authorization Statute" or "EUA Statute."

167.     Part of the explicit statutory conditions for an Emergency Use Authorization under the Emergency Use Authorization statute, **the statute mandates that all individuals to whom the product approved for Emergency Use may be administered be given the option to accept or refuse administration of the product**.

168.     Specifically, 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III), states:

> With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall for a person who carries out an activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following
>
> . . .
>
> Appropriate conditions designed to ensure that individuals to whom the product is administered are informed—
>
> (I) that the Secretary has authorized the emergency us of the product;
>
> (II) of the significant known potential benefits and risks of such use, and of the extent to which such benefits are unknown; and
>
> (III) **of the option to accept or refuse administration of the product,** of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

21 U.S.C. §360bbb-3(e)(1)(A)(ii)(I)-(III) (emphasis added).

169.    Put simply, the Emergency Use Authorization statute provides that, **as a condition of receiving authorization for Emergency Use, <u>all individuals to whom the product may be administered are given the right to accept or refuse administration of the product</u>**.

170.    The only currently available COVID-19 vaccines (Janssen/Johnson & Johnson, Moderna, and Pfizer/BioNTech) are only authorized for use under the Emergency Use Authorization statute and have no general approval under the United States Code.

171.    Because all three of the currently available COVID-19 vaccines are subject only to Emergency Use under the Emergency Use Authorization statute, the Emergency Use Authorization statute mandates that all individuals to whom the product may be administered, including Plaintiffs, be given the right to accept or refuse administration of the product.

172.    The recent FDA biologics license application (BLA) approval of the product COMIRNATY, COVID-19 Vaccine, mRNA, manufactured by BioNTech Manufacturing GmbH,[4] **does not change the EUA status** of the Pfizer-BioNTech COVID-19 Vaccine that has been available under EUA since December 23, 2020.[5] According to the EUA extension letter issued by the FDA to Pfizer on August 23, 2021, the Pfizer-BioNTech COVID-19 Vaccine and BioNTech's COMIRNATY, COVID-19 Vaccine, mRNA "**are legally distinct**" products.[6]

173.    Moreover, the now "approved" COMIRNATY vaccine cannot be distributed for use until BioNTech submits "final container samples of the product in final containers together with protocols showing results of all applicable tests" and BioNTech receives "a notification of

---

[4]     BLA Approval Letter for COMIRNATY, COVID-19 Vaccine, mRNA (Aug. 23, 2021), https://www.fda.gov/media/151710/download.
[5]     EUA Extension Letter for Pfizer-BioNTech COVID-19 Vaccine (Aug. 23, 2021), https://www.fda.gov/media/150386/download.
[6]     *Id.* at 3 n.10 (emphasis added).

release from the Director, Center for Biologics Evaluation and Research (CBER)."[7] Thus, it is not clear when (or if) any NorthShore employee will have access to the "approved" COMIRNATY vaccine, leaving all NorthShore employees who may elect to receive the "Pfizer" vaccine pursuant to NorthShore's mandatory vaccine policy to receive a dose of the current stock of Pfizer-BioNTech vaccine still being administered subject to EUA rules.

174.    On August 23, 2021, the United States Food and Drug Administration issued two separate letters pertaining to two separate COVID-19 vaccines. **Exhibit 11**, BioNTech Letter, United States Food and Drug Administration to BioNTech Manufacturing GmbH (Aug. 23, 2021), **Exhibit 12** Pfizer Letter, United States Food and Drug Administration to Pfizer, Inc. (Aug. 23, 2021).)

175.    In the Pfizer Letter, the FDA confirms that, on December 11, 2020, it granted Emergency Use Authorization for the previous Pfizer-BioNTech COVID-19 Vaccine. (Ex. 12, Pfizer Letter at 1.) It also notes that the EUA approval was continued on December 23, 2020, February 25, 2020, May 10, 2021, June 25, 2021, and August 12, 2021. (Pfizer Letter at 1-2.)

176.    The Pfizer Letter also makes clear that **there is a scientific, manufacturing, and legally significant difference between the Pfizer-BioNTech COVID-19 Vaccine and the newly approved Comirnaty Vaccine**. (Pfizer Letter at 2 n.9.)

