**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**Eastern Division**

| | | |
|---|---|---|
| JANE DOES 1-14, on their own behalf and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:21-cv-05683 |
| v. | ) ) | |
| NORTHSHORE UNIVERSITY HEALTHSYSTEM, | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF CONTENTS………………………………………………………………………..ii

TABLE OF AUTHORITIES…………………………………………………………………..iv

FACTUAL BACKGROUND AND URGENCIES JUSTIFYING TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION………………………………..1

LEGAL ARGUMENT………………………………………………………………………4

I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
    CLAIMS THAT NORTHSHORE'S REFUSAL TO GRANT PLAINTIFFS
    RELIGIOUS EXEMPTIONS AND REASONABLE ACCOMODATIONS FROM
    THE MANDATORY VACCINATION POLICY IS A VIOLATION OF THE
    ILLINOIS HEALTH CARE RIGHT OF CONSCIENCE ACT, TITLE VII OF
    THE CIVIL RIGHTS ACT OF 1964, AND THE EMERGENCY USE
    AUTHORIZATION STATUTE. …………………………………………………………5

    A.  NorthShore's Refusal to Grant Plaintiffs Religious Exemptions and
        Reasonable Accommodations from the Mandatory Vaccination Policy
        Violates the Illinois Health Care Right of Conscience Act………………………..5

    B.  NorthShore's Refusal to Grant Plaintiffs Religious Exemptions and
        Reasonable Accommodations from the Mandatory Vaccination Policy
        Violates Title VII of the Civil Rights Act of 1964…………………………………9

        1.  NorthShore's Flawed Exemption Process and Failure to
            Accommodate Are Unlawful…………………………………………………..9

        2.  NorthShore's Belated Claim of "Undue Hardship" is Without
            Merit and Clearly Pretextual………………………………………………..13

        3.  Courts Across the Country Have Granted Injunctive Relief for
            Similarly Unlawful Mandates…………………………………………...…16

    C.  NorthShore's Refusal to Grant Plaintiffs Religious Exemptions and
        Reasonable Accommodations from the Mandatory Vaccination Policy
        Violates the Emergency Use Authorization Statute…………………………….....17

II. PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ABSENT A TRO AND
    PRELIMINARY INJUNCTION…………………………………………………………...20

III. PLAINTIFFS SATISFY THE OTHER REQUIREMENTS FOR A TRO AND
     PRELIMINARY INJUNCTION…………………………………………………………...23

CONCLUSION…………………………………………………………………………………..24

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Adeyeye v. Heartland Sweeteners*, LLC, 721 F.3d 444 (7th Cir. 2013)....................14, 15, 16

*Bailey v. Delta Air Lines, Inc.*, 722 F.2d 942 (1st Cir. 1983)...........................................21

*Bermand v. New York City Ballet, Inc.*, 616 F. Supp. 555 (S.D.N.Y. 1985)..........................23

*Bilyeu v. UT-Battelle, LLC*, No. 3:21-cv-352, 2021 WL 4859932 (E.D. Tenn. Oct. 15, 2021)....17

*Crue v. Aiken*, 137 F. Supp. 2d 1076 (C.D. Ill. 2001)..................................................4

*Culp v. Madigan*, 840 F.3d 400 (7th Cir. 2016)........................................................4

*Dahl v. Bd. of Trustees of W. Michigan Univ.*, No. 21-2945,
2021 WL 4618519 (6th Cir. Oct. 7, 2021)................................................16, 21

*David Sambrano et. al. v. United Airlines, Inc.*,
Case No. 4:21-01074-P (N.D. Texas. Oct. 18, 2021)......................................16

*Dr. A. v. Hochul*, No. 1:21-CV-1009-DNH-ML,
2021 WL 4734404 (N.D.N.Y. Sept. 14, 2021)...........................................16, 21

*EEOC v. Ilona of Hung.*, 108 F.3d 1569 (7th Cir. 1997)...............................................9

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)................................................4

*Filinovich v. Claar*, No. 04 C 7189,
2005 U.S. Dist. LEXIS 24433 (N.D. Ill. Oct. 19, 2005)......................................12

*Holt v. Continental Grp., Inc.*, 708 F.2d 87 (2d Cir. 1983)...........................................23

*Magliulo v. Edward Via College of Osteopathic Medicine*, No. 3:21-CV-2304,
2021 WL 36799227 (W.D. La. Aug. 17, 2021)...........................................16

*Need v. Bd. of Trustees of E. Ill. Univ.*, No. 05-2137,
2006 WL 1582454 (C.D. Ill. June 6, 2006)................................................7

*Nottelson v. A. O. Smith Corp.*, 481 F. Supp. 756 (E.D. Wis. 1979)..................................14

*On Fire Christian Ctr., Inc. v. Fischer*,
453 F. Supp. 3d 901 (W.D. Ky. 2020)...................................................21

*Rojas v. Martell*, 161 N.E.3d 336 (Ill. Ct. App. 2d)................................................6, 7, 8

iv

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) ………..……………21, 23

*Sheehan v. Purolator Courier Corp.*, 676 F.2d 877 (2d Cir. 1981)………………………………22

*Smith v. Grams*, 565 F.3d 1037 (7th Cir. 2009)……………………………………………………2

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021)………………………………………………………24

*TWA v. Hardison*, 432 U.S. 63 (1977)……………………………………………………………13

*Vandersand v. Wal-Mart Stores, Inc.*, 525 F. Supp. 2d 1052 (C.D. Ill. 2007)……………………..6

*We The Patriots USA, Inc. v. v. Hochul*,
No. 21-2179, dkt. 65 (2d Cir. Sept. 30, 2021)………………………………….…………………16, 21

## STATUTES

21 U.S.C. §360bbb- 3……………………………………………..…………….17, 18

42 U.S.C. § 2000e………………………………………………………………………9

745 ILCS 70/2……………………………………………………..…………..*passim*

Fed. R. Civ. P. 65…………………………………………………………………..1

L. Civ. R. 7.1………………………………………………………………………1

*"It is the public policy of the State of Illinois to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept . . . medical care [and] to prohibit all forms of discrimination . . . by reason of their refusing to act contrary to their conscience or conscientious convictions."[1]*

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to L. Civ. R. 7.1 and Fed. R. Civ. P. 65, Plaintiffs, JANE DOES 1-14, on their own behalf and on behalf of all others similarly situated, by and through counsel, hereby submit this Memorandum of Law in Support of their Motion for Temporary Restraining Order and Preliminary Injunction.

