UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JANE DOES 1-14, on their own behalf and on behalf of all others similarly situated<br><br>    Plaintiffs;<br>  v.<br><br>NORTHSHORE UNIVERSITY HEALTHSYSTEM<br>    Defendant. | Case No. 1:21-cv-05683<br>Judge John F. Kness |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS' MOTION TO EXTEND
PRELIMINARY INJUNCTIVE RELIEF TO THE PROVISIONAL CLASS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND FACTS COMMON TO THE PROVISIONAL CLASS ................................. 4

PROPOSED PROVISIONAL CLASS ................................................................................... 6

LAW AND ARGUMENT ....................................................................................................... 7

I. This Court Should Exercise Its General Equity Power to Grant Preliminary Injunctive Relief to the Provisional Class. ................................................................................. 8

II. Alternatively, the Court Should Conditionally Certify the Provisional Class for Preliminary Injunctive Relief Under Rule 23. .................................................................. 10

    A. The provisional class is sufficiently numerous. ....................................................... 10

    B. There are common questions of law and fact. ....................................................... 12

    C. The class representatives' claims are typical. ....................................................... 14

    D. The class representatives will fairly and adequately protect the interests of the provisional class. ................................................................................................... 15

    E. The Provisional Class Merits Class-Wide Relief Under Rule 23(b)(2) or 23(b)(3). ................................................................................................................ 16

CONCLUSION .................................................................................................................... 18

# INTRODUCTION

As NorthShore's October 31 vaccination deadline approached, my life was in turmoil with the choice that I was being forced to make between providing for my son, who is completely dependent on me, and my religious beliefs and the clear and firm conviction that God was prohibiting me from accepting this vaccine into my body. I kept praying and pleading with God to take this choice away from me. On October 29, after I learned that this Court's temporary restraining order would not apply to me, I was devastated and defeated. I cried myself to sleep that evening, and spent the next day (Saturday) in anguish.

On the morning of Sunday, October 31 – the last day to accept a vaccine and keep my job – with no other choice in sight, I took the Johnson & Johnson vaccine. As I was being taken to the pharmacist, I was shaking and crying. The pharmacist injected me even though I was clearly in distress and under duress. Once the needle was in my arm, I cried out in disbelief that I was going against the will of God clearly revealed for me and my life.

After leaving the pharmacy, I called my family and cried with them uncontrollably. I felt an immense sense of shame and guilt. I felt that I betrayed God, and that I didn't have enough trust in Him to care for my son and to not make us homeless after I was fired.

Many people told me that I would feel better once I had the vaccine and I was no longer faced with the prospect of my family becoming homeless. As of now, six days after my decision, I am still waiting to "feel better." I keep pleading with God for forgiveness. I keep reminding myself that God has promised to forgive sin. I keep asking God to take these feelings of shame and guilt away from me. And yet, today I still feel the same. I am in turmoil and anguish over the decision that I was forced to make to be able to provide for my son.[1]

As the Court considers this Motion, *hundreds* of NorthShore employees who requested religious accommodation from its vaccination mandate are at home on unpaid leave – all of them victims of NorthShore's unlawful, generalized, uniform, across-the-board "no accommodation" policy. These employees – all of them hailed as "healthcare heroes" until just recently – are now all facing the same impossible choice: stay true to their sincerely held religious beliefs and lose their livelihoods, or violate those convictions so that they can keep their jobs to provide for their

---

[1] Declaration of Coerced Employee #1, ¶¶ 4-7, attached hereto as **Exhibit 1**. The need for the Coerced Employees' anonymity is discussed in their respective declarations, and supported by the arguments and authorities in Plaintiffs' Motion for Leave to Proceed Anonymously (dkts. 16-17).

families. As the clock ticks towards their scheduled termination date, and as the last few days of paid time off they have earned are exhausted, many of these employees will feel that they have no "choice" after all, and will accede to NorthShore's demand one-by-one. They will undergo a permanent and irreversible medical procedure that they find morally abhorrent, which can never be undone, and for which no amount of damages could ever compensate.

Indeed, this is already happening *now*, just one week into NorthShore's unforgiving "no accommodation" policy. Numerous employees are already giving up and giving in – and suffering a great deal – because they have no other choice, as exemplified by Coerced Employee #1, above, and by five others:

- Coerced Employee #2 – feels "defeated, ashamed, denigrated and violated" after threat of termination, and of being required to repay NorthShore thousands of dollars previously granted under tuition reimbursement program, caused employee to violate religious beliefs and receive COVID-19 vaccine, because employee had no money to repay NorthShore, and no way to pay mortgage on family home. (**Exhibit 2**).

