## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, JANE DOE 5, JANE DOE 6, JANE DOE 7, JANE DOE 8, JANE DOE 9, JANE DOE 10, JANE DOE 11, JANE DOE 12, JANE DOE 13, JANE DOE 14, | No. 21-cv-05683 |
| | Judge John F. Kness |
| Plaintiffs, | |
| v. | |
| NORTHSHORE UNIVERSITY HEALTHSYSTEM, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

It is a regrettable fact that the COVID-19 pandemic continues to roil nearly all facets of life in the United States and across the globe. Along with the immense toll in lives lost, persistent sickness, and material and financial costs, efforts to ameliorate the pandemic have generated fresh fissures along familiar fault lines. A recent source of COVID-19 is the new mandates—public and private—that certain people receive one of the approved COVID-19 vaccines. Such mandates have, perhaps unavoidably, led to collisions between the interests of public health, personal liberty, and public policy.

This case presents a tangible example of those colliding interests. A group of hospital workers face termination for their refusal, on religious grounds, to be

vaccinated against the COVID-19 disease. Plaintiffs are employed by Defendant NorthShore University Health System, which is a conglomerate of local hospitals. Plaintiffs challenge NorthShore's policy requiring all of its employees to receive one of the available coronavirus vaccines in an effort to stem COVID-19 cases.

NorthShore's hospitals have been on the front lines fighting the pandemic in the Chicagoland area. Its employees, including Plaintiffs, have worked tirelessly to ameliorate the toll wrought by the COVID-19 pandemic. At the close of the first year of the pandemic, three COVID-19 vaccines became widely available to the American public. NorthShore determined that, for the health and safety of its staff, visitors, and patients, it would require its employees to be vaccinated.

NorthShore's vaccine requirement led to the case now before the Court. Plaintiffs registered religious objections to receiving any of the available COVID-19 vaccines because, Plaintiffs say, the vaccines were developed using cell lines derived from aborted fetuses. Plaintiffs offered NorthShore an alternative: in lieu of becoming vaccinated, Plaintiffs would instead submit to full-time masking and weekly COVID-19 testing. But NorthShore insisted that Plaintiffs either get vaccinated or find work elsewhere. Plaintiffs now seek a judicial order preventing NorthShore from firing them based on their unvaccinated status. According to Plaintiffs, NorthShore's policy violates both Title VII of the Civil Rights Act of 1964, as well as the Illinois Health Care Right of Conscience Act.

At issue in this opinion is Plaintiffs' request for a preliminary injunction preserving the status quo during the pendency of this case. Also at issue is Plaintiffs'

request for preliminary class-wide treatment and to litigate using pseudonyms. Striving to save lives while still respecting fundamental rights—a goal professed by both sides—is, of course, both worthy and challenging. But efforts to harmonize those twin aims of safety and liberty must always align with binding legal precepts. As explained below, although Plaintiffs have demonstrated some likelihood of success on the merits of their Title VII claim—employers are required to make reasonable accommodations of religious practices and views—Plaintiffs cannot meet the additional prerequisites for preliminary injunctive relief of showing irreparable harm. Put another way, if Plaintiffs succeed at trial, their damages can be fully compensated through the traditional legal remedy of a damages award. Because that remedy is available, the Court cannot lawfully enter a preliminary injunction. Accordingly, although the Court will allow Plaintiffs to remain pseudonymous, the Court denies Plaintiffs' motions for a preliminary injunction and for preliminary class-wide treatment.

## I.    BACKGROUND

Plaintiffs are healthcare professionals, all of whom have sincerely held religious beliefs against the COVID-19 vaccines. (Dkt. 1 ¶ 4.) Following federal approval of the COVID-19 vaccine and a variety of different approaches to vaccination, NorthShore decided to require its employees to receive COVID-19 vaccinations. (Dkt. 24 at 1.) NorthShore established an exemption process to the mandate much like the process it has used for years regarding mandatory influenza and other required immunizations. (*Id.*) Broadly, employees can request an

exemption from the requirement that they receive the COVID-19 vaccine for religious or medical/disability reasons. (*Id.*) Approximately 700 employees sought exemptions; more than 500 of those requests were based on employees' religious views. (*Id.* at 2.) NorthShore initially denied virtually all religious exemption requests. (Dkt. 1 ¶ 5.) Employees are allowed to appeal denials of their exemption applications, and approximately 400 employees, including the 14 Plaintiffs who brought this case, appealed NorthShore's denials of their applications. (Dkt. 24 at 2.)

NorthShore based its initial denials on "evidence-based criteria" not articulated to employees. (Dkt. 1 ¶¶ 56–74.) But after initially denying the religious exemptions, NorthShore changed tack: it approved *all* requested religious exemptions, but then determined that providing an accommodation to any employee with an in-person role would impose undue hardship on NorthShore. (*Id.* ¶¶ 84–87; *see* Dkt. 24 at 3.)

Under NorthShore's new approach, employees who remain unvaccinated through the end of 2021 will be terminated. (Dkt. 42 at 2.) That diktat followed NorthShore's earlier decision to place employees who chose to remain unvaccinated on unpaid leave (or, paid, if they have paid leave time available) beginning on November 1. (Dkt. 24 at 3.) Employees not party to this suit who received an exemption and failed to meet the October 30 deadline for vaccination were placed on leaves of absence and required to use their accumulated leave time before their eventual January 1 termination. (Dkt. 41 at 5.)