177.    Specifically, the FDA stated that although the COMIRNATY COVID-19 Vaccine was granted full approval by the FDA, the Pfizer-BioNTech COVID-19 Vaccine was still only subject to the EUA authorization. (Pfizer Letter at 2 n.9 ("In the August 23, 2021 revision, FDA clarified that, subsequent to the FDA approval of COMIRNATY (COVID19 Vaccine, mRNA) for the prevention of COVID-19 for individuals 16 years of age and older, **this EUA would remain**

---

[7]     BLA Approval Letter for COMIRNATY, COVID-19 Vaccine, mRNA, *supra* note 4 at 2.

**in place for the Pfizer-BioNTech COVID-19 vaccine for the previously-authorized indication and uses**. It also authorized COMIRNATY (COVID-19 Vaccine, mRNA) under this EUA for certain uses that are not included in the approved biologics license application (BLA)." (Emphasis added).

178.     Put simply, because all three of the currently available COVID-19 vaccines are subject only to Emergency Use under the Emergency Use Authorization statute, the Emergency Use Authorization statute prohibits NorthShore (or any other entity) from making the COVID-19 vaccines mandatory.

179.     All existing vials of the EUA-approved Pfizer-BioNTech COVID-19 vaccine remain under the sole authorization of the EUA. (Pfizer Letter at 2 n.9.)

180.     On information and belief, the existing vials of the EUA-approved Pfizer-BioNTech COVID-19 vaccine register in the millions, and anyone receiving any COVID-19 vaccine for the foreseeable future is guaranteed to receive the EUA-approved Pfizer-BioNTech COVID-19 Vaccine, **not the fully approved COMIRNATY**.

181.     There are no currently existing doses of COMIRNATY in the United States and **it is not being manufactured for production or distribution in the United States at this time**.

182.     **In fact, the FDA Pfizer Letter plainly indicates that COMIRNATY is not available in the United States: "Although COMIRNATY (COVID-19 Vaccine, mRNA) is approved to prevent COVID-19 in individuals 16 years of age and older, there is no sufficient approved vaccine for distribution to the population**." (Pfizer Letter at 6 n.12 (emphasis added).)

183.     Thus, the FDA has admitted and acknowledged that the current supply of the fully approved COMIRNATY is not even available for the population in the United States, and thus issued the continued EUA authorization for the Pfizer-BioNTech Covid-19 Vaccine. (*Id.*).

184.    Indeed, in order for the FDA to have even continued the EUA for the Pfizer-BioNTech Covid-19 Vaccine, **it was required to find that there were no alternatives available for the Pfizer-BioNTech vaccine**. (*See* Pfizer Letter at 6 ("There is no adequate, approved, and **available alternative** to the Pfizer-BioNTech COVID-19 Vaccine to prevent COVID-19." (Emphasis added).)

185.    Thus, the only currently available COVID-19 vaccines are subject solely to EUA approval and therefore cannot be mandated by NorthShore.

186.    In addition, consistent with the requirement in the Emergency Use Authorization statute that all potential recipients of the COVID-19 vaccine be informed of the option to accept or refuse the vaccine, the Emergency Use Authorization Fact Sheet for all three of the currently available COVID-19 vaccines specifically states – **as required by the Emergency Use Authorization statute** – that individuals have the right to refuse administration of the COVID-19 vaccine. A true and correct copy of the Emergency Use Authorization Fact Sheet for the Modern COVID-19 Vaccine is attached hereto as **Exhibit 13** and incorporated herein. A true and correct copy of the Emergency Use Authorization Fact Sheet for the Pfizer-BIONTECH COVID-19 Vaccine is attached hereto as **Exhibit 14** and incorporated herein. A true and correct copy of the Emergency Use Authorization Fact Sheet for the Janssen COVID-19 Vaccine is attached hereto as **Exhibit 15** and incorporated herein.

187.    Specifically, the Emergency Use Authorization Fact Sheets for all three COVID-19 vaccines state that it is the individual's right to refuse administration of the vaccine.

188.    By imposing its Mandatory COVID-19 Vaccination Policy on Plaintiffs and refusing to grant Plaintiffs their requested religious exemption from such mandatory vaccination, NorthShore is denying Plaintiffs their right to accept or refuse administration of the three currently

available COVID-19 vaccines, which are subject only to Emergency Use approval under the Emergency Use Authorization statute.

189.    NorthShore, by denying Plaintiffs the right to accept or refuse administration of the three currently available COVID-19 vaccines, is violating the provisions of the Emergency Use Authorization statute.