## FACTUAL BACKGROUND AND URGENCIES JUSTIFYING TEMPORARY
## RESTRAINING ORDER AND PRELIMINARY INJUNCTION

In the Prayer for Relief in their Verified Class Action Complaint, Plaintiffs seek a Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI") against Defendant's discriminatory, unlawful, and unconscionable refusal to grant Plaintiffs religious exemptions and reasonable accommodations for sincerely held religious beliefs which prohibit Plaintiffs from complying with NorthShore's policy mandating that all of its employees receive one form of the COVID-19 vaccine (hereinafter "Mandatory COVID-19 Vaccination Policy").

Plaintiffs are healthcare professionals, all of whom have sincerely held religious beliefs against the COVID-19 vaccines because they were either developed from, or tested with, aborted fetal cells lines. (V. Compl. ¶¶ 3, 16-29). Because of NorthShore's unlawful actions in denying all or virtually all meritorious exemption requests, Plaintiffs are facing an immediate "choice" to either (a) receive a COVID-19 vaccination in direct violation of their conscience and sincerely held religious beliefs, or (b) be terminated from their employment with NorthShore as a consequence of exercising their fundamental and statutory rights to refuse administration of the

---

[1] Illinois Health Care Right of Conscience Act, 745 ILCS 70/2 (emphasis added).

COVID-19 vaccines. (*Id.* at ¶ 3). "Such a Hobson's choice is actually no choice at all." *Smith v. Grams*, 565 F.3d 1037, 1046 (7th Cir. 2009) (emphasis added).

NorthShore first denied, indiscriminately and *en masse*, all religious exemption requests it received from Plaintiffs, and all or virtually all exemption requests it received from its other employees. (V. Compl. ¶ 5). NorthShore issued generic, non-descript denials, referencing phantom "evidence-based criteria" that NorthShore never articulated to its employees. (*Id.* at ¶¶ 56-74). More recently, after being confronted with the illegality of its conduct, NorthShore switched tactics from denying all of the Plaintiffs' religious exemption requests to informing them that those same requests will now be "approved" in theory and name only, but NorthShore then claimed that it would suffer an "undue hardship" if it allowed any Plaintiff to continue in their current positions. (*Id.* at ¶¶ 84-87). **NorthShore is taking the position that it cannot accommodate any on-site employee with meritorious religious objections to its vaccine mandate, and that all such employees must be purged from all NorthShore facilities by November 1, 2021**. (*Id.* at ¶ 6).

Notably, the federal government, Governor Pritzker, and the Illinois Department of Public Health have all concluded that regular testing of healthcare professionals is an acceptable alternative to mandatory COVID-19 vaccination, and have required healthcare providers such as NorthShore to mandate either vaccination or regular testing. (*Id.* at ¶¶ 47-50). NorthShore's hospital peers in Illinois and throughout the country are freely granting exemptions to their healthcare heroes, and providing accommodations that allow them to remain in their functions of providing compassionate care to those who need it. (*Id.* at ¶ 51 and composite Exhibit 1 (**thirty-two employee declarations** evidencing accommodations provided to healthcare workers in Illinois and throughout the country)).

Although there is nothing unique about NorthShore, it is taking a draconian and hardline approach that flouts the guidance it received from the federal government, Governor Pritzker and the Illinois Department of Public Health, and that categorically refuses any accommodations that would allow its employees to remain on-site to fulfill their mission and life calling. What NorthShore's hospital peers grant freely, NorthShore has decided to unlawfully withhold from its employees who seek religious exemption and accommodation.

And yet, NorthShore does freely grant such accommodations to its employees with various medical conditions, including pregnancy, allowing them to remain in their current, on-site jobs, with proper precautions in place (*i.e.*, PPE and regular testing.) (*Id*. at ¶ 55 and Exhibit 2). NorthShore also does not require its visitors and patients to be vaccinated, even though they interact freely with its healthcare workers in its facilities. (*Id*. at ¶ 54). And, proving that its religious exemption process is arbitrary, illogical and a complete sham, NorthShore granted exemption and accommodation to one employee with the same beliefs as Plaintiffs, in the same job function as Plaintiffs, even though that employee submitted a much simpler, shorter and less detailed exemption request than Plaintiffs. (*Id*. at ¶¶ 81-83).

Unless this Court intervenes immediately and this week, NorthShore's uneven and unlawful vaccination mandate, and its discriminatory denial of Plaintiffs' exemption and accommodation requests, will have devastating and irreparable consequences for Plaintiffs. NorthShore has given Plaintiffs until October 31, 2021 to comply with NorthShore's unconscionable Mandatory COVID-19 Vaccination Policy. (*Id*. at ¶ 6). NorthShore has sent letters to its employees to let them know their jobs are being filled even before this deadline, and even before NorthShore decides their pending appeals. (*Id*.) And, **as of Friday, October 22, 2021, NorthShore had already started to purge itself of employees with sincere religious objections**

3

to its Mandatory COVID-19 Vaccination Policy, by removing many of those employees from the November work schedule, thereby confirming NorthShore's intention to immediately terminate these employees. (*Id*. at ¶ 7).

Unless this Court grants a TRO this week, as of next Monday, November 1, 2021, Plaintiffs and scores of other similarly situated NorthShore employees will suffer incalculable and irreparable harm to themselves and their families, as fully described in the Verified Complaint, including homelessness, lack of medical care, lack of food and shelter, disrupted education for their children, financial ruin, and harms to their physical, mental and emotional health. (*Id*. at ¶¶ 3, 8-10, 16-29, 123-26).

For the reasons that follow, the TRO and PI should issue without delay.[2]

## LEGAL ARGUMENT

To obtain a temporary restraining order and preliminary injunction, Plaintiffs must show that they have "(1) no adequate remedy at law and will suffer irreparable harm if the preliminary injunction is denied and (2) some likelihood of success on the merits." *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). Once Plaintiffs demonstrate these factors, "the district court then must balance the harms that both parties would suffer in the event of an adverse decision" and "consider the public interest in granting or denying an injunction and weigh the threshold factors against each other." *Culp v. Madigan*, 840 F.3d 400, 405 (7th Cir. 2016). Under this test, "the 'sliding-scale' nature of the preliminary injunction inquiry means that the plaintiffs' precise chances of success on the merits are highly relevant to whether an injunction should issue." *Id.* "[T]he standards for granting a TRO and a preliminary injunction are functionally identical." *Crue*

---

[2] Plaintiffs incorporate by reference the remaining factual allegations of their Verified Complaint as their statement of facts in support of this motion.