- Coerced Employee #3 – single mother of 5 children, including newborn, forced to violate her conscience and give in to NorthShore's demand, because of no other means to provide for children, and now she experiences guilt and sadness because she "cannot ever undo what NorthShore made me do." (**Exhibit 3**).

- Coerced Employee #4 – acceded to NorthShore's demand in violation of her religious beliefs because "family could not survive – we would be evicted from our home and we could not feed our children," and now she feels "violated [and like] I have betrayed and angered God." (**Exhibit 4**).

- Coerced Employee #5 – "was immediately inundated with feelings of guilt and regret," and now has difficulty managing "anxiety and panic attacks" along with feeling of "guilt and remorse … every day," after being coerced to violate religious beliefs by NorthShore, because family "would soon be homeless" without this job. (**Exhibit 5**).

- Coerced Employee #6 – "felt a sense of defeat after being forced to violate my faith" when employee accepted vaccine mandated by NorthShore to save family home. (**Exhibit 6**).

Evidently, NorthShore's unlawful policy is operating as intended and designed, with excellent results for NorthShore, but with devastating, incalculable and irreversible effects for its

employees. Unless the Court immediately extends the temporary restraining order already granted to the 14 named Plaintiffs, and any future preliminary injunctive relief, to the entire provisional class of similarly situated employees, in a very short time NorthShore will accomplish its goal of forcing employees to violate their conscience, or of purging those who endure until the end. Class-wide relief from this Court cannot come soon enough for employees who have not yet acceded to NorthShore's demand, but who only have a few days of strength left, as exemplified by these three:

- Coerced Employee #7 – is currently being accommodated by, and allowed to work at, NorthShore under a temporary medical deferral, but that will soon expire and "I fear that I will have no other choice" but to violate conscience. (**Exhibit 7**).

- Coerced Employee #8 – needs NorthShore job to care for incapacitated father after six strokes, but is currently on unpaid leave for not violating conscience; "I'm on the verge of giving up and giving in, because I cannot abandon my parents *or interrupt the medicine that my dad needs in order to survive*. I pray for God to intervene miraculously and save my conscience, but I'm running out of time and out of options." (**Exhibit 8** (emphasis added)).

- Coerced Employee #9 – NorthShore employee on unpaid leave for not violating conscience must have NorthShore job, and health insurance, to pay for aggressive and potentially life-saving cancer treatments; "I don't know how much longer I can hold out. Every day that I am not working is a day that gets me closer to running out of money, out of insurance, and out of my job at NorthShore. The clock is ticking for me, and I am under so much pressure and stress. I fear that unless a miracle happens, and this impossible choice is taken away from me, *I will be forced to violate my conscience imminently – in the next few days*." (**Exhibit 9** (emphasis added)).

To prevent these injustices that further irreversible and irreparable harm, the Court should immediately extend the Temporary Restraining Order (dkt. 31) to the provisional class, and extend any future preliminary injunction to the provisional class, either under the Court's well-established general equity powers or through a provisional class certification under Fed. R. Civ. P. 23.

## BACKGROUND FACTS COMMON TO THE PROVISIONAL CLASS[2]

On August 16, 2021, Defendant Northshore University HealthSystem announced a policy mandating COVID-19 vaccination for its 18,000 employees, contractors, and volunteers by October 31, 2021. (V. Compl., dkt. 1, ¶¶ 41-44). In the policy as announced, NorthShore purported to allow employees to obtain religious exemption and accommodation from the mandate, and provided forms and a purported process for such requests. (*Id*. at ¶¶ 45, 56-58 and Exh. 3.) NorthShore received approximately 700 requests for an exemption to its vaccine mandate, "the majority of which sought accommodations based on religious beliefs." (NorthShore Resp. to Mot. TRO, dkt. 24 at 2.)

By mid-September, however, after granting religious exemptions for some employees, NorthShore unilaterally revoked those exemptions and uniformly denied all or virtually all religious exemptions on the ground that the employees did not meet *undisclosed* "evidence-based criteria." (V. Compl., ¶¶ 60-63). After receiving a demand letter from Plaintiffs' counsel advising that its practice of questioning the merits and validity of its employees' religious beliefs was unlawful, NorthShore then purported to "approve" its employees' religious exemption requests, but still refused to provide *any* accommodation. (*Id*. at ¶¶ 84-87 and Exhs. 9-10).