Separately, NorthShore initially granted accommodations to some employees seeking medical exemptions—the other class of employees eligible for exemptions—so long as they complied with certain precautions including masking and weekly testing. (Dkt. 1 ¶ 55.) At some point after this Court entered a temporary restraining order (Dkt. 31), NorthShore changed its policy such that *all* individuals seeking exemptions (those seeking religious exemptions *and* those seeking medical exemptions) would be placed on unpaid leave. (Dkt. 41 at 22.)

NorthShore's shifting process rests against the backdrop of a complex and changing legal landscape. Governmental units of both the United States and the State of Illinois have promulgated multiple orders and actions that affect the rights and responsibilities of NorthShore to vaccinate its employees. (*See*, *e.g.*, Dkt. 1 ¶¶ 48–49; Dkt. 24 at 2–3; Dkt. 41 at 11–13.) Illinois, the federal Occupational Safety and Health Administration (OSHA), and the federal Centers for Medicare & Medicaid Services (CMS) have issued rules that include some forms of vaccine mandates. (*See* Dkt. 41 at 11–13.) But, importantly, each of those rules included alternatives to receipt of the COVID-19 vaccine that accommodated those seeking religious exemptions. (*Id.*) Other federal district and appellate courts have also weighed in on various legal arguments concerning vaccine mandates like those imposed by NorthShore. *See*, *e.g.*, *Sambrano v. United Airlines, Inc.*, 2021 WL 5176691, at *1 (N.D. Tex. Nov. 8, 2021); *BST Holdings, L.L.C. v. OSHA*, 2021 WL 5279381, at *1 (5th Cir. Nov. 12, 2021).

Seeking relief in advance of the impending vaccination mandate deadlines, Plaintiffs sued on October 25, 2021 seeking, among other remedies, preliminary injunctive relief against NorthShore. (Dkt. 1; Dkt. 3; Dkt. 4.) After an expedited briefing schedule, the Court held a hearing on October 29 and entered a temporary restraining order. (Dkt. 30; Dkt. 31.) At its own instance, the Court also questioned Plaintiffs' effort to litigate pseudonymously (Dkt. 11), before permitting Plaintiffs to proceed pseudonymously pending further briefing and analysis (Dkt. 31). In addition, the Court invited the parties to provide further briefing addressing Plaintiffs' request for a preliminary injunction and Plaintiffs' request for preliminary class treatment. (Dkt. 30.) Following a hearing on November 16, the Court extended the temporary restraining order until November 29. All time-sensitive issues—the requests for a preliminary injunction, class-wide preliminary treatment, and pseudonymity—are now before the Court for resolution.

## II.   LEGAL STANDARD

A preliminary injunction "is often seen as a way to maintain the status quo until merits issues can be resolved at trial." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 783 (7th Cir. 2011). To obtain a preliminary injunction, a plaintiff "must show that: (1) without this relief, it will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its claims." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020), *cert. denied*, 2021 WL 4507625 (U.S. Oct. 4, 2021) (quoting *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020)). If the party seeking preliminary injunctive

relief "fails to demonstrate any one of these three threshold requirements, the court must deny the injunction." *Crawford & Co. Med. Ben. Tr. v. Repp*, 2011 WL 2531844, at *1 (N.D. Ill. June 24, 2011) (quoting *Grace Christian Fellowship v. KJG Invest. Inc.*, 2009 WL 2460990, at *5 (E.D. Wis. Aug. 7, 2009)).

If a plaintiff can satisfy the triple prerequisites of likelihood of success, irreparable harm, and an inadequate remedy, the Court must then "weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Mays*, 974 F.3d at 818 (citing *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)). That balancing test involves a "sliding scale" approach: "the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Id.* (citing *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). In the "final analysis, the district court equitably weighs these factors together, seeking at all times to minimize the costs of being mistaken." *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (cleaned up). Put differently, the district court " 'sits as would a chancellor in equity' and weighs all the factors." *Stuller, Inc. v. Steak N Shake Enter., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (cleaned up) (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

## III.    DISCUSSION

### A.    Whether a Preliminary Injunction is Warranted

#### 1.    Plaintiffs' Likelihood of Success on the Merits

A foundational question the Court must ask before considering injunctive relief is whether Plaintiffs can show "some likelihood of success on the merits." *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011)). As explained below, Plaintiffs have made this showing.

Title VII of the Civil Rights Act of 1964 makes it unlawful to discharge or otherwise to discriminate against an individual due to that person's religion. 42 U.S.C. § 2000e-2(a)(1); *see Korte v. Sebelius*, 735 F.3d 654, 675 (7th Cir. 2013). Plaintiffs must show either direct or indirect evidence of discrimination to establish a Title VII violation. *Hildebrandt v. Ill. Dept. of Nat. Res.*, 347 F.3d 1014, 1029 (7th Cir. 2003). Under the direct method's disparate treatment analysis, "[p]roof of intentional discrimination is required." *Id.* (quoting *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1036 (7th Cir. 1998)). In the alternative, because of "the difficulty in directly proving discrimination, [Plaintiffs] may use the indirect, burden-shifting procedure set forth in *McDonnell Douglas*." *Id.* (citations omitted).