190.    NorthShore, by denying Plaintiffs their requested religious exemption and reasonable accommodation, is denying Plaintiffs' their statutory rights under the United States Code and infringing upon the explicit protections outlined in the Emergency Use Authorization statute.

191.    NorthShore's Mandatory COVID-19 Vaccination Policy has caused, is causing, and will continue to cause Plaintiffs immediate and irreparable harm by denying them their statutory right to accept or refuse administration of the three COVID-19 vaccines, which are subject only to Emergency Use under the Emergency Use Authorization statute.

192.    Plaintiffs have no adequate remedy at law to prevent the ongoing deprivation of their statutory rights under the Emergency Use Authorization statute to be given the right to accept or refuse administration of the COVID-19 vaccines, which are subject only to Emergency Use authorization under the Emergency Use Authorization statute.

193.    Absent a TRO and injunctive relief, NorthShore's deprivation of Plaintiffs' right to accept or refuse administration of a product subject only to Emergency Use Authorization will cause them to suffer adverse employment action from NorthShore.

WHEREFORE, Plaintiffs respectfully pray for relief against NorthShore as hereinafter set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief as follows:

A.       That the Court certify this action as a class action under Federal Rules of Civil Procedure 23(a) and (b).

B.       That the Court issue a Temporary Restraining Order restraining and enjoining NorthShore, all its officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with the Mandatory COVID-19 Vaccination Policy or any other written or unwritten policy or practice denying Plaintiffs their right to accept or refuse administration of the COVID-19 vaccines under the Emergency Use Authorization statute, or subjecting Plaintiffs to discrimination for the exercise of their sincerely held religious beliefs against administration of the COVID-19 vaccines in violation of the Illinois Health Care Right of Conscience Act or Title VII.

C.       That the Court issue a Preliminary Injunction pending trial, and a Permanent Injunction upon judgment, restraining and enjoining NorthShore, all its officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with the Mandatory COVID-19 Vaccination Policy or any other written or unwritten policy or practice denying Plaintiffs their right to accept, or refuse administration of the COVID-19 vaccines under the Emergency Use Authorization statute, or subjecting Plaintiffs to discrimination for the exercise of their sincerely held religious beliefs against administration of the COVID-19 vaccines in violation of the Illinois Health Care Right of Conscience Act or Title VII.

49

D.      That this Court render a Declaratory Judgment declaring that NorthShore's Mandatory COVID-19 Vaccination Policy, both on its face and as applied by NorthShore, is illegal and unlawful under the Emergency Use Authorization statute, 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III), the Illinois Health Care Right of Conscience Act, 745 ILCS 70/5 and 745 ILCS 70/7, and Title VII, 42 U.S.C. § 2000e, *et seq*. and further declaring that:

        a.   by terminating Plaintiffs from employment with NorthShore or by threatening to so terminate or remove Plaintiffs from their current positions, NorthShore has unlawfully denied Plaintiffs their statutory rights under the Emergency Use Authorization statute to refuse administration of a product granted only Emergency Use Authorization; and

        b.   by terminating Plaintiffs from employment with NorthShore or by threatening to so terminate or remove Plaintiffs from their current positions, NorthShore has unlawfully discriminated against Plaintiffs on account of their sincerely held religious objections to receiving or accepting one of the three COVID-19 vaccines in violation of 745 ILCS 70/5 and 745 ILCS 70/7 and Title VII.

E.      That this Court award Plaintiffs and those similarly situated actual damages in an amount to be proven at trial (but not less than $2,500 per violation, as provided by 745 ILCS 70/12), and treble damages as provided by 745 ILCS 70/12, including those for pain and suffering, that Plaintiffs sustained as a result of NorthShore's discriminatory, unconscionable, and unlawful Mandatory COVID-19 Vaccination Policy.

F.      That this Court adjudge, decree, and declare the rights and other legal obligations and relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment.

G. That this Court retain jurisdiction over the matter for the purposes of enforcing the Court's order.

H. That this Court award Plaintiffs the reasonable costs and expenses of this action, including reasonable attorneys' fees, as required by 745 ILCS 70/12 and Title VII.