*v. Aiken*, 137 F. Supp. 2d 1076, 1082-83 (C.D. Ill. 2001). Plaintiffs easily satisfy these factors both factually and legally, and the TRO and PI should issue.

I.  **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS THAT NORTHSHORE'S REFUSAL TO GRANT PLAINTIFFS RELIGIOUS EXEMPTIONS AND REASONABLE ACCOMODATIONS FROM THE MANDATORY VACCINATION POLICY IS A VIOLATION OF THE ILLINOIS HEALTH CARE RIGHT OF CONSCIENCE ACT, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AND THE EMERGENCY USE AUTHORIZATION STATUTE.**

   A.  **NorthShore's Refusal to Grant Plaintiffs Religious Exemptions and Reasonable Accommodations from the Mandatory Vaccination Policy Violates the Illinois Health Care Right of Conscience Act.**

The State of Illinois has made it its public policy to prohibit private entities, such as NorthShore, from discriminating against any person for the exercise of their sincerely held religious beliefs relating to health care decisions. Indeed, the Illinois Health Care Right of Conscience Act provides that:

> **It is the public policy of the State of Illinois to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept . . . health care services and medical care [and] to prohibit all forms of discrimination, disqualification, coercion, disability or imposition of liability upon such persons or entities by reason of their refusing to act contrary to their conscience or conscientious convictions in providing, paying for, or refusing to obtain, receive, accept, deliver, pay for, or arrange for the payment of health care services and medical care**.

745 ILCS 70/2 (emphasis added).

Because of that plain indication of public policy, the Illinois Health Care Right of Conscience Act provides:

> **It shall be unlawful for any** person, public or **private institution**, or public official **to discriminate against any person in any manner**, including but not limited to, licensing, hiring, promotion, transfer, staff appointment, hospital, managed care entity, or **any other privileges**, **because of such person's conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care services contrary to his or her conscience**.

745 ILCS 70/5 (emphasis added). And further provides that:

> **It shall be unlawful for any public or private** employer, entity, agency, **institution**, official or person, including but not limited to, a medical, nursing or other medical training institution, to deny admission because of, to place any reference in its application form concerning, to orally question about, **to impose any burdens in terms or conditions of employment on**, or to otherwise discriminate against, any applicant, in terms of employment, **admission to or participation in any programs for which the applicant is eligible, or to discriminate in relation thereto, in any other manner, on account of the applicant's refusal to receive, obtain, accept, perform, counsel, suggest, recommend, refer, assist or participate in any way in any forms of health care services contrary to his or her conscience.**

745 ILCS 70/7 (emphasis added).

Critically, unlike the Title VII analysis discussed below, the Illinois Health Care Right of Conscience Act does not provide NorthShore any kind of "undue hardship" or "reasonable accommodation" defense. As the Illinois Appellate Court has recognized, "[c]ontrary to Title VII's explicit provision of a reasonable-accommodation defense, **the Right of Conscience Act is devoid of the [undue burden] defense**." *Rojas v. Martell*, 2020 IL App (2d) 190215, ¶ 43, 443 Ill. Dec. 212, 224, 161 N.E.3d 336, 348 (emphasis added). Even more, the court in *Rojas* recognized that, under the Illinois Health Care Right of Conscience Act, Plaintiffs need not even show an adverse employment action, stating that the "plain language of the Right of Conscience Act sets forth no qualification that its protection applies only when the plaintiff can establish the particularized adverse employment action cognizable under Title VII." *Id*. at 347-48.

NorthShore is plainly subject to the statutory prohibition of discrimination against its employees on the basis of their refusal to accept medical care because of their sincerely held religious beliefs. *See Vandersand v. Wal-Mart Stores, Inc.*, 525 F. Supp. 2d 1052, 1057 (C.D. Ill. 2007) (holding that "a private institution . . . may not discriminate against any person because, as a matter of conscience, the person refuses to participate in any way in a form of health care

6

services." (citing 745 ILCS 70/5)). Indeed, "**[u]nder the plain language of the statute, it is unlawful to discriminate against any person in any manner because of the person's conscience-based objection to participation in a particular form of health care services**." *Rojas v. Martell*, 161 N.E.3d 336, 351 (Ill. Ct. App. 2d) (emphasis added). *See also Need v. Bd. of Trustees of E. Ill. Univ.*, No. 05-2137, 2006 WL 1582454, * (C.D. Ill. June 6, 2006) ("The Illinois Health Care Right of Conscience Act . . . prohibits discrimination against individuals who refuse . . . certain health care services contrary to their conscience.").

Further, there is no question that NorthShore's Mandatory COVID-19 Vaccination Policy involves Plaintiffs' health care because the Act broadly and comprehensively defines "Health care as "**any** phase of patient care," "**medication**," and "**other care** or treatment **rendered by a physician or physicians, nurses, paraprofessionals or health care facility, intended for the physical … well-being of persons**." 745 ILCS 70/3(a) (emphasis added). There is similarly no question that Plaintiffs' sincerely held religious objections, detailed in their requests for exemption to NorthShore, constitute Plaintiffs' "conscience" rights under the Act because they represent "a sincerely held set of moral convictions arising from belief in or relation to God." 745 ILCS 70/3(e).

Plaintiffs articulated their objections to the three currently available COVID-19 vaccines because of, among other things, their undisputed connection to aborted fetal cells lines, and stated that their sincerely held religious beliefs and rights of conscience preclude them accepting such vaccines. Nevertheless, NorthShore denied each of Plaintiffs' requests for a religious accommodation and exemption and threatened them with termination beginning on November 1, 2021. Although NorthShore recently changed course and purported to "approve" Plaintiffs' religious exemption requests in name only, NorthShore informed Plaintiffs that they would still lose their positions and be evicted from anywhere "on site," on the basis of some unarticulated

(and, under *Rojas*, legally irrelevant) "undue hardship." As such, NorthShore's actions (actual and threatened) against Plaintiffs for the exercise of their sincerely held religious beliefs constitutes a denial of "**any other privileges**, **because of such person's conscientious refusal to receive, obtain, accept, … or participate in any way in any particular form of health care services contrary to his or her conscience**." 745 ILCS 70/5 (emphasis added). Thus, under the plain language of the Act, NorthShore has impermissibly discriminated against Plaintiffs by taking, or threatening to take, adverse employment actions against them because of their religious beliefs.