Instead, NorthShore adopted a categorical, uniform, and across-the-board "no accommodation" policy for its religiously unvaccinated employees. (*Id*.) Instead of conducting an individualized, case-by-case analysis and interactive process with each religious exempt employee, as required by law, NorthShore decided that "permitting [religiously] unvaccinated staff to remain working at its facilities created an undue hardship." (NorthShore's Resp. to Mot. TRO, at 4.) NorthShore implemented its categorial rule against *all* employees with religious objections,

---

[2] The relevant facts are fully set forth in Plaintiffs' Verified Complaint (Dkt. 1).

4

*irrespective of the nature, function and circumstances of an employee's particular job* (*e.g.*, whether the employee has direct patient contact or works only in a cubicle). (*Id.*; *see also* Decl. of Coerced Employee #9, attached as Exhibit 9, ¶¶ 2, 4 (placed on unpaid leave even though "I work in a cubicle [and] I have no physical contact with any patients.").) No employee unvaccinated for religious reasons has been allowed to remain anywhere in any facility owned by NorthShore, and all have been placed on an unpaid leave as of November 1, 2021, leading to termination on or before December 31, 2021, unless the employees violate their conscience and accede to NorthShore's demand. (V. Compl., ¶¶ 77-78; Decl. of Coerced Employees ## 1-9, attached hereto as Exh. 1-9).

While refusing to accommodate any employee with religious objections to its vaccination mandate, NorthShore has found ways to accommodate employees with non-religious reasons for declining vaccination, including those with various medical conditions (*e.g.*, Decl. of Coerced Employee #7, Exh. 7, ¶ 6 ("[d]uring my medical deferral, NorthShore is allowing me to stay in the same role"), and those who are pregnant. (V. Compl., ¶ 55 and Exh. 2). NorthShore decided to allow *these* unvaccinated employees to continue working (with various alternative safety precautions, including PPE and weekly testing) in their same jobs at NorthShore facilities, even with patients. (*Id.*) Similarly, NorthShore does not require patients and visitors to be vaccinated to enter its premises (*id.* at ¶ 54)., because "it is not practicable to require every external person (such as patients and visitors) entering a NorthShore facility to be fully vaccinated." For patients, NorthShore is satisfied with "screen[ing] for COVID-19 upon admission and appropriately test[ing] based on their screening." (NorthShore's Resp. to Mot. TRO, at 4-5.)

Fourteen named Plaintiffs brought this class action against NorthShore, on behalf of themselves and all other similarly situated NorthShore employees, alleging the NorthShore has

5

violated the Illinois Health Care Right of Conscience Act ("Conscience Act"), Title VII of the Civil Rights Act of 1964, and the Emergency Use Authorization provisions of federal law. (V. Compl., dkt. 1). On October 29, 2021, following the conclusion of the hearing on Plaintiffs' motion for a temporary restraining order, the Court orally issued a temporary injunction against NorthShore, memorialized in a written TRO on November 1, 2021 (dkt. 31), concluding that the 14 named Plaintiffs have some likelihood of success on the merits of their HCRCA and Title VII claims, and that Plaintiffs "made a showing that they may suffer irreparable harm for which money damages are not adequate … given the choice to be vaccinated against their religious beliefs or potentially lose their employment. (TRO, dkt. 31, at 1). The Court temporarily enjoined NorthShore from placing the named Plaintiffs on unpaid leave or taking other adverse employment action against them. (*Id*. at 2). The TRO, however, applied only to the 14 named Plaintiffs. (*Id*. at 3).

Without any protection from NorthShore's "no accommodation" policy, after just one week of NorthShore's unpaid leave punishment many religiously exempt employees have had no choice but to accede to NorthShore's demand, undergo an irreversible medical treatment that they find morally abhorrent, and violate their conscience. (Decl. of Coerced Employees ## 1-6, attached hereto as Exh. 1-6). Other employees have not yet violated their conscience, but are in imminent danger of doing so, as their unpaid leave punishment progresses and they are left without any means for providing for their families. (Decl. of Coerced Employees ## 7-9, attached hereto as Exh. 7-9).