To make out a prima facie case of religious discrimination under Title VII "based on an employer's failure to provide reasonable accommodation, a plaintiff 'must show that the observance or practice conflicting with an employment requirement is religious in nature, that she called the religious observance or practice

to her employer's attention, and that the religious observance or practice was the basis for her discharge or other discriminatory treatment.' " *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012) (quoting *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997)).

Once Plaintiffs make a prima facie showing of discrimination, the burden "shifts to the employer to make a reasonable accommodation of the religious practice or to show that any reasonable accommodation would result in undue hardship." *Id.* That *McDonnell Douglas* burden-shifting framework "is not inflexible." *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (quoting *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 821 (7th Cir. 2006)). And that flexibility gives the Court some discretion to fully assess the evidence to make a considered judgment, even if some of that evidence standing alone would not suffice to support a claim. *See Volling*, 840 F.3d at 383 (observing that "all evidence belongs in a single pile and must be evaluated as a whole") (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016)).

Title VII's reasonable-accommodation requirement is meant "to assure the individual additional opportunity to observe religious practices, but it [does] not impose a duty on the employer to accommodate at all costs." *Porter*, 700 F.3d at 951 (quoting *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986)). That means a "reasonable accommodation" of an employee's religious practices is "one that 'eliminates the conflict between employment requirements and religious practices.' " *Id.* (quoting *Wright v. Runyon*, 2 F.3d 214, 217 (7th Cir.1993)); *see Ilona*, 108 F.3d at

1574–75. As the Seventh Circuit has explained, the defendant's burden of proof to justify an adverse employment action (rather than to provide an accommodation) requires that the defendant "show, as a matter of law, that any and all accommodations would have imposed an undue hardship." *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 455 (7th Cir. 2013) (citations omitted). As the Supreme Court has explained, an undue hardship exists when an accommodation imposes more than a *de minimis* burden on an employer. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977).

Assessing the undue-hardship question on the merits typically requires factual development, because whether an employer can "reasonably accommodate a person's religious beliefs without undue hardship 'is basically a question of fact.' " *Minkus v. Metro. Sanitary Dist. of Greater Chicago*, 600 F.2d 80, 81 (7th Cir. 1979) (quoting *Redmond v. GAF Corp.*, 574 F.2d 897, 902 (7th Cir. 1978)); *see Kaplan v. City of Chicago*, 2004 WL 2496462, at *11 (N.D. Ill. Nov. 4, 2004) ("In rejecting these contentions and reversing the district court, the Seventh Circuit held that summary judgment on the 'undue hardship' issue was incorrect because 'whether an employer can reasonably accommodate a person's religious beliefs without undue hardship is a question of fact.' ") (quoting *Minkus*, 600 F.2d at 81); *Rodriguez v. City of Chicago*, 156 F.3d 771, 776 n.7 (7th Cir. 1998) ("The determination of whether an accommodation is reasonable in a particular case must be made in the context of the unique facts and circumstances of that case."). But although determining whether an accommodation is an undue hardship is a fact-intensive inquiry, the spectrum for

hardship can vary significantly. *See Adeyeye*, 721 F.3d at 456 ("regular payment of premium wages (such as overtime or holiday wage rates) for substitutes" imposed undue hardship; not so when defendant-employer was required to bear "administrative costs such as those incurred in rearranging schedules and recording substitutions for payroll purposes") (citing 29 C.F.R. § 1605.2(e)(1)).

NorthShore concedes at this stage that Plaintiffs can establish a prima facie case of religious discrimination based on its failure to accommodate. (Dkt. 41 at 18.) As a result, the burden shifts to NorthShore to show that a "reasonable accommodation of the religious practice would result in undue hardship." *Porter*, 700 F.3d at 951 (citation omitted). NorthShore frames Plaintiffs' requested accommodations as seeking "to continue to work at NorthShore facilities without being vaccinated against COVID-19"; for present purposes, the Court accepts that framing. (Dkt 41 at 19.) NorthShore contends that Plaintiffs working without vaccination constitutes an undue hardship because of the "greater risk of transmission of and severe illness from COVID-19 with unvaccinated employees," "additional costs and liability from the transmission of COVID-19," and deference to the hospital's expertise in determining the best and safest practices in its facilities. (*Id.* at 19–20.)

At this preliminary stage, it is by no means settled that NorthShore has done all it can to reasonably accommodate Plaintiffs. This finding flows in part from NorthShore's own conduct during this affair: initially, NorthShore told its employees that it could and would accommodate those with religious exemptions. (Dkt. 42 at 16–

17.) NorthShore allowed each of the Plaintiffs to perform their roles with masking and testing throughout much of the ongoing public health emergency. Even accounting for the widespread availability of vaccines for hospital workers beginning in early 2021, almost a full year passed during which NorthShore apparently considered masking and testing to be sufficient to keep its patients, visitors, and employees safe. Plaintiffs contend that they seek to continue to comply with "all reasonable requirements that work as alternatives everywhere else, including masking, PPE, regular testing, self-monitoring, self-reporting, and all other reasonable safety protocols." (Dkt. 5 at 24.) Even as late as September 2021, NorthShore was prepared to accommodate its religiously-exempt employees by allowing them indefinitely to undergo routine testing. (Dkt. 42 at 17.)