I. That this Court grant such other and further relief as the Court deems equitable and just under the circumstances.

Respectfully submitted,

/s/ Sorin A. Leahu
Local Counsel
Ill. Bar No. 6315515
LEAHU LAW GROUP, LLC
53 W. Jackson Blvd., #1527
Chicago, IL 60604
847-529-7221
sleahu@leahulaw.com

/s/ Horatio G. Mihet
Mathew D. Staver*
Horatio G. Mihet*
Roger K. Gannam*
Daniel J. Schmid*
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Facsimile: (407) 875-0770
Email: court@lc.org
hmihet@lc.org
rgannam@lc.org
dschmid@lc.org
*Applications for Admission pro hac vice pending

*Attorneys for Plaintiffs and Proposed Class*

51

## **VERIFICATION**

I, Jane Doe 1, am over the age of eighteen years and am an employee of NorthShore. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: October 23, 2021

/s/ Jane Doe 1
Jane Doe 1
(Original Signature of Jane Doe 1 retained by Counsel)

## **VERIFICATION**

I, Jane Doe 2, am over the age of eighteen years and am an employee of NorthShore. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: October 23, 2021

/s/ Jane Doe 2_____
Jane Doe 2
(Original Signature of Jane Doe 2 retained by Counsel)

## **VERIFICATION**

I, Jane Doe 3, am over the age of eighteen years and am an employee of NorthShore. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: October 23, 2021

/s/ Jane Doe 3
Jane Doe 3
(Original Signature of Jane Doe 3 retained by Counsel)

## **VERIFICATION**

I, Jane Doe 4, am over the age of eighteen years and am an employee of NorthShore. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: October 23, 2021

/s/ Jane Doe 4
Jane Doe 4
(Original Signature of Jane Doe 4 retained by Counsel)

## **VERIFICATION**

I, Jane Doe 5, am over the age of eighteen years and am an employee of NorthShore. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: October 23, 2021

/s/ Jane Doe 5
Jane Doe 5
(Original Signature of Jane Doe 5 retained by Counsel)

## **VERIFICATION**

I, Jane Doe 6, am over the age of eighteen years and am an employee of NorthShore. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: October 23, 2021

/s/ Jane Doe 6
Jane Doe 6
(Original Signature of Jane Doe 6 retained by Counsel)

## **VERIFICATION**

I, Jane Doe 7, am over the age of eighteen years and am an employee of NorthShore. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: October 23, 2021

/s/ Jane Doe 7
Jane Doe 7
(Original Signature of Jane Doe 7 retained by Counsel)

58

**<u>VERIFICATION</u>**

I, Jane Doe 8, am over the age of eighteen years and am an employee of NorthShore. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: October 23, 2021

/s/ Jane Doe 8
Jane Doe 8
(Original Signature of Jane Doe 8 retained by Counsel)

## **<u>VERIFICATION</u>**

I, Jane Doe 9, am over the age of eighteen years and am an employee of NorthShore. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: October 23, 2021

/s/ Jane Doe 9
Jane Doe 9
(Original Signature of Jane Doe 9 retained by Counsel)

## **<u>VERIFICATION</u>**

I, Jane Doe 10, am over the age of eighteen years and am an employee of NorthShore. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: October 23, 2021

/s/ Jane Doe 10

Jane Doe 10

(Original Signature of Jane Doe 10 retained by Counsel)

## **VERIFICATION**

I, Jane Doe 11, am over the age of eighteen years and am an employee of NorthShore. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: October 23, 2021

/s/ Jane Doe 11
Jane Doe 11
(Original Signature of Jane Doe 11 retained by Counsel)

## **<u>VERIFICATION</u>**

I, Jane Doe 12, am over the age of eighteen years and am an employee of NorthShore. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated:  October 23, 2021

/s/ Jane Doe 12

Jane Doe 12

(Original Signature of Jane Doe 1 retained by Counsel)

## **<u>VERIFICATION</u>**

I, Jane Doe 13, am over the age of eighteen years and am an employee of NorthShore. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: October 23, 2021

/s/ Jane Doe 13
Jane Doe 13
(Original Signature of Jane Doe 1 retained by Counsel)

## **<u>VERIFICATION</u>**

I, Jane Doe 14, am over the age of eighteen years and am an employee of NorthShore. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Illinois, that the foregoing statements are true and correct to the best of my knowledge.

Dated: October 23, 2021

/s/ Jane Doe 14
Jane Doe 14
(Original Signature of Jane Doe 14 retained by Counsel)