This conclusion is reinforced by a recent Illinois state court decision granting a temporary restraining order to medical personnel who filed suit against Quincy Physicians and Surgeons Clinic, S.C., and Blessing Corporate Services, Inc., because of a nearly identical COVID-19 vaccine mandate which violated their conscience. That court correctly recognized that:

> The Plaintiffs have shown that there is a fair question and clear right that is in need of protection, namely their respective rights to refuse and be free from compulsory vaccination . . . as a condition for continued employment . . . . Those rights to refuse to obtain, receive or accept health care services related to COVID-19 are clearly articulated and enshrined in Illinois law as plainly set forth by the Illinois General Assembly in the Health Care Right of Conscience Act. 745 ILCS 70/1 et. seq.

*Darnell et. al, v. Quincy Physcians and Surgeons Clinic, S.C, et al*, Case No. 2021 MR 193 (Oct. 1, 2021) attached herein as **Exhibit A.**

NorthShore's similar policy and actions violate the Illinois Health Care Right of Conscience Act and should be enjoined. Without an immediate intervention from this Court, this week, **as of Monday Plaintiffs and many other NorthShore employees will have no job, no paycheck, no health insurance for themselves and their families, and no means to provide food, shelter, medical care, education and other basic life necessities for family members who are daily-dependent on these things**. This Court's immediate intervention is necessary to

preserve the status quo and prevent incalculable and irreparable harm from befalling NorthShore's employees at the callous hands of NorthShore.

**B. NorthShore's Refusal to Grant Plaintiffs Religious Exemptions and Reasonable Accommodations from the Mandatory Vaccination Policy Violates Title VII of the Civil Rights Act of 1964.**

NorthShore has violated Title VII of the Civil Rights Act of 1964 by (i) creating and maintaining a sham religious exemption application process, (ii) failing to engage in the interactive process, (iii) granting at least one individual a religious exemption and reasonable accommodation but denying the same to the similarly situated Plaintiffs and numerous other employees, and/or (iv) otherwise failing to offer Plaintiffs reasonable religious accommodations. Furthermore, NorthShore's recently-minted claim of an "undue hardship" is without merit, and merely the latest pretext for achieving the same unlawful result it set out to achieve all along.

**1. NorthShore's Flawed Exemption Process and Failure to Accommodate Are Unlawful.**

Title VII makes it unlawful to discharge or otherwise to discriminate against an individual because of that individual's religion. 42 U.S.C. § 2000e-2(a)(1). The statute defines "religion" to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). Importantly, "once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to make a reasonable accommodation of the religious practice or to show that any accommodation would result in undue hardship." *EEOC v. Ilona of Hung.*, 108 F.3d 1569, 1574-75 (7th Cir. 1997). To state a *prima facie* case, Plaintiffs need only "show that the observance or practice conflicting with an employment requirement is religious in nature, that [they] called the religious observance or practice to [their] employer's attention, and that the religious observance or practice was the basis for [their] discharge or other discriminatory treatment." *Id*. There is no doubt that Plaintiffs have stated a *prima facie* case.

9

First, Plaintiffs have adequately demonstrated that their objections to the mandatory vaccine are religious in nature. This fact is supported by Plaintiffs' personal statements which provided detailed explanations of their religious beliefs supported by Scripture. In some cases, Plaintiffs included letters of support from clergy.

Second, these matters were unquestionably brought to NorthShore's attention in the initial exemption application and then again on appeal.

Third, there is no question that Plaintiffs are all subject to imminent termination or other adverse employment action as a result of their religious beliefs forbidding them from obtaining COVID-19 vaccines because of their connection to aborted fetal cells. NorthShore has made it clear that obtaining a COVID-19 vaccine is a condition of continued employment with NorthShore, a condition which Plaintiffs cannot meet because of their sincere religious beliefs.

Thus, Plaintiffs have made out a *prima facie* case and the burden shifts to NorthShore to establish why it could not accommodate Plaintiffs' religious beliefs. But, before addressing NorthShore's purported "undue hardship" pretext that it minted just in time for this lawsuit, it is fitting to first consider NorthShore's actions which brought us here in the first place.

To begin, NorthShore failed from the onset by not providing a legitimate process through which Plaintiffs could apply for, and receive, religious exemptions. (V. Compl. ¶¶ 56-87). Those seeking religious exemptions were required to submit a "Request for Religious Exemption" form by September 30, 2021. (*Id*. at ¶ 57 and Exh. 3). The form specified that an employee need only provide "a description of my sincerely held religious principle or practice that guides my objection to receiving the required vaccination." (*Id*.) NorthShore asked employees to limit their responses to a mere five lines of text, "if possible," indicating to them that NorthShore was not seeking detailed explanations. (*Id*. at ¶ 58). In submitting their requests for religious exemptions, each of

10

the Plaintiffs followed the directions given to them by NorthShore. (*Id*. at ¶ 59). However, after first granting the exemptions for some employees, NorthShore then unilaterally re-reviewed the requests and denied **all or virtually all** of them in mid-September. (*Id*. at ¶ 60). NorthShore's generic denials were purportedly because **all** of the requests failed to meet some phantom "evidence-based criteria" that NorthShore never provided its employees in advance. (*Id*. at ¶ 61). And yet, the Religious Exemption Form contained no "criteria," "evidence-based" or otherwise, to guide employees as to what information or "evidence" NorthShore was seeking. (*Id*.)

NorthShore then only gave Plaintiffs **three business days** to file an appeal – providing no guidance on what was deficient in the original application. (*Id*. at ¶ 64). In that appeal, and regardless of the nature of any individual request, NorthShore also required employees to do the impossible – include their entire vaccination history since the age of eighteen, ostensibly to judge the validity of their religious beliefs, even though NorthShore never requested its employees to provide prior vaccine information in their initial exemption requests. (*Id*. at ¶ 65). NorthShore's "Appeal for Exemption" form also contained no guidance for employees as to any criteria NorthShore would be using or expecting. (*Id*. at ¶ 66).