## PROPOSED PROVISIONAL CLASS

Plaintiffs are healthcare professionals, all of whom have sincerely held religious beliefs against the COVID-19 vaccines because they were either developed from, or tested with, aborted

fetal cells lines, or for other religious reasons that were explained to NorthShore. (V. Compl. ¶ 4.) Plaintiffs seek preliminary, class-wide injunctive relief either under the Court's general equity powers, or pursuant to provisional certification of the following class (hereinafter "Provisional Class"):

> All NorthShore University HealthSystem employees who sought a religious exemption or accommodation to NorthShore's COVID-19 vaccination policy, who were refused, and who are presently or imminently subject to unpaid leave, employment termination, or unilateral change to their compensation, benefits, terms or conditions of their employment because of their COVID-19 vaccination status or their non-compliance with NorthShore's COVID-19 vaccination policy.[3]

As demonstrated herein, this Court has ample equity powers to grant preliminary injunctive relief to the Provision Class, and, in any event, provisional class certification for purposes of preliminary injunctive relief easily meets the requirements of Fed. R. Civ. P. 23.

## LAW AND ARGUMENT

It is black-letter law that a court has the authority to issue class-wide preliminary injunctive relief prior to class certification. *See Newberg on Class Actions* §4:30 (5th ed. June 2021 update) ("[A] court may issue a classwide preliminary injunction in a putative class action suit prior to a ruling on the class certification motion or in conjunction with it." (collecting cases)). In fact, courts in this district and elsewhere *routinely* issue class-wide preliminary injunctions concurrently with certifying a class or even prior to fully certifying a class. *See, e.g.*, *Mays v. Dart*, 453 F. Supp. 3d 1074, 1085 (N.D. Ill. 2020) ("There is nothing improper about a preliminary injunction preceding a ruling on class certification") (quoting *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 433 (6th Cir. 2012); *Lee v. Orr*, No. 13-CV-8719, 2013 WL 6490577 (N.D. Ill. Dec. 10, 2013) (granting

---

[3] Notwithstanding Plaintiffs' proposed definition, a trial court "has discretion to define the class." *Heritage Operations Grp., LLC v. Norwood*, 322 F.R.D. 321, 326 (N.D. Ill. 2017) (citing *Buycks–Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 322, 328 (N.D. Ill. 1995)).

7

class-wide preliminary injunction prior to class certification); *O.B. v. Norwood*, 170 F. Supp. 3d 1186, 1200 (N.D. Ill. 2016) (granting preliminary class-wide injunctive relief); *Harris v. Graddick*, 593 F. Supp. 128 (M.D. Ala. 1984) (certifying class concurrently with preliminary injunction); *Kaiser v. Cty. of Sacramento*, 780 F. Supp. 1309, 1312 (E.D. Cal. 1991) (granting classwide injunctive relief while provisionally certifying class); *Thomas v. Johnston*, 557 F. Supp. 879, 916 n.29 (W.D. Tex. 1983) ("It appears to be settled ... that a district court may, in its discretion, award appropriate classwide injunctive relief prior to a formal ruling on the class certification issue based upon either a conditional certification of the class or its general equity powers").

This Court should extend the Temporary Restraining Order, and any future preliminary injunctive relief, to the entire Provisional Class, either using its clear, broad and general equity power, or by certifying the Provisional Class.

**I.      This Court Should Exercise Its General Equity Power to Grant Preliminary Injunctive Relief to the Provisional Class.**

This Court can fashion preliminary injunctive relief for the Provisional Class even without a provisional class certification, using its "general equity powers." *Mays v. Dart*, 453 F. Supp. 3d 1074, 1085–86 (N.D. Ill. 2020). Indeed, "it is unnecessary to certify, or even conditionally certify, Plaintiffs' proposed class at this time." *Norwood*, 170 F. Supp. 3d at 1200 (N.D. Ill. granting preliminary injunctive relief to the class under "general equity powers").

In *Mays*, inmates challenging a jail's COVID-19 protocols sought a class-wide temporary restraining order but had not yet moved for a class certification ruling. 453 F. Supp. 3d at 1085. This district court concluded that the absence of a class ruling "[did] not foreclose the possibility of relief for the plaintiffs at this stage, because a district court has general equity powers allowing it to grant temporary or preliminary injunctive relief to a conditional class." *Ibid*. Similarly, in *Orr*, this district court did not grant provisional certification but nonetheless used "its general equity

8

powers to order preliminary injunctive relief" allowing same-sex couples to obtain marriage licenses. 2013 WL 6490577, at *2. And in *Illinois League of Advocates for the Developmentally Disabled v. Illinois Department of Human Services*, this district court again extended injunctive relief to a class of unnamed residents of a developmental center, recognizing that "[d]istrict courts have the power to order injunctive relief covering potential class members prior to class certification." 2013 WL 3287145, at *3 (N.D. Ill. June 28, 2013).[4]