NorthShore has presented little justification for its abrupt policy change. Patients, visitors, and even employees of other hospital groups that provide medical or religious accommodations to their employees will still be permitted to enter NorthShore facilities, just as they were before the policy change. Indeed, under the new policy, a Plaintiff who is fired for being unvaccinated would nonetheless be permitted to visit a NorthShore patient even if that Plaintiff remained unvaccinated. And although NorthShore purports to rely on a new workplace rule from OSHA as a justification for its new policy, that rule allows the option of masking and testing. (*See* Dkt. 41 at 11–12; 29 C.F.R. § 1910.501.)

Whether NorthShore will ultimately succeed in meeting the *de minimis* burden test established in *Trans World Airlines, Inc. v. Hardison* is uncertain. At this stage

of the case at least, where no discovery has occurred and where complex and significant factual issues have been presented under a tightly compressed timeframe, the Court cannot usurp the factfinder's role and definitively say that NorthShore will fail in showing that Plaintiffs' requested accommodations presents an undue hardship. But by the same token, it cannot be said that Plaintiffs have no reasonable chance of success on the merits. Especially in the light of the present record—where NorthShore changed its policy in an arguably arbitrary manner, other NorthShore employees who sought an exemption on nonreligious grounds were (at least initially) treated differently, and other hospitals comparable to NorthShore have not categorically foreclosed any accommodation short of vaccination—a factfinder could determine that the accommodations Plaintiffs seek are not undue burdens. Plaintiffs have thus established some likelihood of success on the merits.[1] *See Mays*, 974 F.3d at 822 ("A plaintiff must demonstrate that its claim has some likelihood of success on the merits, not merely a better than negligible chance.") (cleaned up) (quoting *Eli Lilly and Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018)). Accordingly, the

---

[1] Plaintiffs also rely on the Illinois Health Care Right of Conscience Act as a separate basis for relief on the merits. (Dkt. 42 at 7.) That statutory scheme prohibits discrimination "against any person in any manner" who refuses to "obtain, receive or accept" "health care services" or "medical care." 745 ILCS 70/2, 70/5, 70/7, 70/8. NorthShore counters that the Conscience Act is inapplicable to an employee vaccine requirement imposed by a health care provider. (Dkt. 41 at 13.) Interpretation of the Conscience Act is unsettled. Indeed, Illinois recently amended the Conscience Act to clarify (NorthShore says) that it does not apply to vaccine mandates. (*Id.*) Because the effect of the Conscience Act is both unclear and unsettled under state law, the Court declines to find that Plaintiffs have shown some likelihood of success on the merits of their state-law claim. *Cf. Amling v. Harrow Indus. LLC*, 943 F.3d 373, 379 (7th Cir. 2019) (courts possess "unique and substantial discretion" to decline to issue a declaration of rights under the Declaratory Judgment Act).

Court must next consider whether Plaintiffs can demonstrate that they face irreparable harm.

### 2. Irreparable Harm

To satisfy the "irreparable harm" prerequisite of the preliminary injunction test, a movant must show an "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Cassell*, 990 F.3d at 545. Harm is irreparable "if legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). Inadequate does not mean " 'wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.' " *Id.* (quoting *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)). Stated differently, irreparable harm is "harm that 'cannot be repaired' and for which money compensation is inadequate." *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (quoting *Graham v. Med. Mut. Of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997)). A plaintiff seeking a preliminary injunction "must demonstrate that he will *likely* suffer irreparable harm absent obtaining preliminary injunctive relief." *Id.* (internal quotation omitted).

Preliminary injunctive relief is uncommon in the context of employment discrimination actions under Title VII, as well as in cases brought under the Conscience Act. This is because, in the ordinary case, money damages are available as compensation for the loss of income and other employment-related harms. Although equitable remedies were the norm—indeed, the exclusive remedy—for Civil Rights Act claims before 1991, an amendment that year allowed for the award of

compensatory damages. *Gedmin v. N. Am. Safety Prods., Inc.*, 2010 WL 4539447, at *1 (N.D. Ill. Nov. 3, 2010); *see Randolph v. IMBS, Inc.*, 368 F.3d 726, 732 (7th Cir. 2004) ("Until the Civil Rights Act of 1991, only equitable remedies (including back pay) were available for violations of the 1964 Act."); *Hildebrandt*, 347 F.3d at 1031 (7th Cir. 2003) ("With the passage of the Civil Rights Act of 1991, a plaintiff also may recover compensatory damages."). And now the statute clearly establishes that compensatory and punitive monetary damages are available relief for Title VII violations. 42 U.S.C.A. § 1981a ("Damages in cases of intentional discrimination in employment"); *see Gedmin*, 2010 WL 4539447, at *1; *Bennett v. Smith*, 2001 WL 717490, at *1 (N.D. Ill. June 26, 2001). Indeed, in addition to the compensatory damages allowed by the statute, victorious plaintiffs suing under Title VII are entitled to uncapped amounts of back and front pay. *See Gedmin*, 2010 WL 4539447, at *1. Given the availability of "front pay in lieu of reinstatement," demonstrating the irreparable nature of the harm from an adverse employment action is difficult. *See id.* (citing *Shick v. IDHS*, 307 F.3d 605, 614 (7th Cir. 2002)). If Plaintiffs here ultimately succeed on the merits, they will be entitled to the full panoply of legal remedies under Title VII—the availability of which conclusively undermines Plaintiffs' contention of irreparable harm under the Civil Rights Act.