NorthShore then removed all pretense of a lawful exemption process by suddenly changing its exemption form to include a warning that all religious objections based on "aborted fetal cell lines, stem cells, tissue or derivative materials" "will result in denials," because supposedly "[t]hese are not in the NorthShore administered vaccines." (*Id*. at ¶ 68). NorthShore falsely asserted or implied that the COVID-19 vaccines have no link to aborted fetal cell lines, and also unlawfully purported to judge as invalid the religious beliefs of employees who object to the vaccines' indisputable connection to aborted fetal cell lines. (*Id*. at ¶ 69). Thus, the entire exemption

11

application process was a sham and designed to result in mass denials, which is exactly what occurred.

Moreover, **at no time during the religious exemption application process did NorthShore ever bother to meaningfully engage in the interactive process. At no time did NorthShore engage any of the Plaintiffs, or any of its similarly situated employees, in any dialogue or in any good faith attempt to investigate whether accommodations were possible**. As one court explained, employers may be liable under Title VII "where breakdown of the interactive process led to the employer's failure to provide a reasonable accommodation." *Filinovich v. Claar*, No. 04 C 7189, 2005 U.S. Dist. LEXIS 24433, at \*11 (N.D. Ill. Oct. 19, 2005). Instead of engaging Plaintiffs in good faith, NorthShore denied Plaintiffs' religious exemption requests *en masse*, providing nothing more than copy and paste responses, informing them that they lacked "evidence-based criteria," whatever that means. By failing to engage any of the Plaintiffs and its numerous employees with religious objections in good faith, NorthShore had no way to know whether an acceptable accommodation might have been appropriate. The only responses received by Plaintiffs and NorthShore's employees were one-size-fits all blanket denials.

And, although NorthShore's *modus operandi* was to deny, indiscriminately and *en masse,* legitimate religious exemption requests, it appears that NorthShore was willing to let one slide. (V. Compl. ¶¶ 81-83). The Verified Complaint highlights the religious exemption request of non-party Jane Doe 15, whose request was initially denied, but then approved on appeal. (*Id.*) Like all of the Plaintiffs herein and numerous other employees, Jane Doe 15's exemption request was based on her objection to abortion and the link between the vaccines and aborted fetal cells. (*Id.*) Yet,

12

Jane Doe 15 was granted an exemption along with a reasonable accommodation to remain in her same on-site, patient-care role, while Plaintiffs were not. (*Id*.)

NorthShore illusory religious exemption process was designed from the beginning, and then successfully implemented, to result in the denial of all or virtually all exemption and accommodation requests. In so doing, NorthShore failed to engage its employees in a good faith interactive process, and failed to respect and accommodate their religious beliefs. NorthShore's violations of Title VII are numerous, pervasive, and clear.

### 2. NorthShore's Belated Claim of "Undue Hardship" is Without Merit and Clearly Pretextual.

Knowing that it could not legally defend its rejection of the religious beliefs of Plaintiffs and numerous other employees, NorthShore now contends that allowing any Plaintiff and any unvaccinated employee to continue working anywhere at any NorthShore site would be an "undue hardship." Here, NorthShore may seek to rely on the Supreme Court's decision in *TWA v. Hardison*, 432 U.S. 63 (1977), where the Court held that requiring an employer "to bear more than a *de minimis* cost" in order to accommodate an employee "is an undue hardship." *Id*. at 84. But *Hardison* differs substantially from this case. Unlike the employer in *Hardison*, NorthShore did not attempt to determine the cost of accommodating its employees. In addition, the employee in *Hardison* sought a religious accommodation that would have required the employer to breach a collective-bargaining agreement or pay other employees overtime to cover the shifts. *Id.* at 76-77. In that context, such burdens exceeded a "*de mininis* cost" and constituted "undue hardship." *Id*. at 84. Nothing of the sort is present in this case. Plaintiffs want nothing more than to keep their jobs and continue working as they have been, with all safety measures in place, since the start of the pandemic.

The Governor or Illinois, the Illinois Department of Health, and the federal government have all concluded that healthcare employers **can** be accommodated and **may** be permitted to work by either vaccinating for COVID-19, **or by undergoing regular testing**. (V. Compl. ¶¶ 47-49). Numerous of NorthShore's hospital peers in Illinois and throughout the country have found ways to accommodate healthcare heroes with religious beliefs against COVID-19 vaccination, through the use of PPE, regular testing, and other safety measures. (*Id.* at ¶ 51 and Exhibit 1 (**thirty-two employee declarations evidencing reasonable accommodations of healthcare employees are possible in Illinois and throughout the country**). And, NorthShore figured out a way to exempt and accommodate Jane Doe 15, with PPE and regular testing. (*Id.* at ¶¶ 81-83). And, NorthShore has also figured out how to exempt and accommodate its employees with pregnancy and other medical issues, allowing them too to remain in their current job functions with PPE and testing. (*Id.* at ¶ 55 and Exhibit 2). Finally, NorthShore appears to be content to allow patients and visitors on its premises without COVID-19 vaccination. (*Id.* at ¶ 54). **The only ones who cannot be accommodated by NorthShore without "undue hardship" are Plaintiffs and others who have voice their religious objections to its vaccine mandate**. This is as clear a pretext as they come.

The Seventh Circuit has explained that "Title VII is a remedial statute" that must be construed "liberally in favor of employee protection." *Adeyeye v. Heartland Sweeteners*, LLC, 721 F.3d 444, 450 (7th Cir. 2013). Regarding an "undue hardship," that court emphasized that the employer bears the burden of proof "so it must show, as a matter of law, that any and all accommodations would have imposed an undue hardship." *Id.* at 455. The *Adeyeye* court further stressed that "Title VII requires proof not of minor inconveniences but of hardship, and 'undue' hardship at that." *Id. See also*, *Nottelson v. A. O. Smith Corp.*, 481 F. Supp. 756, 760 (E.D. Wis. 1979) ("Undue hardship means something greater than hardship."). The *Adeyeye* court then

14

distinguished *Hardison*, finding that its holding did not fit the context of the religious discrimination matter at hand, because "*Hardison* is most instructive when the particular situation involves a seniority system or collective bargaining agreement, as in *Hardison* itself. Its broad reference to 'more than a de minimis cost' should be understood in this context . . . ." *Id*. at 456. The court thus rejected the defendant's argument that "any inconvenience or disruption, no matter how small, excuses its failure to accommodate." *Id*. at 455.