Given its clearly established general equity power, the Court need not even proceed to the alternative grounds presented subsequently in this Motion. Instead, the Court can – and should – exercise that equity power to extend the injunctive relief already granted to the named Plaintiffs, and any future preliminary injunctive relief, to the Provisional Class. What NorthShore has done to the named Plaintiffs NorthShore is doing to the Provisional Class, in the same indiscriminate and generalized manner, and with already tragic results, as detailed above. The very same factors that counseled in favor of injunctive relief for the named Plaintiffs now cry out for the same relief

---

[4] Preliminary class-wide relief prior to class certification is by no means peculiar to this district. The cases are legion outside of this district as well, including in a similar case involving United Airlines' similar "no accommodation" policy for its employees. *See* Temporary Restraining Order, dkts. 66, 95, *Sambrano et al. v. United Airlines Inc.*, Case No. 21-cv-01074 (N.D. Tex.) (attached hereto as **Exhibit 11** (granting temporary restraining order enjoining United Airlines from "**placing any employee on unpaid leave if that employee was granted either a religious or medical exemption from United Airlines, Inc.'s COVID-19 vaccine mandate**," "**to avoid risking irreparable injury and to maintain the status quo**"). *See also, e.g.*, *Ligon v. City of New York*, 925 F. Supp. 2d 478, 539 (S.D.N.Y. 2013) (issuing preliminary injunctive relief before class certification without any prior finding of liability); *Strouchler v. Shah*, 891 F.Supp.2d 504, 518–19 (S.D.N.Y. 2012) (finding that class certification was likely and considering facts relating to putative class members when adjudicating preliminary injunction motion); *Sanchez v. McAleenan*, 2020 WL 607032, at *6 n.7 (D. Md. 2020), *modified in part*, 2020 WL 6263428 (D. Md. 2020) (rejecting defendant's argument that "[a]s a procedural matter, the Court should not grant preliminary injunctive relief to absent members of the uncertified class"); *Rodriguez v. Providence Comm. Corrections, Inc.*, 155 F. Supp. 3d 758, 767 (M.D. Tenn. 2015) ("[A] district court may, in its discretion, award appropriate classwide injunctive relief prior to a formal ruling on the class certification issue based upon either a conditional certification of the class or its general equity powers.")

for the Provisional Class, whose members are imminently close to being forced to permanently and irreversibly violate their conscience, as many of them have already been forced to do. This Court's class-wide intervention cannot wait.

### II. Alternatively, the Court Should Conditionally Certify the Provisional Class for Preliminary Injunctive Relief Under Rule 23.

Even if this Court did not possess plenary equity powers to fashion class-wide preliminary injunctive relief, the Court could (and should) nevertheless provide such relief by conditionally certifying the Provisional Class under Fed. R. Civ. P. 23. A plaintiff whose lawsuit meets the requirements of Rule 23 has a "categorical" right "to pursue his claim as a class action." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.*, 559 U.S. 393, 398 (2010). Rule 23(a) provides that a class may be certified by meeting four prerequisites: numerosity, commonality, typicality, and adequate representation. *See Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1025 (7th Cir. 2018). Once these four prerequisites are met, the potential class must also satisfy at least one provision of Rule 23(b). *See Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992).

Plaintiffs here easily satisfy all requirements, and provisional class certification for purposes of preliminary injunctive relief is appropriate and warranted. *See e.g.*, *Kaiser*, 780 F. Supp. at 1312 (granting class-wide injunctive relief while provisionally certifying class); *Thomas*, 557 F. Supp. at 916 n.29 (conditional certification of the class is appropriate mechanism for preliminary injunctive relief to the proposed class).

### A. The provisional class is sufficiently numerous.

Plaintiffs easily meet the numerosity requirement: The provisional class is so numerous that joinder of all members would be impractical. *See* Fed. R. Civ. P. 23(a)(1). By NorthShore's own account, approximately 700 exemption requests were made, "the majority of which sought accommodations based on religious beliefs." (Dkt. 24 at 2). The precise number of members in the

10

Provisional Class will be ascertained from NorthShore's records during discovery,[5] but since NorthShore has uniformly, categorically (and unlawfully) denied all accommodation requests to all religious objectors, that number will easily exceed 350 (a "majority" of 700), and will likely be much higher.