This opinion joins recent rulings from other courts facing similar arguments that strongly suggest Plaintiffs cannot demonstrate irreparable harm. Plaintiffs cited two cases in support of their request for a temporary restraining order, but the courts

in both cases have since declined to issue preliminary injunctions.[2] (*See* Dkt. 5 at 16–17 (citing *Sambrano*, 2021 WL 5176691, at *1; *Bilyeu v. UT-Battelle, LLC*, 2021 WL 4859932 (E.D. Tenn. Oct. 15, 2021))). In *Sambrano v. United Airlines*, Judge Pittman of the Northern District of Texas focused almost entirely on the failure of Plaintiffs to establish irreparable harm. 2021 WL 5176691, at *4–8. Of relevance here, Judge Pittman found that the "Impossible Choice" theory pressed by the plaintiffs—the choice between getting vaccinated and enduring unpaid leave—did not constitute irreparable harm. *Id.* at *4.

As in *Sambrano*, Plaintiffs here advance a similar "Impossible Choice" theory of irreparable harm, arguing that NorthShore has conditioned Plaintiffs' continued employment on violating their sincerely held religious beliefs. But it bears emphasis that neither the defendant in *Sambrano* nor NorthShore are government actors; accordingly, the First Amendment is not implicated. *See id.* at *5 ("The Court likewise declines to elevate statutory protections from private-company-discrimination to the level of constitutional protections from government encroachment"); *see also Beckerich v. St. Elizabeth Med. Ctr.*, 2021 WL 4398027, at *6 (E.D. Ky. Sept. 24,

---

[2] In issuing this opinion, the Court is mindful that it earlier granted a temporary restraining order and necessarily found, if only preliminarily, that Plaintiffs had demonstrated irreparable harm. But that decision followed an accelerated briefing and hearing schedule that was necessitated by NorthShore's imminent employment action. Having received the benefit of additional briefing and argument, and on fuller reflection, the Court now finds that Plaintiffs do not face irreparable harm. Neither party has argued that the Court is precluded from refining its view of the case, especially at this early stage, and the Court is aware of no authority to that effect. *See, e.g., LTD Commodities, Inc. v. Perederij*, 699 F.2d 404, 408 (7th Cir. 1983) (affirming denial of a preliminary injunction following an earlier grant of a temporary restraining order); *cf. Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011) (findings made at the preliminary injunction stage "do not bind the district court as the case progresses").

2021), *reconsideration denied*, 2021 WL 4722915 (E.D. Ky. Sept. 30, 2021) ("constitutional rights are not at question [in the irreparable harm analysis], as Defendants are not state actors").[3]

Plaintiffs' initial reliance on *Bilyeu v. UT-Battelle, LLC* similarly fails. (*See* Dkt. 41-1, Ex. E (*Bilyeu v. UT-Battelle, LLC* Preliminary Injunction Denial).) As in *Sambrano*, the *Bilyeu* court found that the plaintiffs failed to demonstrate the threat of irreparable harm despite making a similar "Impossible Choice" argument. (*Id.* at 7–9.) Although the *Bilyeu* plaintiffs cited the chilling effect that the denial of a preliminary injunction would have on their exercise of Title VII rights, and the concomitant loss of income and benefits (*id.* at 8–17), Judge Atchley found the harms to be either "too speculative to compel the extraordinary of injunctive relief" or "quintessentially reparable" (*Id.* at 17).

*Sambrano* and *Bilyeu*, although not binding here, are persuasive authority counseling against a finding of irreparable harm. To be sure, Plaintiffs are statutorily protected "from employers' attempts to discriminate or retaliate against these employees for living out their religious convictions." *Sambrano*, 2021 WL 5176691, at *5. But that difficulty "does not demonstrate irreparable harm." *Id.*

---

[3] Just today, Plaintiffs raised as supplemental authority Judge Schelp's preliminary injunction against the CMS vaccination mandate. (Dkt. 50; Dkt. 50-1 (*Missouri v. Biden*, 4:21-cv-01329-MTS (E.D. Mo. Nov. 29, 2021)). Although *Missouri v. Biden* is also a case that concerns a vaccine mandate, the court's analysis focused on the sovereign interests of both parties in finding irreparable harm. (Dkt. 50-1, at 23–28.) Because similar sovereign interests are not at issue here, Judge Schelp's carefully-reasoned opinion does not inform the irreparable harm analysis in what is fundamentally an employment-discrimination case.