NorthShore cannot show any "undue hardship" by simply allowing Plaintiffs to continue working as they have been, without incident, since the start of the pandemic; and **as the Governor of Illinois, the Illinois Department of Public Health and the federal government have all concluded to be safe and permissible; and as NorthShore already does for patients, visitors and pregnant employees; and as NorthShore's hospital peers in Illinois and throughout the country do with their healthcare heroes**. To be sure, NorthShore has failed to articulate any "undue hardship" at any time during this process. The granting of the requested relief does nothing more than allow Plaintiffs to continue working as many others in their position have done and are doing today all across the country, **in full compliance with guidance from relevant authorities**.

Finally, the *Adeyeye* decision is also instructive for its discussion concerning the nature of a reasonable accommodation. In that case, the employer argued that it provided plaintiffs with a "reasonable accommodation in the form of voluntary self-termination with the possibility of being rehired." *Id*. at 456. The Seventh Circuit responded to that argument as follows:

> Heartland had the good sense to relegate this argument to a footnote. It has little to recommend to it. We strain to imagine a situation in which such an offer could be considered an accommodation, nor could we locate a federal court in the country opining that such an accommodation could be reasonable for a religious request. **Title VII does not contemplate asking employees to sacrifice their jobs to observe their religious practices**. At the risk of belaboring the obvious, **Title VII aimed to ensure that employees would not have to sacrifice their jobs to observe their religious practices**.

An option of voluntary termination with the right to ask for one's old job later is not a reasonable accommodation.

*Id.* (emphasis added).

NorthShore's approach is the same as the one taken by Heartland, equally unlawful, and should meet the same fate. After rejecting them at every turn, NorthShore here finally provided Plaintiffs with a hollow "approval," only to inform them that none can "remain in the worksite." This is no different than a termination "with the possibility of being rehired," the same kind of tactic the Seventh Circuit clearly denunciated in *Adeyeye*. In remains to be seen, however, whether NorthShore will have "the good sense to relegate this argument to a footnote."

### 3. Courts Across the Country Have Granted Injunctive Relief for Similarly Unlawful Mandates.

When faced with similar mandates from public and private entities, courts across the country have issued TROs and preliminary injunctions against such edicts that refuse to recognize what Title VII plainly requires. *See e.g.*, *David Sambrano et. al. v. United Airlines, Inc*., Case No. 4:21-01074-P (N.D. Texas. Oct. 18, 2021) (granting temporary restraining order and enjoining refusal to provide reasonable accommodation to employees with religious objections to COVID-19 vaccines); *Dr. A. v. Hochul*, No. 1:21-CV-1009-DNH-ML, 2021 WL 4734404, *9 (N.D.N.Y. Sept. 14, 2021) (granting preliminary injunction against enforcement of New York's COVID-19 vaccine mandate on healthcare workers for failure to grant religious exemptions and noting that "**Title VII does not demand mere neutrality with regard to religious practices . . . rather, it gives them favored treatment.' Thus, under certain circumstances, Title VII 'requires otherwise-neutral policies to give way to the need for an accommodation**." (emphasis added)); *We The Patriots USA, Inc. v. v. Hochul*, No. 21-2179, dkt. 65 (2d Cir. Sept. 30, 2021) (issuing an injunction pending appeal against enforcement of New York's COVID-19 Vaccine Mandate for

its failure to allow for religious accommodations); *Dahl v. Bd. of Trustees of W. Michigan Univ.*, No. 21-2945, 2021 WL 4618519 (6th Cir. Oct. 7, 2021) (allowing the preliminary injunction to stand against a University's failure to accommodate student athletes with sincerely held religious objections to the COVID-19 vaccine mandate and noting that "The University **put plaintiffs to the choice: get vaccinated or stop fully participating in intercollegiate sports**. . . . **By conditioning the privilege of playing sports on plaintiffs' willingness to abandon their sincere religious beliefs, the University burdened their free exercise rights**." (emphasis added)); *Magliulo v. Edward Via College of Osteopathic Medicine*, No. 3:21-CV-2304, 2021 WL 36799227 (W.D. La. Aug. 17, 2021) (granting temporary restraining order against a medical school for the school's failure to grant religious exemptions when reasonable accommodations were available (such as masking, testing, etc.) and mandatory vaccination was not the least restrictive means of achieving the school's interest in protecting the school's student body); *Bilyeu v. UT-Battelle, LLC*, No. 3:21-cv-352, 2021 WL 4859932, * (E.D. Tenn. Oct. 15, 2021) (granting TRO enjoining healthcare employer "from terminating or placing on indefinite unpaid leave any employee who has received a religious or medical accommodation").

### C. NorthShore's Refusal to Grant Plaintiffs Religious Exemptions and Reasonable Accommodations from the Mandatory Vaccination Policy Violates the Emergency Use Authorization Statute.

NorthShore's Mandatory COVID-19 Vaccination Policy and its refusal to provide Plaintiffs with a religious exemption and accommodation from such mandatory vaccines also violates the plain statutory language of the Emergency Use Authorization ("EUA") statute. 21 U.S.C. §360bbb- 3(e)(1)(A)(ii)(III). Put simply, the EUA statute **mandates that all individuals to whom the product approved for Emergency Use may be administered be given the option to accept or refuse administration of the product**. *See* 21 U.S.C. §360bbb- 3(e)(1)(A)(ii)(III).

Indeed, the EUA statute plainly states that with respect to all EUA approved medical products "**individuals to whom the product is administered**" must be given "**the option to accept or refuse administration of the product**." 21 U.S.C. §360bbb- 3(e)(1)(A)(ii)(III) (emphasis added). All of the three currently available COVID-19 vaccines are subject only to EUA approval.