Although "no magic number" is regarded as sufficient, 40 or more class members are generally accepted as sufficient to satisfy Rule 23(a). *See Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 859 (7th Cir. 2017). Here, joinder is clearly impracticable, given that the size of the Provisional Class will likely exceed the generally accepted threshold *by a factor of 10* or more. Courts in this district consistently find the numerosity factor satisfied with classes similar in size to the Provisional Class. *See, e.g.*, *Allen v. City of Chicago*, 828 F. Supp. 543, 550–551 (N.D. Ill. 1993) (putative class of more than 600 laid-off employees satisfied numerosity requirement for racial and age discrimination class action); *Honorable v. Easy Life Real Est. Sys., Inc.*, 182 F.R.D. 553, 559 (N.D. Ill. 1998) (certifying class of more than 100 home buyers in racial discrimination class action); *Scholes v. Tomlinson*, 145 F.R.D. 485 (N.D. Ill. 1992) (holding that class of between 129 and 300 investors satisfied numerosity requirement in securities class action). Accordingly, the Provisional Class satisfies the numerosity requirement.[6]

---

[5] "[A] class action may proceed upon estimates as to the size of the proposed class." *McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002); *cf.* William B. Rubenstein, 1 Newberg on Class Actions § 3:13 (5th ed.) ("it is well settled that a plaintiff need not allege the exact number or specific identity of proposed class members").

[6] *See also, e.g.*, *Evans v. Evans*, 818 F. Supp. 1215 (N.D. Ind. 1993) (holding that a class of 100 to 200 members satisfied the numerosity requirement in action by disabled students challenging state's educational program procedures); *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473 (2d Cir. 1995) (concluding that the numerosity requirement would be satisfied regardless of whether the putative class contained 300 or 700 members); *Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356 (D. Md. 2004) (concluding that proposed class of 541 African Americans satisfied numerosity requirement in Section 1981 action); *Salvagne v. Fairfield Ford, Inc.*, 264 F.R.D. 321 (S.D. Ohio 2009) (concluding that joinder would be impracticable where

### B. There are common questions of law and fact.

The proposed class also meets Rule 23(a)(2)'s commonality requirement. "Commonality requires at least one question common to all the class members, the answer to which is 'apt to drive the resolution of the litigation.'" *Mays*, 453 F. Supp. 3d at 1086 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Thus, the commonality requirement is usually met where there is a common nucleus of operative fact. *See Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992). A common nucleus of operative fact is generally found where "the defendants have engaged in standardized conduct towards members of the proposed class." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998); *Chandler v. Sw. Jeep-Eagle, Inc.*, 162 F.R.D. 302, 308 (N.D. Ill. 1995) (same); *cf. Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (noting that commonality is generally satisfied where "the lawsuit challenges a systemwide practice or policy that affects all of the putative class members"). Indeed, where a company like NorthShore "operates under a general policy of discrimination," companywide class certification is appropriate. *Dukes*, 564 U.S. at 358 (citation omitted).

Here, the proposed class easily meets the commonality requirement. Class members sought religious accommodation to NorthShore's vaccine mandate through a process that was materially identical or substantially similar to the named Plaintiffs' exemption requests. The named Plaintiffs and the Provisional Class members were all denied accommodation under the same, uniform, categorial, and discriminatory "no accommodation" policy that NorthShore implemented for its religious objectors (but not for employees who declined vaccination for non-religious reasons). This class action lawsuit therefore challenges NorthShore's "general policy of discrimination," *id.*,

---

proposed class would contain approximately 375 members)*; Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114 (E.D. Cal. 2009) (concluding that presence of 150 class members would satisfy numerosity requirement).

and its system-wide practice and policy of refusing to accommodate employees with sincerely held religious beliefs to the available COVID-19 vaccines.

Moreover, there are numerous questions of law and fact common to all members of the Provisional Class (and the named Plaintiffs), including but not limited to:

- Whether NorthShore complied with federal and state law when it indiscriminately denied religious exemption and accommodation requests en masse;
- Whether NorthShore complied with federal and state law when it informed Plaintiffs that although their exemptions were finally "approved," it would be an "undue hardship" for NorthShore to allow them into any NorthShore facility, regardless of the nature of their positions, and regardless of alternative safety measures that Plaintiffs are willing to undertake and that other healthcare employers in Illinois and throughout the country allow their employees to undertake;
- Whether NorthShore complied with its obligations under Title VII to engage in the interactive process when it indiscriminately denied accommodation to all religious objectors;
- Whether NorthShore violated federal and state law when it informed Plaintiffs and others that they could not, and should not, submit exemption requests premised on the link between the vaccines and abortion;
- Whether NorthShore provided an adequate mechanism for requesting and obtaining a religious exemption when it provided Plaintiffs and others only three days to appeal, and to provide an entire adult vaccine history, and then to deny them based on the lack of "evidence-based criteria"; and
- Whether NorthShore violated federal and state law when it failed to render a decision to its employees' appeals within the timeframe to which NorthShore committed; when it pressured its employees to receive an injection against their religious beliefs by advertising their employment positions and recruiting their replacements; and when it placed religious objectors on unpaid leave leading to termination.