Plaintiffs' arguments concerning the Conscience Act fare no better. The Conscience Act specifically establishes damages as a remedy for violations of that statute. *See* 745 ILCS 70/12 ("Actions; damages"). More specifically, the Conscience Act establishes a $2,500 floor for damages (before accounting for the suit's costs and attorneys' fees). *Id.* Neither party, nor the Court, has found a state or federal opinion that granted a preliminary injunction based on the Conscience Act.

Instead, Plaintiffs contend that the Conscience Act establishes a state policy that forbids discrimination or coercion against anyone who "refuse[s] to obtain, receive or accept" a vaccine. (Dkt. 42 at 10, 28); 745 ILCS 70/2; *see* 745 ILCS 70/5. And Plaintiffs further contend that NorthShore's mandatory vaccination policy, with its lack of accommodations, is coercive. (*See* Dkt. 42 at 29.) From establishing the potential of NorthShore violating Plaintiffs' statutory right not to be coerced, Plaintiffs build a carefully constructed edifice that leads to finding irreparable harm. (*Id.* at 29–30.) Explaining that "irreparable harm" is harm that "cannot be undone," *Foster v. Ghosh*, 4 F. Supp. 3d 974, 983 (N.D. Ill. 2013), and that "vaccinations cannot be undone," *In the Int. of T.C.*, 290 So. 3d 580, 583 (Fla. Dist. Ct. App. 2020), Plaintiffs seek to establish that coercion to get vaccinated is itself irreparable harm (Dkt. 42 at 29).

Yet Plaintiffs' carefully constructed edifice rests on a shaky foundation. The explicit availability of compensatory and statutory damages undermines the claim of irreparable harm. *See* 745 ILCS 70/12. Indeed, if Plaintiffs succeed on the merits, they will be entitled to compensatory damages, attorneys' fees, and statutory

18

damages under the Conscience Act. *Id.* To be sure, several Illinois circuit courts have entered temporary restraining orders based on the Conscience Act. *See*, *e.g.*, *Fraternal Order of Police Chi. Lodge No. 7 v. City of Chicago*, Case No. 2021 CH 5276 (Ill. Cir. Ct. Cook County). Yet the Court is unaware of any decisions from either the Supreme Court of Illinois or the state's appellate courts granting the injunctive relief Plaintiffs seek here. *Smith v. RecordQuest, LLC*, 989 F.3d 513, 517-18 (7th Cir. 2021) (when interpreting state law, a federal court's "task is to determine how the state's highest court would rule"; although a "state supreme court's rule would control, a state appellate court's decision can provide controlling guidance as well."). Without further guidance to the contrary from either the courts of Illinois, the Seventh Circuit, or any other authoritative tribunal, the Court cannot confidently predict that the Conscience Act supports the injunctive relief Plaintiffs seek.

Loss of employment "is not irreparable because it is fully compensable by monetary damages." *Beckerich*, 2021 WL 4398027, at *6. Indeed, "permanent loss of employment, standing alone, does not equate to irreparable harm." *E. St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005). Because Plaintiffs complain about harms that are compensable through money damages, the Court cannot lawfully find that Plaintiffs face irreparable harm.

In making this finding, the Court is mindful of the dilemma Plaintiffs face. It is undeniable that any recovery of damages by Plaintiffs—even an across-the-board victory—is months or perhaps even years away. During that interval, Plaintiffs will still need to provide food, shelter, and myriad other necessities for themselves and,

often, their dependents. The contingent hope of a future recovery does nothing to meet present needs, and that uncertainty may indeed cause some Plaintiffs to choose to get vaccinated despite their religious views. But in that sense, Plaintiffs are situated no differently than other Title VII plaintiffs who may face the same choice—who may feel compelled to tolerate invidious discrimination at work based on personal needs, and yet for whom precedent establishes that money damages are a sufficient remedy.

In short, in the absence of clearer authority authorizing preliminary injunctive relief in this context, the Court finds that Plaintiffs have not established that they face irreparable harm. Because a finding of irreparable harm is a prerequisite to the issuance of a preliminary injunction, Plaintiffs' motion must be denied.[4] *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085–86 (7th Cir. 2008).

### B. Pseudonymous Litigation

Under Rule 10 of the Federal Rules of Civil Procedure, "[t]he title of the complaint must name all the parties." Fed. R. Civ. P. 10. That rule "instantiates the principle that judicial proceedings, civil as well as criminal, are to be conducted in public." *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Subject to the "strong presumption of public access," *HTG Cap. Partners, LLC v. Doe(s)*, 2015 WL 5611333, at *8 (N.D. Ill. Sept. 22, 2015), the use of fictitious names

---

[4] A movant must establish all three threshold factors before the Court can consider whether preliminary injunctive relief is warranted. *See*, *e.g.*, *Repp*, 2011 WL 2531844, at *1. Because Plaintiffs have failed to cross the irreparable harm threshold, the Court does not proceed to the second step of weighing the balance of harms and the public interest. *Girl Scouts*, 549 F.3d at 1085–86.

is thus "generally frowned upon." *K.F.P. v. Dane County*, 110 F.3d 516, 519 (7th Cir. 1997); *see also Doe v. City of Chicago*, 360 F.3d 667, 669 (7th Cir. 2004) ("Judicial proceedings are supposed to be open, as these cases make clear, in order to enable the proceedings to be monitored by the public. The concealment of a party's name impedes public access to the facts of the case, which include the parties' identity.").