The recent FDA biologics license application (BLA) approval of the product COMIRNATY, COVID-19 Vaccine, mRNA, manufactured by BioNTech Manufacturing GmbH, does not change the EUA status of the Pfizer-BioNTech COVID-19 Vaccine that has been available under EUA since December 23, 2020. According to the EUA extension letter issued by the FDA to Pfizer on August 23, 2021, the Pfizer-BioNTech COVID-19 Vaccine and BioNTech's COMIRNATY, COVID-19 Vaccine, mRNA "are legally distinct" products.

Moreover, the now "approved" COMIRNATY vaccine cannot be distributed for use until BioNTech submits "final container samples of the product in final containers together with protocols showing results of all applicable tests" and BioNTech receives "a notification of release from the Director, Center for Biologics Evaluation and Research (CBER)." Thus, it is not clear when (or if) any NorthShore employee will have access to the "approved" COMIRNATY vaccine, leaving all (or at least the vast majority of) NorthShore employees who may elect to receive the "Pfizer" vaccine pursuant to NorthShore's mandatory vaccine policy to receive a dose of the current stock of Pfizer-BioNTech vaccine still being administered subject to EUA rules.

On August 23, 2021, the United States Food and Drug Administration issued two separate letters pertaining to two separate COVID-19 vaccines. (V. Compl. Ex. 11, BioNTech Letter, United States Food and Drug Administration to BioNTech Manufacturing GmbH (Aug. 23, 2021), V. Compl. Ex. 12, Pfizer Letter, United States Food and Drug Administration to Pfizer, Inc. (Aug. 23, 2021).) In the Pfizer Letter, the FDA confirms that, on December 11, 2020, it granted

Emergency Use Authorization for the previous Pfizer-BioNTech COVID-19 Vaccine. (V. Compl. Ex. 12, Pfizer Letter at 1.) It also notes that the EUA approval was continued on December 23, 2020, February 25, 2020, May 10, 2021, June 25, 2021, and August 12, 2021. (Pfizer Letter at 1-2.) The Pfizer Letter also makes clear that there is a scientific, manufacturing, and legally significant difference between the Pfizer-BioNTech COVID-19 Vaccine and the newly approved Comirnaty Vaccine. (Pfizer Letter at 2 n.9.) Specifically, the FDA stated that although the COMIRNATY COVID-19 Vaccine was granted full approval by the FDA, the Pfizer-BioNTech COVID-19 Vaccine was still only subject to the EUA authorization. (Pfizer Letter at 2 n.9 ("In the August 23, 2021 revision, FDA clarified that, subsequent to the FDA approval of COMIRNATY (COVID19 Vaccine, mRNA) for the prevention of COVID-19 for individuals 16 years of age and older, this EUA would remain in place for the Pfizer-BioNTech COVID-19 vaccine for the previously-authorized indication and uses. It also authorized COMIRNATY (COVID-19 Vaccine, mRNA) under this EUA for certain uses that are not included in the approved biologics license application (BLA)." (emphasis added).

Indeed, even the fact sheets for each of the three currently available COVID-19 vaccines explicitly state that individuals have the right to refuse administration of these products. (*See* V. Compl. ¶ 109 and Ex. 13 ( "**[i]t is your choice to receive or not to receive the Moderna COVID-19 vaccine**" (emphasis added)); V. Compl. Ex. 14 (same as to Pfizer-BioNTech COVID-19 vaccine); V. Compl. Ex. 15 (same as to Janssen COVID-19 vaccine).) Thus, NorthShore's Mandatory COVID-19 Vaccination Policy violates the plain statutory right of Plaintiffs to refuse administration of any of the three COVID-19 vaccines.

By imposing its Mandatory COVID-19 Vaccination Policy on Plaintiffs and refusing to grant them religious exemptions and reasonable accommodations, NorthShore is denying

Plaintiffs their right to accept or refuse administration of the three currently available COVID-19 vaccines, which are subject only to Emergency Use approval under the Emergency Use Authorization statute. NorthShore, by denying Plaintiffs the right to accept or refuse administration of the three currently available COVID-19 vaccines, is violating the provisions of the Emergency Use Authorization statute. Simply put, by denying all Plaintiffs' requested religious exemptions from the Mandatory COVID-19 Vaccination Policy, NorthShore has deprived Plaintiffs of their statutory rights to refuse administration of an EUA product and violated federal law.

## II.  PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ABSENT A TRO AND PRELIMINARY INJUNCTION.

Plaintiffs have been given until October 31, 2021 to comply with NorthShore's unconscionable Mandatory COVID-19 Vaccination Policy or face termination or other adverse employment action. NorthShore has already begun to purge itself of religiously-exempt employees, by removing them from the November work schedule. **Unless this Court grants a TRO this week, as of next Monday, November 1, 2021, Plaintiffs and scores of other similarly situated NorthShore employees will suffer incalculable and irreparable harm to themselves and their families, as fully described in the Verified Complaint, including homelessness, lack of medical care, lack of food and shelter, disrupted education for their children, financial ruin, and harms to their physical, mental and emotional health**. (*Id*. at ¶¶ 3, 8-10, 16-29, 123-26).

Under the Illinois Health Care Rights of Conscience Act, Title VII, and the Emergency Use Authorization statute, Plaintiffs have the statutory right to refuse to accept unwanted medical care that violates their sincerely held religious beliefs. Yet, NorthShore's Mandatory COVID-19 Vaccination Policy is forcing Plaintiffs to choose between violating their sincerely held religious

belief and remaining employed at NorthShore or compliance with their sincerely held religious beliefs and termination from NorthShore.

It is beyond cavil that such pressure on Plaintiffs' sincerely held religious beliefs causes irreparable harm. Indeed, demonstrating irreparable harm in this matter "**is not difficult. Protecting religious freedom was a vital part of our nation's founding, and it remains crucial today**." *On Fire Christian Ctr., Inc. v. Fischer*, 453 F. Supp. 3d 901, 913 (W.D. Ky. 2020) (emphasis added). As the Supreme Court noted in *Roman Catholic Diocese of Brooklyn v. Cuomo*, "there can be no question that the challenged restrictions, if enforced, will cause irreparable harm," 141 S. Ct. 63, 67 (2020), because the infringement on individual's right to the exercise of their sincerely held religious beliefs is *per se* irreparable harm.