In sum, "commonality abounds." *Lacy v. Cook Cty.*, 897 F.3d 847, 865–66 (7th Cir. 2018).

13

### C. The class representatives' claims are typical.

The claims of the named Plaintiffs as representative parties "are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Claims are typical if they 'arise[ ] from the same event or practice or course of conduct that gives rise to the claims of other class members' and if they 'are based on the same legal theory' as other class members." *Holmes v. Godinez*, 311 F.R.D. 177, 220 (N.D. Ill. 2015) (quoting *Arreola v. Godinez,* 546 F.3d 788, 798 (7th Cir. 2008)).

> [T]he test for typicality *is not demanding*. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent. *Typicality does not require a complete identity of claims*. Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. *If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality*.

*Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) (emphasis added).

Nothing is unique or disparate about the Named Plaintiffs' claims against NorthShore. Instead, the Named Plaintiffs' claims are typical of the claims of the Provisional Class because they, like the class members, requested accommodation from the vaccine mandate and NorthShore denied those requests. Plaintiffs' claims are typical of the Provisional Class because "both focus on the same alleged policies and standard practices," *Holmes*, 311 F.R.D. at 221, which affect all NorthShore employees who were unlawfully denied accommodation.

Likewise, the named Plaintiffs and Provisional Class members "share the same legal theories." *Id*. Namely, they allege that NorthShore's practices and policies violate the same state and federal statutes by not providing reasonable accommodations to employees with sincerely held religious beliefs against vaccination. In sum, despite any inconsequential factual differences, the named Plaintiffs' claims are typical of the provisional class members "in that they focus on the same conduct and are based on the same legal theories." *Id*.

14

**D.  The class representatives will fairly and adequately protect the interests of the provisional class.**

The named Plaintiffs and their counsel will fairly and adequately protect the interests of the Provisional Class. To satisfy this requirement under Rule 23(a)(4), "the interests of the class representative must coincide with those of the rest of the class, and the class representative and his attorney must be prepared to prosecute the action vigorously and with adequate financial commitment." *Grossman v. Waste Mgmt., Inc.*, 100 F.R.D. 781, 789–90 (N.D. Ill. 1984). In other words, adequacy of representation merely requires that the class representative's attorneys be qualified and that the class representative not have interests conflicting with the proposed class. *See Sosna v. Iowa*, 419 U.S. 393, 403 (1975).

Fed. R. Civ. P. 23(g)(1)(A) provides that, in appointing class counsel, a court "must consider" the following: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Each of those requirements is satisfied here. Plaintiffs' counsel have investigated NorthShore's mandatory vaccination policy and analyzed the legal basis for Plaintiffs' claims, as is evident from the Verified Complaint, the Motion for Temporary Restraining Order and Preliminary Injunction, and the zealous advocacy of counsel on behalf of the named Plaintiffs and the Provisional Class in these proceedings thus far. Plaintiffs' counsel have extensive and "deep bench" experience litigating First Amendment and civil rights – including religious rights – claims at the highest levels of advocacy, including at the Supreme Court. (*See* Decl. of Horatio Mihet, attached hereto as **Exhibit 10**, ¶¶ 3-4, 10.) Plaintiffs' counsel have extensive and specific experience litigating COVID-19 restrictions and requirements in relation to civil and constitutional

15

rights. (*Id*. at ¶ 5). They have handled and are handling numerous matters involving forced vaccination mandates, and the refusal to provide religious accommodations, of the type involved in this case. (*Id*. at ¶ 6). And, Plaintiffs' counsel also have a wealth of experience in class actions, collective actions, multi-plaintiff actions, multi-district litigation and other forms of complex litigation. (*Id*. at ¶ 9). In sum, Plaintiffs' counsel have more than sufficient skill, experience and resources to adequately represent the Provisional Class in this case. (*Id*. at ¶¶ 7, 11).

Finally, the named Plaintiffs are also adequate class representatives because they have no "antagonistic or conflicting claims with other members of the class." *Chandler*, *supra*, 162 F.R.D. at 309. Accordingly, Plaintiffs have met their burden of satisfying Rule 23(a)(4)'s adequacy of representation requirement.