The presumption against pseudonymity is amplified by the public's constitutionally guaranteed right of access to court proceedings. After the Supreme Court held that the First Amendment protected the public's right of access to the court in criminal cases, *see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573–76 (1980), the Seventh Circuit expressly extended that right to civil cases, *see In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984) (extending "the presumption of access" to attend proceedings to "civil cases"). In short, "[t]he people have a right to know who is using their courts." *Blue Cross*, 112 F.3d at 872.

Parties seeking to overcome the presumption against proceeding pseudonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016) (quoting *Blue Cross,* 112 F.3d at 872). The party requesting pseudonymity "bears the burden of proof to show that" such exceptional circumstances "outweigh[] the ordinary presumption of judicial openness." *Doe v. Cook County, Ill.*, 2021 WL 2258313, at *3 (N.D. Ill. June 3, 2021).

Plaintiffs' identities are among the "facts of the case" to which the public is entitled. *Doe v. City of Chicago*, 360 F.3d at 669.[5] Plaintiffs thus "bear[] the burden" of showing that the "strong presumption of judicial openness" is overcome in this case. *Doe v. Cook County, Ill.*, 2021 WL 2258313, at *6. In support of their position, Plaintiffs offer three interrelated arguments. First, Plaintiffs argue that their decisions not to get vaccinated "relate to sensitive and private medical decisions." (Dkt. 17 at 6.) Second, they contend that those decisions stem from their "private religious beliefs." (*Id.* at 9.) Third, Plaintiffs appeal to "their legitimate fear of ostracism, humiliation and retaliation from co-workers, supervisors and the public at large." (*Id.* at 11.)

Although the issue is close, the Court agrees that Plaintiffs have met their burden and should be allowed to proceed pseudonymously. The bulk of Plaintiffs' concerns are built into their third argument for pseudonymity: namely, they "legitimately fear that public disclosure of their quintessentially private religious beliefs and medical decisions will make them the targets of intensified and focused scorn and humiliation directed at them and their families." (*Id.* at 3.) Plaintiffs have offered sufficient support for the harms they will allegedly suffer if their identities are revealed during this litigation, so the Court finds their argument overcomes the

---

[5] Plaintiffs' contention that allowing their pseudonymity "will not impede the public's right to follow the proceedings" (Dkt. 17 at 12) is not supported by existing caselaw. It is true, as Plaintiffs note, that they are not (at this point) seeking to conceal any information beyond their names. (*See, e.g.*, *id.* at 13 ("Plaintiffs only seek to have their names protected").) But, as explained above, "[t]he concealment of a party's name impedes public access to the facts of the case, which include the parties' identity." *Doe v. City of Chicago*, 360 F.3d at 669.

"strong presumption of public access." *HTG Cap. Partners, LLC*, 2015 WL 5611333, at *8.

Plaintiffs cite news articles and online comments about this case in which commenters ridicule or insult Plaintiffs and call for them to be fired. (*See* Dkt. 17-1 ¶ 10.) Plaintiffs also refer to the "broader sentiment around the country," and "threats, ridicule, ostracism, harassment, scorn and opprobrium directed more generally at those who, like [Plaintiffs], have religious objections to receiving a COVID-19 vaccine." (*Id.* ¶¶ 11–12.) Plaintiffs' appeals to online comments on national news sources—The Hill and MSN—and "broader sentiment[s]" (Dkt. 17-1 ¶¶ 10–12) demonstrate "risk of serious social stigmatization surpassing a general fear of embarrassment." *Doe v. Cook County, Ill.*, 2021 WL 2258313, at *5.

Moreover, Plaintiffs offer additional offline examples in support of their concerns. Plaintiffs represent that they "have suffered pressure, intimidation and harassment from their superiors who know (from NorthShore) that they are religiously opposed to vaccination." (Dkt. 17-1 ¶ 6.) Plaintiffs describe a "peaceful protest" at which one of the Plaintiffs "was harassed by an individual to the point where law enforcement [was] required to come and rescue [Plaintiff] from that situation, and remove the person harassing her from her proximity." (*Id.* ¶ 7.) Such examples, if true, do present cause for concern.[6] In addition to the arguments involving medical records and the private nature of religious beliefs, these concerns

---

[6] NorthShore disputes at least some of the assertions in Plaintiffs' counsel's declaration. (Dkt. 41 at 29 n.17.)

suffice to overcome the "strong presumption of public access." *HTG Cap. Partners, LLC*, 2015 WL 5611333, at *8.

NorthShore opposes Plaintiffs' motion to proceed pseudonymously. (Dkt. 42 at 28.) Each of their arguments against pseudonymity focuses generally on the strong reasons in favor of public disclosure. (*Id.*) But as NorthShore knows the Plaintiffs' identities, it is not prejudiced by allowing this litigation to proceed in its current manner with Plaintiffs' names remaining undisclosed to the public. *See Doe v. Vill. of Deerfield*, 819 F.3d at 377.