Here, Plaintiffs have statutory rights under both federal and state law to refuse administration of a COVID-19 vaccine because of their sincerely held religious beliefs, and the Mandatory COVID-19 Vaccination Policy deprives them of such right and impermissibly punishes them for the exercise of that right. Only a TRO and preliminary injunction will suffice to prevent irreparable harm because any other remedy would be "seriously deficient as compared to the harm suffered." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003).

Indeed, in numerous instances where employers have denied religious exemptions and accommodations, as Defendants have here, courts across the country have issued injunctive relief. *See, e.g.*, *We The Patriots USA, Inc. v. v. Hochul*, No. 21-2179, dkt. 65 (2d Cir. Sept. 30, 2021) (issuing an injunction pending appeal against enforcement of New York's COVID-19 Vaccine Mandate for its failure to allow for religious accommodations because plaintiffs faced irreparable harm in the absence of injunctive relief); *Dahl v. Bd. of Trustees of W. Michigan Univ.*, No. 21-

2945, 2021 WL 4618519 (6th Cir. Oct. 7, 2021) (same); *Dr. A. v. Hochul*, No. 1:21-CV-1009-DNH-ML, 2021 WL 4734404, *9 (N.D.N.Y. Sept. 14, 2021) (same).

Moreover, even in the Title VII context, injunctive relief is available to preserve the status quo. *See, e.g.*, *Bailey v. Delta Air Lines, Inc.*, 722 F.2d 942, 944-45 (1st Cir. 1983) (holding that plaintiffs in Title VII context may seek injunctive relief while the administrative process plays out in the EEOC); *Sheehan v. Purolator Courier Corp.*, 676 F.2d 877, 884 (2d Cir. 1981); *Drew v. Liberty Mut. Ins. Co.*, 480 F.3d 69, 74 (5th Cir. 1973). Specifically, the Second Circuit held that "if the court eventually will have jurisdiction of the substantive claim and an administrative tribunal has preliminary jurisdiction, **the court has incidental equity jurisdiction to grant temporary relief to preserve the status quo pending ripening of the claim for judicial action on the merits**." *Id.* (emphasis added). It continued, "within the framework of Title VII, we are persuaded that Congress intended the federal courts to have resort to all of their traditional equity powers, direct and incidental, in aid of the enforcement of the Title." *Id.* at 885. Indeed,

> It is noteworthy that the court is the only arbiter of the merits of a discrimination claim, and **we think it plain that for the court to renounce its incidental equity jurisdiction to stay such employer retaliation pending the EEOC's consideration would frustrate Congress's purposes**. Unimpeded retaliation during the now-lengthy (180-day) conciliation period is likely to diminish the EEOC's ability to achieve conciliation. It is likely to have a chilling effect on the complainant's fellow employees who might otherwise desire to assert their equal rights, or to protest the employer's discriminatory acts, or to cooperate with the investigation of a discrimination charge. **And in many cases the effect on the complainant of several months without work or working in humiliating or otherwise intolerable circumstances will constitute harm that cannot adequately be remedied by a later award of damages**. Given the singular role in 1964 of the individual private action as the only method of enforcing Title VII, and the continued view in 1972 of that right of action as "paramount," **we cannot conclude that Congress intended to preclude the courts' use of their incidental equity power in these circumstances to prevent frustration of Congress's goals**.

*Id.* at 885-86 (emphasis added).

Put simply, "**where a person has filed a Title VII charge with the EEOC, the court has jurisdiction to entertain a motion for temporary injunctive relief against employer retaliation while the charge is pending before the EEOC and before the EEOC has issued a right to sue letter**." *Id.* at 887 (emphasis added). *See also Holt v. Continental Grp., Inc.*, 708 F.2d 87, 89-90 (2d Cir. 1983) (same); *Bermand v. New York City Ballet, Inc.*, 616 F. Supp. 555, 556 (S.D.N.Y. 1985) ("Decisions by our Court of Appeals, however, **firmly establish** . . . this Court has jurisdiction to entertain applications for preliminary injunctive relief for the purpose of preserving the status quo pending EEOC's investigative and conciliatory process." (emphasis added))

## III. PLAINTIFFS SATISFY THE OTHER REQUIREMENTS FOR A TRO AND PRELIMINARY INJUNCTION.

As to the balance of the equities and public interest, both factors weigh in favor of the Plaintiffs. As discussed above, the granting of the injunction here does not impose any undue hardship on NorthShore. Even with a religious exemption, NorthShore could still require Plaintiffs to take all reasonable mitigation measures such as PPE wearing and periodic testing. The granting of the requested relief does nothing more than allow Plaintiffs to continue working as many others in their position have done and are doing today all across the country, **in full compliance with the guidance issued by the federal government, Governor Pritzker and the Illinois Department of Public Health**. On the other hand, the denial of the requested relief here would result in immense hardship to the Plaintiffs who will be faced with a "choice" of violating their beliefs or becoming homeless, destitute, and unable to provide food, shelter, medical care, education and other basic needs for themselves and their families.

Likewise, it cannot be "shown that the [injunction] will harm the public." *Catholic Diocese*, 141 S. Ct. at 68. If the federal government, Governor Pritzker, the Illinois Department of Public

23

Health, and NorthShore's hospital peers in Illinois and throughout the country all say that the public is sufficiently protected by allowing healthcare workers to undertake alternative safety precautions, such as regular testing, NorthShore cannot be the one entity to defy this truth and say otherwise.

Plaintiffs are not seeking to roam about uninhibited. Plaintiffs are willing to and will comply with all reasonable requirements that work as alternatives everywhere else, including masking, PPE, regular testing, self-monitoring, self-reporting, and all other reasonable safety protocols. Simply put, "precautions that suffice for other activities suffice for religious exercise too." *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion for temporary restraining order and preliminary injunction.

Respectfully submitted,

/s/ Sorin A. Leahu
Local Counsel
Ill. Bar No. 6315515
LEAHU LAW GROUP, LLC
53 W. Jackson Blvd., #1527
Chicago, IL 60604
847-529-7221
sleahu@leahulaw.com

/s/ Daniel J. Schmid
Mathew D. Staver*
Horatio G. Mihet*
Roger K. Gannam*
Daniel J. Schmid*
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Facsimile: (407) 875-0770
Email: court@lc.org
hmihet@lc.org
rgannam@lc.org
dschmid@lc.org

*Applications for Admission *pro hac vice* pending

***Attorneys for Plaintiffs and Proposed Class***

24