    **E.**    **The Provisional Class Merits Class-Wide Relief Under Rule 23(b)(2) or 23(b)(3).**

Rule 23(b)(2) permits class actions if "the party opposing the class has acted or refused to act on grounds that apply generally to the class," so that injunctive relief is appropriate for the class as a whole. Fed. R. Civ. P. 23(b)(2). The rule "focuses on the defendant and questions whether the defendant has a policy that affects everyone in the proposed class in a similar fashion." William B. Rubenstein, *Newberg on Class Actions* § 4:28 (5th ed. 2018). "Not surprisingly, 'civil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of Rule 23(b)(2) classes." *Chi. Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 441 (7th Cir. 2015) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)).

Plaintiffs satisfy Rule 23(b)(2) because they seek the same injunctive relief for everyone in the Provisional Class, to stop the same "no accommodation" policy and practice that affects all religious objectors in the same or similar fashion. *See Mays v. Dart*, *supra*, 453 F. Supp. 3d at 1087 (citing *Chi. Tchrs. Union*, 797 F.3d at 442). As demonstrated above, the crux of this case is

16

NorthShore's indiscriminate, categorical, generally applicable policy of refusing to accommodate all objecting religious employees who work in NorthShore's facilities, irrespective of the individual circumstances or individual job functions of those employees.

In the context of Rule 23(b)(2), "generally applicable" means that the defendant "acted consistently toward the class such that their actions may be viewed as part of a pattern of activity." *Honorable v. Easy Life Real Est. Sys., Inc.*, 182 F.R.D. 553, 561 (N.D. Ill. 1998). NorthShore has clearly acted in a manner generally applicable to the class, rendering injunctive relief appropriate to the class as a whole. *See* Fed. R. Civ. P. 23(b)(2). Categorical "solutions" call for categorical relief. An injunction against NorthShore's discriminatory policy would apply to each class member and drive resolution of the litigation. Accordingly, Rule 23(b)(2) is satisfied.

Notably, "individualized relief does not preclude certification of a class for common equitable relief." *Chi. Tchrs. Union,* 797 F.3d at 430–31; *see also Lacy v. Dart*, No. 14 C 6259, 2015 WL 1995576, at *6 (N.D. Ill. Apr. 30, 2015), *aff'd sub nom. Lacy v. Cook Cty.*, 897 F.3d 847 (7th Cir. 2018) ("The injunctive relief plaintiffs seek as a class would resolve their alleged injuries at one time, regardless of the level of accommodation individual class members require.") Because all class members seek the same injunctive relief regarding NorthShore's mandatory vaccination policy, certification is appropriate under Rule 23(b)(2).[7]

---

[7] Similarly, and for the same reasons, Plaintiffs also may seek damages in subsequent stages of the suit without precluding provisional class certification under Rule 23(b)(2) for purposes of preliminary injunctive relief. The Seventh Circuit has recognized that a district court may certify a Rule 23(b)(2) class as to claims for declaratory or injunctive relief, and subsequently a Rule 23(b)(3) class as to claims for monetary relief. *See, e.g.*, *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 371 (7th Cir. 2012); *Lemon v. Int'l Union of Operating Eng'rs, Loc. No. 139, AFL-CIO*, 216 F.3d 577, 581 (7th Cir. 2000); *see also, e.g.*, *Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997). Accordingly, although the instant motion focuses on preliminary injunctive relief appropriate for this stage of the litigation, Plaintiffs preserve the right to seek certification of a Rule 23(b)(3) class for damages at an appropriate later stage.

17

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be granted, and the Court should extend the Temporary Restraining Order (dkt. 31), and any future preliminary injunctive relief, to the entire Provisional Class.

Dated: November 8, 2021

Respectfully submitted,

/s/ Sorin A. Leahu
Sorin A. Leahu, Ill. Bar No. 6315515
Local Counsel
LEAHU LAW GROUP, LLC
53 W. Jackson Blvd., #1527
Chicago, IL 60604
(847) 529-7221
sleahu@leahulaw.com

/s/ Horatio G. Mihet
Mathew D. Staver
Horatio G. Mihet
Roger K. Gannam
Daniel J. Schmid
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@lc.org
hmihet@lc.org
rgannam@lc.org
dschmid@lc.org

*Attorneys for Plaintiffs and Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on this November 8, 2021, I caused a true and correct copy of the foregoing to be electronically filed with the Court. Service will be effectuated on all counsel of record via the Court's ECF/electronic notification system.

/s/ Horatio G. Mihet
Horatio G. Mihet
Attorney for Plaintiffs