Moreover, some guidance should be taken from the Supreme Court—which recently addressed pseudonymous litigation by plaintiffs challenging a vaccine mandate. *See Does 1–3 v. Mills*, 595 U.S. __ (Oct. 29, 2021). Neither the concurrence nor the dissent from denial of the preliminary injunction in *Does 1–3 v. Mills* discussed the issue of pseudonymity; rather, the plaintiffs' pseudonymity was accepted, if only tacitly. *See generally id.* Given the charged atmosphere concerning vaccinations and vaccine mandates, and for the other reasons discussed above, the Court is persuaded that this is the rare case where a party should be permitted to proceed pseudonymously. Accordingly, Plaintiffs' request to proceed pseudonymously is granted.

C.    **Class Certification**

Plaintiffs seek to extend their requested relief to those they claim are similarly situated. (Dkt. 37 at 6–7.) To that end, they seek preliminary, class-wide injunctive relief either under the Court's general equity powers or as a provisionally certified

24

class action. Plaintiffs define their provisional class as: "All NorthShore University HealthSystem employees who sought a religious exemption or accommodation to NorthShore's COVID-19 vaccination policy, who were refused, and who are presently or imminently subject to unpaid leave, employment termination, or unilateral change to their compensation, benefits, terms or conditions of their employment because of their COVID-19 vaccination status or their non-compliance with NorthShore's COVID-19 vaccination policy." (*Id.* at 7.)

Determining whether class treatment is appropriate, even provisionally, is premature at this stage. Accordingly, and in view of the denial of Plaintiffs' motion for a preliminary injunction, the motion for provisional class certification is denied without prejudice. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) ("certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied' "); *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, (1982) ("actual, not presumed, conformance with Rule 23(a) remains . . . indispensable"); *Damasco v. Clearwire Corp.*, 662 F.3d 891, 897 (7th Cir. 2011) ("Although discovery may in some cases be unnecessary to resolve class issues, in other cases a court may abuse its discretion by not allowing for appropriate discovery before deciding whether to certify a class") (citation omitted), *overruled on other grounds*, *Chapman v. First Index, Inc.*, 796 F.3d 783 (7th Cir. 2015).

Given the challenges in satisfying Rule 23 on the expedited basis presented in this lawsuit, Plaintiffs ask the Court in the alternative to grant preliminary class-wide relief under its equitable powers. (Dkt. 37 at 7.) In support, Plaintiffs explain

that courts may issue class-wide relief in a preliminary injunction before class certification. (*See*, *e.g.*, *id.* (citing *Newberg on Class Actions* § 4:30 (5th ed. June 2021 update) ("[A] court may issue a classwide preliminary injunction in a putative class action suit prior to a ruling on the class certification motion or in conjunction with it.")); *id.* (citing *Mays v. Dart*, 453 F. Supp. 3d 1074, 1085 (N.D. Ill. 2020) ("[T]here is nothing improper about a preliminary injunction preceding a ruling on class certification")). NorthShore counters that such relief would be an impermissible shortcut "in the class certification process." (Dkt. 44 at 18 (quoting *Spano v. Boeing Co.*, 633 F.3d 574, 591 (7th Cir. 2011).) NorthShore's argument on that narrow ground is persuasive.[7] Given that neither the *Federal Rules of Civil Procedure* nor the Seventh Circuit endorse the use of equity to grant relief to a class in a preliminary injunction, the Court declines to do so here. As a result, Plaintiffs' motion for class certification is denied without prejudice.

## IV. CONCLUSION

This case involves a subject—mandatory vaccinations—that is at the forefront of a national debate so vituperative at times that it has led Plaintiffs to seek to conceal their own names. This debate becomes even more fraught when, as here, core interests of public health, religious convictions, and employers' rights collide. In

---

[7] Two of NorthShore's broader arguments concerning the Court's equity powers, however, are unpersuasive. First, NorthShore mischaracterizes as substantive Justice Barrett's procedural concurrence in *Doe v. Mills*, 595 U.S. __ (Oct. 29, 2021) (Barrett, J., concurring). Second, NorthShore impermissibly conflates a court's general equitable power to issue injunctions with the separate obligation to balance the equities in considering whether to grant a preliminary injunction. (*Compare* Dkt. 44 at 19 *with* Samuel L. Bray, *The Supreme Court and the New Equity*, 68 Vand. L. Rev. 997, 1030–34 (explaining the federal courts' modern rules concerning equity in the preliminary injunction context).)

resolving Plaintiffs' request for a preliminary injunction, however, the Court need not opine on the value of COVID-19 vaccines, the theological bases of Plaintiffs' views, or the soundness of NorthShore's management practices. Those are matters to be addressed elsewhere. Rather, Court's sole duty at this stage is to consider the threshold question whether Plaintiffs have met the legal standard for entry of a preliminary injunction. For the reasons discussed above, the Court finds that they have not.

Plaintiffs' motion for a preliminary injunction and for preliminary class certification is denied. Plaintiffs are granted leave to proceed pseudonymously.

SO ORDERED in No. 21-cv-05683.

Date: November 30, 2021

JOHN F. KNESS
United States District Judge